1  SUE ANN SALMON EVANS, State Bar No. 151562
   AMY R. LEVINE, State Bar No. 160743
2  SARAH L. W. SUTHERLAND, State Bar No. 239889
   MILLER BROWN & DANNIS
3  Symphony Towers
   750 B Street, Suite 2310
4  San Diego, CA 92101
   Telephone: (619) 595-0202
5  Facsimile: (619) 702-6202

6  Attorneys for Plaintiff
   SAN DIEGO UNIFIED SCHOOL DISTRICT

7



**FILED**

JAN 0 4 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

8                  UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  SAN DIEGO UNIFIED SCHOOL          Case No. **'08 CV 0039 L RBB**
    DISTRICT,
12
                Plaintiff,            **COMPLAINT FOR RELIEF AND
13                                    ATTORNEYS' FEES UNDER THE
         v.                          INDIVIDUALS WITH DISABILITIES
14                                   EDUCATION ACT AND FOR
    T.B., a minor, Allison Brenneise and   DECLARATORY RELIEF**
15  Robert Brenneise, his parents, Steven
    Wyner, and Wyner and Tiffany,
16
                Defendants.
17

18                      **INTRODUCTORY STATEMENT**

19       1.    The San Diego Unified School District ("Plaintiff" or "District") brings this action

20  to overturn part of the decision of the California Office of Administrative Hearings ("OAH") in

21  *San Diego Unified School District v. T.B.*, consolidated with *T.B., Allison Brenneise, and Robert*

22  *Brenneise v. San Diego Unified School District,* OAH Case Nos. N2006120002/ N2007010848.

23  The OAH decision followed a due process hearing convened to determine whether the District

24  offered Defendant T.B., a student in the District, a free appropriate public education ("FAPE") for

25  the 2006-2007 school year and whether it complied with the procedural requirements of the

26  Individuals with Disabilities Education Improvement Act, 20 U.S.C. sections 1400 *et seq.*

27  ("IDEA") in assessing T.B. and developing its offers. The District prevailed in that hearing,

28  although OAH found in T.B.'s favor in some minor ways. It is only those limited adverse

1

LB 100829v2

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1    determinations that the District challenges here.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over Plaintiff's claims for relief under the IDEA, pursuant to 20 U.S.C. sections 1415(i)(2)(A), 1415(i)(3)(A), and 1415(i)(3)(B)(i)(II) and (III) and for declaratory relief, pursuant to 28 U.S.C. section 2201(a), and for all claims pursuant to 28 U.S.C. section 1331.

3.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(b) as the violations alleged herein occurred within the State of California and within the geographical borders of the Southern District of California, and the Defendant resides within that judicial district.

## PARTIES

4.    Plaintiff San Diego Unified School District is a public school district organized and existing under California law, with its principal offices in San Diego, California.

5.    Defendant, T.B., is a thirteen-year-old boy, with autism and late diagnosed Phenylketonuria ("PKU"), a genetic metabolic disorder. Individuals with PKU are unable to metabolize phenylalanine, resulting in a toxic build up of phenylalanine in the blood stream. To prevent this build up and still receive sufficient protein and amino acids, T.B. supplements his low protein diet with a phenylalanine-free formula, which he ingests through daily gastrostomy tube ("g-tube") feedings. He is eligible for special education under the category of autism and resides with his mother, Allison Brenneise, and father, Robert Brenneise, in the County of San Diego.

6.    Defendant Steven Wyner is a duly licensed attorney in the State of California who has represented Allison Brenneise, Robert Brenneise and T.B. since October 2004, including during the due process hearing which is the subject of this action. Defendant Wyner is a resident of the State of California; his county of residence is unknown to Plaintiff.

7.    Defendant Wyner & Tiffany is a law firm organized and existing California law with principal offices located in Torrance, California, which has represented Allison Brenneise, Robert Brenneise and T.B. since October 2004, including during the due process hearing which is the subject of this action.

2

**COMPLAINT FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES
EDUCATION ACT AND DECLARATORY RELIEF**

1

2

3

**FIRST CAUSE OF ACTION**

**For·Relief Under the IDEA**
**20 U.S.C. Section 1415**
**(Against T.B., Allison Brenneise, and Robert Brenneise)**

4      8.      Congress enacted the IDEA in the 1970s to reverse the history of neglect and

5    isolation of disabled students. (*Schaffer v. Weast*, 546 U.S. 49 (2005).)  Once a child is found

6    eligible for special education under one of the disabling conditions listed in the IDEA and

7    California law, a child is entitled to a FAPE.  (20 U.S.C. §§ 1401(3)(a)(26)(29); 1412(a).)  The

8    term FAPE refers to "special education" and "related services" available to the student at no

9    charge to his parent or guardian, that meets State educational standards, and conforms to the

10   student's individualized education program ("IEP").  (20 U.S.C. § 1401(9).)  The term "special

11   education" means specially designed instruction to meet the unique needs of the student, when his

12   educational needs cannot be met with modification of the regular instructional program, and the

13   "related services" that may be needed to assist him to benefit from his education.  (Cal. Educ.

14   Code, § 56031.).  The term "individualized education program" or "IEP" means a written

15   statement for a child with a disability that is developed, reviewed, and revised in accordance with

16   section 1414(d)" of the IDEA.  (20 U.S.C. § 1401(14).)

17      9.      In October 2003, T.B.'s parents unilaterally removed him from his school

18   placement because they disagreed with how the District was implementing T.B.'s June 11, 2003

19   IEP.  Because of his parents' continued refusal of District offers for placement and services, T.B.

20   remained unilaterally placed in a home-based program until July 17, 2006.  The District continued

21   to offer, fund, and/or reimburse the family for various related services throughout this time,

22   including in-home behavioral services, a full time one-to-one aide, occupational therapy, speech

23   therapy, music therapy, and vision therapy.

24      10.      On July 17, 2006, following a series of IEP meetings and negotiations between

25   counsel with regard to IEP specifics, T.B.'s parents provided conditional consent to an extended

26   school year ("ESY") IEP which called for T.B. to attend Coronado Academy within the Coronado

27   Unified School District ("CUSD").  In order to return T.B. to a school based program as soon as

28   possible, the District also offered to provide T.B. with related services at the level of service

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

3

**COMPLAINT FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES**
**EDUCATION ACT AND DECLARATORY RELIEF**

LB 100829v2

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1    demanded by Allison Brenneise, through providers demanded by Allison Brenneise, pending

2    completion of the District's triennial assessment of T.B.  Allison Brenneise also demanded, and

3    the District agreed, that T.B. would return to the home program for the remainder of the summer

4    following the conclusion of Coronado Academy's ESY program on August 3, 2006.  The IEP also

5    called for the District to convene an IEP meeting by August 30, 2006, prior to the start of the

6    2006-2007 school year, to develop an IEP for T.B. for the 2006-2007 school year.  The District

7    had hoped T.B.'s placement at Coronado Academy would be successful, such that T.B. could

8    continue there for the 2006-2007 school year.

9          11.    T.B. attended Coronado Academy from July 20 to July 26, at which time a CUSD

10   administrator informed the District it was unilaterally terminating T.B.'s placement within CUSD.

11   T.B. returned to his home program for the remainder of the summer as delineated in the July 17,

12   2006 IEP.

13         12.    The District convened an IEP meeting on August 30, 2006, as promised in the July

14   17, 2006 IEP, to develop an IEP for T.B. for the 2006-2007 school year.  Allison Brenneise

15   refused to attend this meeting, and requested the District go forward without the parents.   At that

16   meeting, the District proposed to place T.B. in a non-public school ("NPS").  The District assured

17   Allison Brenneise that it would convene an additional IEP meeting to discuss the proposed draft

18   IEP with her and gain her input.

19         13.    After visiting the proposed NPS placement on September 15, 2006, Allison

20   Brenneise informed the District, through counsel, that she would not consent to the placement

21   offered on August 30, 2006.  Thus, she kept T.B. in his home-based program, now stay put.

22   Shortly thereafter, Allison Brenneise indicated she was then willing to come to an IEP meeting

23   and discuss alternative placements.

24         14.    The District convened four additional IEP meetings, on October 7, October 27,

25   November 16, and December 4, 2006, to gain input from Allison Brenneise, Robert Brenneise,

26   and the rest of T.B.'s IEP team regarding each page of the draft IEP.  Allison Brenneise continued

27   to refuse to consent to the IEP, despite over twenty hours of discussion and revisions at IEP team

28   meetings.

4

LB 100829v2

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

15.     On November 29, 2006, the District filed for due process to establish its triennial assessment of T.B. was appropriate, since it had refused Allison Brenneise's request for independent educational evaluations.  On December 15, 2006, after ALLISON BRENNEISE confirmed in writing she would not consent to the IEP dated December 4, 2006, the District amended it due process complaint to include the appropriateness of the December 4, 2006 IEP offer.

16.     Pursuant to discussions with Allison Brenneise and District process, the District convened two additional meetings in January and February of 2007 for Allison Brenneise to meet with the District's physician and two District nurses to attempt to develop mutually agreeable individualized school health plans ("ISHP") to delineate the how T.B.'s health needs would be addressed at the school site given the health nursing services offered in the IEP.  Allison Brenneise refused to provide timely access to T.B.'s physicians, who were knowledgeable of his health needs and necessary to finalize the ISHPs.

17.     On January 29, 2007, one week before the parties were to proceed to hearing on the appropriateness of the District's triennial assessment and December 4, 2006 IEP offer, T.B., Allison Brenneise, and Robert Brenneise filed a twenty-one page request for a due process hearing with OAH, and also moved for consolidation with the District's pending due process filing, raising sixteen issues regarding the 06-07 school year and requesting reimbursement for evaluations and other expenses, compensatory education until such time as T.B. functioned at grade level, drastic modification to the December 4, 2006 IEP, the provision of several additional services to T.B., and a salary for Allison Brenneise  OAH granted the motion for consolidation and continued the hearing over the District's opposition.

18.     OAH convened the due process hearing on May 14-June 1, June 11-13, June 19-20, and July 11-20, 2007.  The Administrative Law Judge ("ALJ") issued a Decision on October 3, 2007; OAH served the Decision on October 5, 2007 via mail delivery, which was then received by the District on October 8, 2007.

19.     OAH concluded that the December 4, 2006 IEP offered T.B. a FAPE in nearly every area, that the District's triennial assessment was appropriate in all respects, and that the

5

LB 100829v2

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1  District had appropriately implemented T.B.'s stay put IEP. The ALJ also found T.B. was not

2  entitled to any remedy beyond minor modification of the December 4, 2006 IEP as discussed

3  below. A true and correct copy of OAH's October 3, 2007 Decision is attached hereto as Exhibit

4  A.

5        20.    OAH did make two sets of findings that were erroneous as contrary to the law and

6  the evidence presented at the due process hearing. First, OAH held the District did not prove that

7  a trained behavioral aide, under the supervision of a school nurse, was qualified to assist T.B. with

8  his g-tube feedings, and that the District had attempted to provide for T.B.'s g-tube feeding, a

9  specialized physical health care service under California law, outside of the IEP. As a result,

10  OAH wrongfully ordered the District to modify the IEP to require a school nurse to be present to

11  personally assist T.B. with his g-tube feedings and wrongfully concluded that T.B. would not have

12  been safe at school under the December 4, 2006 IEP.

13        21.    California law expressly allows "designated school personnel trained in the

14  administration of specialized physical health care" to provide specialized physical health care

15  services, including g-tube feedings, "if they perform those services under the supervision . . . of a

16  credentialed school nurse . . . ." (Cal. Educ. Code § 49423.5(a)(2); § 49423.5(d) (defining

17  specialized physical health care services as including g-tube feedings). Specialized physical

18  health care services, by definition, only include those services that: are routine for the pupil, pose

19  little potential harm for the pupil, are performed with predictable outcomes, and do not require a

20  nursing assessment, interpretation, or decision-making by the designated school personnel. (Cal.

21  Educ. Code § 49423.5(a)(2)(A)-(D).) Thus, as a matter of law, a trained behavioral aide may

22  assist T.B. in performing his g-tube feedings. In fact, the California Legislature has already

23  determined that g-tube feedings are routine, pose little potential harm, and do not require direct

24  nursing care, contrary to what the OAH Decision reflects.

25        22.    The second set of findings involves the transition plan included as part of the

26  December 4 IEP to effectuate a smooth transition from T.B.'s home-based program to a school-

27  based program, a process that was anticipated to take a matter of weeks.

28        23.    Neither the IDEA nor California law requires a written transition plan as part of an

6

**COMPLAINT FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES
EDUCATION ACT AND DECLARATORY RELIEF**

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1  IEP in this circumstance, nor do they delineate substantive requirements for transition plans when

2  they are included. (20 U.S.C. § 1414(d); Cal Educ. Code § 56032.) In fact, the section of the

3  IDEA defining and delineating IEP requirements expressly codifies: "[n]othing in this section

4  shall be construed to require that additional information be included in a child's IEP beyond what

5  is explicitly required in this section. . ." (20 U.S.C. § 1414(d)(ii)). Furthermore, there is no law

6  that supports the notion that movement from one phase of a transition plan to another is a "change

7  of placement" under the IDEA that triggers the parents' procedural safeguards. Nonetheless,

8  despite the fact that Allison Brenneise *was* included in the transition plan, and *was* given the

9  opportunity to participate in the development of the December 4 IEP as a whole, including the

10  transition plan, OAH erroneously concluded that the transition plan denied T.B. a FAPE because it

11  did not offer to include the parent in subsequent provider meetings designed to discuss T.B.'s

12  readiness to move from one phase of the transition to the next based on data they collected

13  (although her input was to be considered), and did not offer to allow the parent to challenge such

14  transitions every step of the way. And, despite the fact that District staff unanimously testified

15  that the plan was appropriate and clear as drafted, and despite the fact that Allison Brenneise

16  refused to participate in any discussion regarding the transition plan, OAH erroneously concluded

17  that the plan denied T.B. a FAPE because it did not specify who would provide related services

18  during the transition period until the fourth phase.

19      24.    The OAH decision also erroneously ordered the District to provide related services

20  to T.B. during the transition through non-certified private providers. California law provides:

21          a hearing officer may not render a decision that results in the placement of an
            individual with exceptional needs in a nonpublic, nonsectarian school, or that
22          results in a service for an individual with exceptional needs provided by a
            nonpublic, nonsectarian agency, if the school or agency has not been certified . . .
23

24  (Cal. Educ. Code § 56505.2(a).) T.B.'s private occupational therapy ("OT") provider, Chris

25  Vinceneux, testified his private agency, School Options, is not certified with the California

26  Department of Education ("CDE"), yet in the Decision, the ALJ ordered the District to provide OT

27  services through School Options until T.B. is fully transitioned into a school program, which,

28  according to the ALJ, could take a full year. Given that OAH also determined that each phase of

7

**COMPLAINT FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES
EDUCATION ACT AND DECLARATORY RELIEF**

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1   the transition was a placement triggering procedural safeguards, it could take even longer.  The

2   District sought clarification of that portion of the Decision with OAH, but OAH erroneously

3   denied the motion, effectively requiring the District to provide related services through a non-

4   certified private provider in contravention of California law.  (A true and correct copy of the

5   November 21, 2007 Order Denying Motion for Clarification is attached hereto as Exhibit B).

6       25.    The IDEA provides that a due process hearing may be held regarding any dispute

7   relating to a student's educational placement, or the provision of FAPE.  (20 U.S.C. § 1415(c).)

8   Any party aggrieved by the findings and decisions rendered at the due process hearing has a right

9   to bring a civil action by filing a complaint in a United States District Court.  (20 U.S.C. §

10  1415(i).)   In such an action, the court shall receive the records of the administrative proceedings,

11  shall hear additional evidence at the request of a party, and, basing its decision on the

12  preponderance of the evidence following a *de novo* review, shall grant such relief as the court

13  determines is appropriate.  (20 U.S.C. § 1415(i)(C).)

14      26.    The ALJ's findings and determinations described in paragraphs 1 to 25 above were

15  not supported by the law or any documentary or testimonial evidence presented at the hearing, and

16  the District is therefore aggrieved by such findings and determinations.  Accordingly, the District

17  is entitled to a determination that the December 4, 2006 IEP offered T.B. a FAPE in all respects.

18  It is also entitled to a determination that it may provide OT services during transition through any

19  certified NPA or qualified District staff.

20

21                  **SECOND CAUSE OF ACTION**
                    **For Attorneys Fees and Costs**
22                  **20 U.S.C. Section 1415**
23  **(Against Allison Brenneise, Robert Brenneise, Steven Wyner, and Wyner & Tiffany)**

24      27.    Plaintiff hereby incorporates by reference paragraphs 1 through 26, inclusive, as

25  though set forth here in full.

26      28.    The IDEA allows this Court to award reasonable attorneys' fees to a prevailing

27  school district "against the attorney of a parent who files a complaint or subsequent cause of action

28  that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who

8

**COMPLAINT FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES**
**EDUCATION ACT AND DECLARATORY RELIEF**

LB 100829v2

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1  continued to litigate after the litigation clearly became frivolous, unreasonable, or without

2  foundation." 20 U.S.C. § 1415(i)(3)(B)(i)(II). The IDEA also allows this Court to award

3  reasonable attorneys' fees to a prevailing school district "against the attorney of a parent, or

4  against the parent, if the parent's complaint or subsequent cause of action was presented for any

5  improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost

6  of litigation." 20 U.S.C. §1415(i)(3)(B)(i)(III).

7      29.    Defendants Steven Wyner, his firm, Wyner and Tiffany, and T.B.'s parents, Allison

8  Brenneise and Robert Brenneise, have continued to litigate after litigation has become clearly

9  frivolous and have presented complaints for the improper purpose of harassing the District,

10  causing unnecessary delay, and needlessly increasing the cost of litigation. These actions include,

11  but are not limited to: refusal to allow the District to observe T.B. in his home-based program and

12  at related service provider locations; inappropriately threatening to file suit against District counsel

13  personally if the District would not withdraw the eventually successful motion to compel

14  observations; filing untimely motions, replies, and evidence with OAH before and during the due

15  process hearing; repeatedly seeking admission of the late evidence excluded by the ALJ on the

16  first day of hearing; serving improperly issued, untimely subpoenas duces tecum with no good

17  cause or relevance showing on District staff at their homes at night during the hearing after being

18  put on notice months earlier that the District would not produce the documents sought and where

19  District counsel had agreed to accept service; seeking to litigate issues not plead, issues that lacked

20  any evidentiary basis, and issues clearly outside the jurisdiction of OAH before and during the

21  hearing; filing another due process complaint on a moot IEP; filing a complaint with the

22  California Department of Education ("CDE") regarding issues that were heard and decided by

23  OAH; and refusing to consent to an IEP for the current school year which conforms to OAH's

24  order.

25      30.    As a result of the parents', Mr. Wyner's, and Wyner and Tiffany's bad faith

26  conduct, the District has been forced to incur substantial attorneys' fees and costs, which it is

27  entitled to recover here, in an amount subject to proof.

28

LB 100829v2

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

1

## THIRD CAUSE OF ACTION
### For Declaratory Relief
### 28 U.S.C. § 2201(a)
### (Against T.B., Allison Brenneise, Robert Brenneise, Steven Wyner, and Wyner and Tiffany)

31.    Plaintiff hereby incorporates by reference paragraphs 1 through 30, as though set forth here in full.

32.    An actual controversy has now arisen between the parties related to the legal rights and duties of the District for which the District desires a declaration of rights.

33.    The District has and will continue to experience actual hardship in the form of demands that the District provide OT services to T.B. through a non-certified private agency that refuses to contract with the District pursuant to District policy and practice, and that charges more than two times the prevailing rate in the community for comparable services.  The District continues to believe it may provide related services to T.B. through comparable, certified NPA providers or qualified District staff and T.B.'s parents continue to demand services through particular providers, including the non-certified provider erroneously ordered by OAH in the underlying due process hearing.  The District therefore requires a declaration that the IDEA provides the District with the discretion to substitute one qualified provider for another in compliance with T.B.'s IEP, and that the District cannot be compelled to contract with non-certified NPAs in violation of State law.

34.    Attorney Steven Wyner, of Wyner and Tiffany, filed a compliance complaint against the District with CDE on behalf of T.B., Allison Brenneise and Robert Brenneise on July 31, 2006 regarding CUSD's termination of T.B.'s placement at Coronado Academy and the implementation of the July 17, 2006 IEP.   CDE issued a decision on November 8, 2006.  On October 26, 2007, nearly a year later, Mr. Wyner sent the District a demand for $7,113.50 in attorney's fees and costs allegedly incurred in filing that compliance complaint.  Mr. Wyner has since filed at least one other compliance complaint with CDE against the District on behalf of the family for which he may seek fees from the District.

35.    The District therefore has and will continue to experience actual hardship in the form of demands for attorneys' fees and costs incurred by the parents in filing compliance

10

LB 100829v2

1  complaints with CDE.  The District does not believe a favorable determination by CDE conveys

2  prevailing party status to a parent under the IDEA because the CDE compliance complaint process

3  is not an "action or proceeding" for which fees are available to prevailing parents under the IDEA

4  and because it lacks the requisite judicial imprimatur to convey such entitlement under

5  *Buckhannon Board & Care Home v. West Virginia Department of Health and Human Resources*,

6  532 U.S. 598 (2001); *see also*, *Shapiro v. Paradise Valley Unified School District*, 374 F.3d 857

7  (9th Cir. 2004) (the Ninth Circuit held that *Buckhannon's* "judicial imprimatur" rule applied to

8  IDEA claims.)  The District therefore requires a declaration that the IDEA's fee shifting

9  provisions do not entitle a parent to reimbursement for fees and costs incurred in filing a

10  compliance complaint with CDE.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.      Receive the administrative records of this action, to be lodged forthwith;

2.      Grant Plaintiff's request for relief by reversing OAH's Decision that the District

denied T.B. a FAPE in its December 4, 2006 IEP offer;

3.      Grant declaratory relief;

4.      Award Plaintiff its reasonable attorneys fees, expenses and costs; and

5.      Provide all such other and further relief as the Court may deem just and proper.

DATED: January 4, 2008                          MILLER BROWN & DANNIS

                                                By: _____
                                                SUE ANN SALMON EVANS
                                                AMY R. LEVINE
                                                SARAH L. W. SUTHERLAND
                                                Attorneys for Plaintiff
                                                SAN DIEGO UNIFIED SCHOOL DISTRICT

MILLER BROWN & DANNIS
SYMPHONY TOWERS
750 B STREET, SUITE 2310
SAN DIEGO, CA 92101

**COMPLAINT FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES
EDUCATION ACT AND DECLARATORY RELIEF**

LB 100829v2

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Consolidated Matter of:<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>        Petitioner,<br><br>v.<br><br>STUDENT,<br><br>       Respondent; | OAH CASE NO.  N2006120002 |
| STUDENT and PARENTS,<br><br>        Petitioners,<br><br>v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>       Respondent. | OAH CASE NO.  N2007010848 |

## DECISION

  Administrative Law Judge (ALJ) Susan Ruff of the Office of Administrative Hearings (OAH), Special Education Division, State of California, heard these consolidated matters on May 14 - 18, 21 - 25, 29 - 31, June 1, 11 - 13, 19, 20, and July 11 - 13, and 16 - 20, 2007, in San Diego, California.

  Steven Wyner, Esq., and Dana Wilkins, Esq., of Wyner & Tiffany, represented Student (Student) and Student's parents. Student's parents were present for most of the hearing. Student was not present.



Elizabeth Estes, Esq., and Sarah Sutherland, Esq., of Miller Brown & Dannis, represented the San Diego Unified School District (District). MarySue Glynn, Director of Special Education for the District, appeared on behalf of the District.

On November 29, 2006, the District filed a due process hearing request in case number N2006120002. The District requested and received leave to file an Amended Due Process Request on January 9, 2007. On January 29, 2007, Student filed his request for a due process hearing in case number N2007010848 and requested that the two cases be consolidated. On February 1, 2007, OAH granted Student's request to consolidate the two cases and continued the hearing dates. The hearing began on May 14, 2007. At the close of the hearing on July 20, 2007, the parties requested the opportunity to file written closing argument. That request was granted. The matter was deemed submitted upon receipt of written closing argument on September 17, 2007.

ISSUES[1]

Issues Related to Assessments

1.     Is the District's Multidisciplinary Assessment dated July 14, 2006, appropriate?

2.     Did the District fail to assess Student in all areas of unique need during the 2006-2007 school year, particularly in the areas of speech and language, learning disabilities related to reading, writing, and math, assistive technology, listening comprehension, physical therapy and social/emotional?[2]

3.     Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student before eliminating physical health services?[3]

---

[1] Issues number one and ten were raised by the District. The other issues were raised by the Student. These issues have been reorganized from the way they were listed in the Prehearing Conference Order to provide greater clarity in this Decision.

[2] In the Prehearing Conference Order, issue two also included Student's claim that the District failed to assess in the area of behavior. However, that issue has been removed from issue two because it is already addressed in issue four which specifically relates to behavior. Likewise, issue two originally contained an allegation that the District failed to assess in the area of health, including dietary restrictions. The District's health assessment of Student will be addressed in issue three, regarding the District's alleged failure to assess before eliminating physical health services.

[3] Issue three originally read: "Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student before eliminating music therapy and physical health services?" Student withdrew the part of the issue involving music therapy during the hearing. Apparently Student did so in the belief that the failure to assess in the area of music therapy would then be included as part of Student's claim of failure to assess in issue two, above.

2

4.      Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student's behavioral needs and failing to develop an appropriate behavior plan?

5.      Did the District violate IDEA by failing to reimburse Student's parents for the Independent Educational Assessments (IEEs) obtained by the parents, as requested by Student's mother at the October 9, 2006 IEP meeting?

<u>Issues Related to the August 30, 2006 Proposed IEP</u>

6.      Did the District deny Student a free appropriate public education (FAPE) during the 2006-2007 school year by failing to have an individualized education program (IEP) in place at the commencement of the school year on September 5, 2006?

7.      Did the District deny Student a FAPE during the 2006-2007 school year by failing to have appropriate team members – including Student's parent(s) – at the IEP meeting convened on August 30, 2006?

8.      Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose an appropriate placement for Student in the August 30, 2006 IEP?

9.      Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose appropriate goals and objectives in the August 30, 2006 IEP?

<u>Issues Related to the December 4, 2006 Proposed IEP</u>

10.     Did the District's education programming offer, memorialized in the proposed December 4, 2006 IEP, offer Student a FAPE designed to meet his unique needs and allow him to benefit from his education?

11.     Did the District deny Student a FAPE in the proposed December 4, 2006 IEP, by failing to develop annual goals and objectives that would enable Student to make educational progress and access the grade level general curriculum?

12.     Did the District deny Student a FAPE in the proposed December 2006 IEP by failing to provide adequate staff development and training in the use of Student's specialized software programs which Student needs to access the curriculum?

13.     Did the District deny Student a FAPE by failing to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP?

<u>Issues Related to Both IEPs</u>

14.     Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop an appropriate health care plan that would enable Student to attend school safely?


15.    Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop and implement an appropriate transition plan to transition Student from a home school program to a school based program?

16.    Did the District violate the provisions of the Individuals with Disabilities Education Act (IDEA) by failing to implement a "stay put" placement as of July 25, 2006?

17.    Did the District deny Student a FAPE for the 2006-2007 school year by failing to allow meaningful participation in the IEP process by Student's parents?

18.    Did the District deny Student a FAPE during the 2006-2007 school year by failing to consider the goals and objectives proposed by Student's parents?

## FACTUAL FINDINGS

*Is the District's Multidisciplinary Assessment dated July 14, 2006, appropriate?*

1.    The District conducted a triennial assessment of Student and issued a report dated July 14, 2006. The parties dispute whether that assessment was appropriate and whether the District assessed Student in all areas of unique need during the 2006-2007 school year.

2.    A school district is required to assess a special education student in all areas of educational need at least once every three years. This three year assessment is often referred to as a "triennial assessment." In order to meet the requirements of the law, an assessment must be performed by the appropriately qualified individuals, must include tests and assessment materials that are tailored to assess the student's areas of unique need, and must not be racially, culturally, or sexually discriminatory.

3.    Student is a 13-year-old boy who has needed special education services since he first entered school. During the 2006-2007 school year (the school year relevant to this proceeding), he was eligible for special education services under the category of autism. Student has a serious health condition known as Phenylketonuria (PKU). Student was born without the ability to metabolize the amino acid called Phenylalanine (PHE). This amino acid naturally occurs in food proteins and is essential for life. However, if too much PHE builds up in an infant's body, over time it can cause brain damage and other ailments. An individual who has PKU must carefully monitor food intake to maintain a certain level of PHE (but not more). In addition, every day the individual with PKU must drink a special formula that provides necessary nutrients, but is free of PHE. This formula has an unpleasant taste, but infants who grow up drinking the formula are used to it.

4.    There is a blood test given to newborn infants to check for PKU. Once the condition is discovered, immediate dietary steps can be taken to make certain that the infant's PHE levels never rise high enough to cause brain damage to the infant. Individuals

4

with PKU also undergo periodic blood testing throughout their lives to make certain that the levels of PHE in their blood are within acceptable limits.

5.      Due to medical error, Student's PKU condition was not noted at birth and was not diagnosed until Student was three years old. For this reason, Student suffered irreversible brain damage and other physical difficulties caused by the late-diagnosed PKU.

6.      Because of Student's age and impaired condition when his PKU condition was discovered, he was unwilling to drink the special PHE-free formula that contains the nutrients essential for children with PKU. After unsuccessful attempts to entice Student to drink the formula, Student's physicians fitted him with a gastrostomy tube (G-Tube) through which the formula could be poured directly into his stomach. At the start of the 2006-2007 school year, Student had G-Tube feedings twice a day, but later in the year his physician recommended G-Tube feedings at least three times a day. Student also suffers from a mild seizure disorder, exhibits autistic-like behaviors, and has difficulty with gross and fine motor skills as a result of his late-diagnosed PKU.

7.      The parties dispute whether Student suffers from osteoporosis or osteopenia which is significant enough to affect his school activities. Osteoporosis is a weakening of the bone structure which leads to bone fractures. Osteopenia is one step short of osteoporosis. It refers to a weakness in the bones, but not bones that are ready to fracture at any moment. It is necessary to take medication to combat osteoporosis, but not osteopenia.

8.      Medical testing in 2005 indicated that Student suffered from osteoporosis or osteopenia. Later physician evaluations indicated that he did not have osteoporosis, and questioned whether his osteopenia was significant enough to restrict his daily activities. However, it is not necessary to decide the question for purposes of this Decision, because the evidence shows that at the time of the 2006 triennial assessment, the August 30, 2006 IEP offer, and the December 4, 2006 IEP offer, the District reasonably believed that Student had osteoporosis and osteopenia, and made its IEP offers accordingly.[4]

9.      In addition to Student's significant health needs, he also has educational needs as a result of his late-diagnosed PKU and resulting brain damage. Student has needs in the areas of reading, writing, mathematics, daily living skills, keyboarding and computer use, speech/language and social/emotional skills. Student reads independently at a third grade level, is at approximately a third grade level in math calculations, and has extremely poor writing skills. Student has auditory and visual processing problems that affect his ability to learn in a regular classroom environment, as well as attention issues, difficulty maintaining focus on tasks, and some behavioral difficulties such as hitting his head and rubbing his eyes.

---

[4] On September 18, 2006, prior to the December 4, 2006 IEP meeting, Dr. Ron Newfield conducted a follow-up examination of Student and concluded that the testing did not show osteoporosis or any significant osteopenia. He found no need to restrict Student's activities beyond what he would restrict for any typical child. He recommended that Student stop taking the osteoporosis medication. However, Student's mother did not inform the District of Dr. Newfield's opinion before or during the December 4, 2006 IEP meeting,

10.    Student's parents and the District have a history of disputes about Student's education. In 2003, Student's parents pulled Student from the District schools and began educating him at home. As a result of due process proceedings and settlement agreements, as of July 2006, Student was being educated in a home program which involved services provided by non-public agency (NPA) providers, some of which were paid for by the District.

11.    In July 2006, Student was due for his triennial assessment. The District conducted that assessment during June and July 2006. The assessment included a psychoeducational assessment, including cognitive and achievement tests, a social skills and adaptive behavior assessment, an academic assessment in the areas of reading, writing and math, a speech/language assessment, an occupational therapy assessment, which included testing in the area of visual perception, an adaptive physical education assessment, and an assistive technology assessment. The District's assessment report was dated July 14, 2006. The District also performed separate health and auditory assessments.

12.    On July 17, 2006, the parties held an IEP meeting to receive the assessor's reports and discuss the assessments. At that meeting, Student's counsel explained that Student's mother would be sending the District a written letter with comments regarding the report.

13.    On that same day, the parties agreed to an IEP which placed Student in Coronado Academy for an extended school year (ESY) program, during the summer of 2006. Coronado Academy is a public school, but it is not a school within the District. That July 17, 2006 IEP became the "stay put" IEP which will be discussed later in this Decision. The two IEP proposals in dispute in this case, which will also be discussed later in this Decision, were presented at IEP meetings held on August 30, 2006, and December 4, 2006.

14.    The District faxed Student a revised assessment report on August 18, 2006, based on the input received during the July 17, 2006 meeting. That revised report is the multidisciplinary assessment report at issue in this case.[5]

15.    On August 18, 2006, Student's mother sent an email to MarySue Glynn, the District's Director of Special Education, with 31 pages of questions, concerns and comments about the original July 14 assessment report. Student's mother explained in her cover email that she had not had time to review the revised report yet. On September 29, 2006, the District's counsel faxed a 31 page letter to Student's counsel responding to the questions and concerns Student's mother raised in the August 18 email. On October 7, 2006, Student's counsel's office sent another email to the District with additional comments about the assessment.

---

[5] It will be referred to as the "triennial assessment."

6

16.    The evidence supports a finding that the District's July 2006 assessment of Student met the requirements of the law.[6]  Testing was performed by trained and knowledgeable personnel and administered in accordance with the test manufacturer's instructions.  The tests were selected to assess specific areas of Student's educational needs.  The school psychologist administered the tests relating to intellectual and emotional functioning.  The testing and other assessment materials were selected and administered so as not to be racially, culturally or sexually discriminatory.  No single measure or assessment was used to determine Student's eligibility for special education services or what services he requires.  The tests were administered in Student's native language (English), and they were used for the purposes for which they were valid and reliable.

17.    Dr. Robert Patterson, Student's psychoeducational expert, testified that the triennial assessment report was "generally…well done" and that it identified Student's major needs.  His two main objections to the report involved the style of the report.  First he had a concern that the report, as written, would be difficult for an unsophisticated parent to read and understand.  He also expressed concern that the District's report set up "straw men" issues, such as whether Student was properly classified with autism.  In his opinion, there is no dispute about these "straw men" issues and they should not have been discussed in the triennial assessment.

18.    The evidence supports a finding that neither of Dr. Patterson's objections is sufficient to invalidate the District's assessment.  Student's mother was not an unsophisticated individual who might be confused by a technical-sounding report.  Instead she is astute, dedicated and well-versed in special education procedures.  She acts as an advocate for other parents in special education matters, and was represented during the 2006-2007 school year by one of the most respected special education attorneys in the field.  Following her receipt of the District's assessment report, she sent a 31-page letter to the District, containing questions and concerns about the information in the assessment.  The District's counsel sent an equally long letter in response, addressing each of her concerns and questions.  Any problems with the presentation of the report were addressed in that follow-up correspondence.  Likewise, even if the District's report discussed irrelevant matters and "straw men," it still covered the essential elements required by law and was still valid and reliable.

19.    Dr. Patterson also took issue with the assessment because the District did not conduct some of the specific tests listed in the assessment proposal the parent signed.  However, Michele Bronson, the school psychologist, testified that she determined during the course of the assessment process that she had sufficient information to determine Student's needs and did not need to conduct those assessments.  Student cites to no legal authority

---

[6]  During the hearing, the parties stipulated that each of the District witnesses, if questioned on direct examination, would testify that the District's triennial assessment met the various requirements of the law.  Because of the stipulation, there is no need for this Decision to discuss the testimony of each of the District employees involved with the assessment and the actions each one took in conducting the assessment.  Instead, this Decision will focus on those areas in which Student contends the District's assessment was deficient and the testimony of the witnesses related to the alleged deficiencies.

7

requiring a district to conduct all proposed assessments if it has sufficient information. There was no violation.

20.     Student's experts criticized some of the District's assessors for using prompts and accommodations. However, the District assessors were unanimous in their testimony that no prompts or accommodations were used in a way that would invalidate assessment results.

21.     Student also takes issue with a few of the individual tests and assessments administered as part of the triennial assessment. In particular, Student's experts criticized the speech/language portion of the triennial assessment and the academic assessment.

22.     The speech/language portion of the District's assessment was conducted by Rachel Zijlstra, a speech/language pathologist who directs a company known as Sound Therapies. Zijlstra is not a District employee, but she was hired by the District to conduct the assessment. She is on the Board of Directors for the San Diego chapter of the Autism Society and has provided speech/language services to hundreds of students over the years. Zijlstra found that Student had adequate language for academic success, but showed significant deficits in the areas of social language and ability to communicate ideas.

23.     Student's speech/language expert Joanne Hein conducted her own assessments of Student in 2005 and December 2006. Hein is a well qualified speech/language pathologist who has treated speech/language patients for over 30 years. She criticized the District's speech/language assessment because it failed to sufficiently address receptive language and because it emphasized Student's difficulties with social communication while minimizing his significant problems with his underlying language skills. She felt that the District's findings were not detailed enough with respect to the context in which Student's strengths and weaknesses occurred (for example, whether Student exhibited certain types of language strengths in various settings). She disagreed with the District's conclusion that Student had adequate language for academic success. She also disagreed with the recommendations for services made in the District's assessment.

24.     Hein's criticisms of the District's assessment are not sufficient to invalidate that assessment. Both Hein and Zijlstra testified that many of their test results and findings were very similar. Hein agreed that at least some of the testing done by Zijlstra was appropriate and done correctly. Contrary to Hein's observations, a review of the speech/language portion of the District's assessment shows that there was constant mention made of the context in which Student performed and how his performance differed in unstructured settings. At least one of the tests given by Zijlstra, the Comprehensive Assessment of Spoken Language (CASL), did address the issue of receptive language. Hein said that she prefers to use different tests, because she felt that the CASL does not sufficiently distinguish between expressive and receptive language, but she admitted that it is a respected test.

8

25.    During her testimony, Hein admitted that she had never observed Student in a social situation or even with a peer. All her testing was done in her office. Zijlstra, on the other hand, observed Student in a social skills group at ACES[7] as well as conducting tests in an office. Zijlstra's conclusion that Student's greatest areas of need with respect to speech/language involved social communication and Student's ability to communicate ideas was supported by the testimony of other witnesses, including the District's academic assessor Nancy Fazio and school psychologist Michele Bronson. Even Student's expert Dr. Patterson recognized Student's needs in the social/emotional area.

26.    The evidence supports a finding that the District's speech/language assessment was appropriate and sufficient to address Student's needs.

27.    Student also criticized the portion of the triennial assessment which related to academic skills, in particular reading and writing. The academic portion of the triennial assessment was performed by Nancy Fazio, a program diagnostic resource specialist working for the District. She has been with the District since 1978 and has held positions as a resource specialist and special day class (SDC) teacher, among others. She holds both special education and general education teaching credentials. She has taught hundreds of special education students over the years and has conducted hundreds of assessments. She found that Student had a good vocabulary and could pull information from a text if asked very specific questions, but he lacked the ability to draw inferences from what he read. She found that he could read comfortably at a third grade level, but was inconsistent at higher grade levels. His instructional reading level was in the fourth to sixth grade range. He could read a story at higher levels, but needed support to draw conclusions. He would get caught in detail and miss the main idea of the story. His greatest needs were his inferential and higher order thinking skills.

28.    Student's reading expert Lynne Thrope concurred with the District's assessment that Student's independent reading level was at the third grade, and found his instructional reading level was at the fourth grade. She reported that Student had dyslexia, a visual reading disorder, dysgraphia, a disorder of written expression, and a central auditory processing deficit. She disagreed that Student's instructional reading level went from fourth to sixth grade. She believed there is no way Student could do sixth grade work. However, most of her criticisms of the triennial assessment involved the District's references to her own previous assessment. While she agreed with many of the District's findings, she believed that she was misquoted more than once in the District's assessment report. She also believed that the District's assessment did not address Student's areas of need in word recognition, spelling and vocabulary. She felt that just because Student was stronger in these areas did not mean he could not learn more. She also felt that skills related to literal comprehension should be part of his educational plan.

---

[7] Comprehensive Educational Services, Inc., doing business as A.C.E.S. (ACES), was the NPA that, among other things, supplied Student's behavioral aides for his home program and provided him with instructional services.

29.  With respect to writing, Thrope felt that the District's assessment did not address all of Student's written communication needs. Unless he would be in a computer driven classroom, he would need a lot of work in constructing sentences, formation of letters and similar tasks.

30.  The evidence supports a finding that the District properly assessed Student in his academic areas of need. The District had Thrope's previous assessment report and referred to it in the District's assessment. Thrope's findings were very similar to Fazio's regarding Student's reading levels. Although Thrope believed that the designation of Student's instructional reading level of fourth through sixth grade was in error, she did agree that his instructional level was at fourth grade. Just because Fazio's test results showed Student had some skills above fourth grade level did not invalidate Fazio's findings. Because Student's program anticipated that he would learn to use the computer for writing, it was not necessary to do a detailed academic assessment of his needs with respect to formation of letters. The assessment properly recognized that he had a weakness in that area and that he needed assistive technology. While Thrope would have preferred additional assessment in the areas of vocabulary, word formation, and literal comprehension, she did not dispute that Student's primary area of weakness involves drawing inferences.

31.  In Student's written closing argument, Student contends that the District did not assess in the areas of executive processing skills and speed, short term and working memory, social language, oral motor skills, speech and intelligibility, and motor skills related to oral and G-Tube feeding. However, a review of the triennial assessment report shows that each of these areas or the skills underlying these areas was addressed. Student also contends that the District failed to assess in the area of occupational therapy (OT), but the evidence does not support that contention. The District's triennial assessment contains a comprehensive OT section, covering the aspects of OT which Student contends were missed.

32.  The evidence supports a finding that the District's Multidisciplinary Assessment dated July 14, 2006, was appropriate and met the requirements of law.

*Did the District fail to assess Student in all areas of unique need during the 2006-2007 school year, particularly in the areas of speech and language, learning disabilities related to reading, writing, and math, assistive technology, listening comprehension, physical therapy and social/emotional?* [8]

Speech/Language

33.  As set forth in Factual Findings 22-26 above, the District's speech/language assessment conducted as part of the triennial assessment was comprehensive and identified

---

[8] Although Student's counsel stated during the Prehearing Conference that one of Student's issues involved the District's failure to adequately assess in the area of assistive technology, Student's written closing brief omitted any argument on that issue, so presumably Student dropped that issue. However, even if that is still an issue in the case, the validity and comprehensiveness of the District's assistive technology assessment was well supported by the testimony of Anne Callies, the District's assistive technology expert who conducted the assessment.

10

Student's unique needs in that area. Student did not present any evidence to show that Student's speech/language needs changed during the remainder of the 2006-2007 school year to warrant a second assessment. Student's expert Joanne Hein testified that when she assessed Student in December 2006, his speech/language needs had changed very little since her assessment in 2005.

## Academic Areas of Reading, Writing and Mathematics

34.    As set forth in Factual Findings 27-30 above, the District's Multidisciplinary Assessment included sufficient testing and assessments in the area of Student's unique needs in academic subjects such as reading, mathematics and writing. There is no evidence that Student's needs changed after the July 2006 triennial assessment to an extent that a new assessment would be mandated.

## Listening Comprehension

35.    Student contends that the District failed to assess in the area of listening comprehension. The evidence does not support Student's contention.

36.    On July 26, 2006, Marcia Veltre, an audiologist working for the District, conducted extensive testing relating to Student's central auditory processing disorder and his difficulties with listening comprehension. Student's auditory expert Carol Atkins criticized the way Veltre administered and reported her findings on some of the tests. For example, Atkins raised concerns that Veltre did not distinguish between one ear and the other on the frequency and duration discrimination test.[9] However, she admitted that her findings and Veltre's findings in general were very similar. When Atkin's drafted her May 2007 report, she relied on Veltre's test results and previous testing done of Student, rather than conducting new tests of Student.

37.    The main disagreement between the two reports is whether Student requires direct auditory services designed to remediate his central auditory processing deficit. There is a dispute among the experts as to whether training designed to remediate auditory processing deficits has any value for a child of Student's age. Maturation of the auditory nervous system is thought to be maximized around 10 to 12 years of age. Atkins herself wrote in her April 21, 2005 report that "Persistent difficulty at his age suggests that modification of the listening environment and developing self-advocacy strategies may be more beneficial than direct therapy." Veltre's recommendations included modifications and accommodations to the classroom environment to address Student's auditory needs, but did not recommend direct remediation designed to reduce Student's auditory processing deficit.

---

[9] In Student's written closing argument, Student contends that Veltre only tested one ear. The evidence does not support that contention. Atkins criticized Veltre for failing to distinguish between the two ears on one type of test, not for only testing one ear to the exclusion of the other. Many of the tests reported in Veltre's assessment showed separate results for each ear.

38.    Despite the disagreement over recommended services, the evidence supports a finding that Veltre's assessment properly identified Student's listening comprehension needs in her assessment. The District did not fail to assess Student in the area of listening comprehension.

Physical Therapy

39.    Student contends that the District failed to assess Student in the area of physical therapy (PT). The District's triennial assessment did not contain a specific PT assessment. On June 6, 2006, prior to the preparation of the triennial assessment report, the District sent a supplemental assessment proposal to Student's mother which included a proposed PT assessment. Student's parents did not consent to the proposed assessment and no specific PT assessment was conducted by the District.

40.    The District's physical therapy expert Patricia La Bouff explained that the triennial assessment provided sufficient information to address Student's PT needs, and that after that triennial assessment was completed, she no longer believed a separate PT assessment was necessary. The OT and adaptive physical education (APE) portions of the assessment adequately determined Student's needs in the areas of core strength, posture, endurance, coordination and movement.

41.    Student's PT expert Roxanne Husson identified the same basic needs for Student as LaBouff did during her testimony, including core strength and endurance. She also found that he needed limitations in his physical activity due to his osteoporosis. She did not conduct any independent tests to determine whether he had osteopenia or osteoporosis, but instead relied upon the doctors' reports.

42.    La Bouff explained that part of the reason for the District proposing a PT assessment was to address the concerns of Christian Vinceneux, the occupational therapist providing services to Student through an NPA, that Student's primitive reflexes might not be fully integrated. Primitive reflexes are automatic, involuntary physical movements used by infants to begin development of motor skills. For example, when an infant turns his head to the side, his arm moves as well, as a precursor to developing hand-eye coordination. Usually as the child grows older, the child is able to overcome these primitive reflexes. Based on his observations of Student during OT sessions, Vinceneux determined that Student still exhibits primitive reflexes which would affect his coordination and motor skills.

43.    After Student's parents refused the proposed PT assessment, La Bouff observed Student's physical activity during the OT and APE assessments and determined that Student was able to overcome his primitive reflexes when appropriate. There was no need for a further assessment. She also opined that current PT theory and studies show that reflex integration intervention is not effective.

12

44.    The evidence does not support a finding that the District failed to assess Student in the area of PT. Although the District initially sent an assessment plan to Student's parents (to which the parents did <u>not</u> consent), the District was able to determine Student's unique needs with respect to PT through the other tests and assessments done during the triennial assessment. There is no indication that Student's PT needs changed during the 2006-2007 school year to warrant another assessment. The evidence is disputed as to whether Student had needs relating to integration of primitive reflexes, but even if he did, the District had enough information in the triennial assessment and Vinceneux's prior reports to address those concerns. There was no need for additional assessment.

## Social/Emotional

45.    Student also contends that the District failed to properly assess Student's emotional needs, including his social skills. Contrary to Student's claims, the District's psychoeducational assessment included rating scales designed to assess his adaptive behavior and social functioning. His significant needs in social communication and social awareness were discussed throughout the District's assessment. His social skills and needs were analyzed by Michele Bronson, the District's school psychologist, as well as the speech/language assessor and the APE assessor. The District's attempts to get Student away from his home program and into an educational environment with other children were a direct result of the District's understanding of those needs. The evidence does not support a finding that the District failed to assess in the areas of social/emotional needs.

## Music Therapy

46.    Student contends that the District failed to assess in the area of music therapy. At various times in the past Student has received music therapy and sound therapy to assist him in his academic pursuits.

47.    Sound therapy and music therapy are two different techniques used to assist a child with academic performance. Sound therapy involves a child listening through headphones to particular selections of music. The music is chosen to help soothe the child and prepare the child to focus on academic tasks. It may be used as part of an OT program. Music therapy involves songs with words taught to a child to help with matters such as memorization. A good example is the familiar "ABC" song that children sing to help them memorize the alphabet.

48.    The evidence does not support a finding that Student has academic "needs" in the area of music. Instead, both sound therapy and music therapy are tools used to assist with his academic, attention and processing needs.

49.    Michele Lazar, the founder of Coast Music Therapy, a private agency that provides music therapy services, explained that Coast Music Therapy does not identify areas of need when they evaluate children for music therapy services. Instead they rely on other assessments and evaluate whether music therapy could assist pupils with any of the needs

identified by other assessors. They are not qualified to determine areas of need. She testified that music therapy is effective as a memorization aid for younger children. However, after children reach a certain age, their studies tend to be less about rote memorization and more about higher thinking skills. She believed that music therapy might assist Student with his social skills by helping Student memorize "social scripts" that he could use when dealing with other Students. However, she admitted that she did not know if other strategies would work just as effectively.

50.    Contrary to Student's claims, there was no need to assess Student in the area of music therapy. The other comprehensive assessments of Student were sufficient to allow the IEP team to determine if Student's unique needs could be met by the inclusion of a music therapy program as part of his designated instruction and services (DIS services). According to the triennial assessment, most of Student's academic needs were in the area of higher thinking and inferential reasoning, not rote memorization. While music therapy might help Student to memorize social scripts, there was no evidence that it was a required technique or even a necessary technique to increase his social awareness. The evidence does not support a finding that the District failed to assess in all areas of unique need because the District failed to provide a music therapy assessment.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student before eliminating physical health services and failing to appropriately assess Student regarding Student's health needs, including diet?*

51.    Student contends that the District failed to assess Student with respect to Student's health needs during the 2006-2007 school year and that the District eliminated physical health services without an assessment.

52.    The "stay put" IEP of July 17, 2006, provided for 30 minutes per month of "specialized physical health care services." These specialized services were to consist of PKU training for all staff and food handling services as described elsewhere in the IEP.

53.    The District's August 30, 2006 IEP proposal did not contain a listing of "specialized physical health care services." However, it did contain a proposal for eight hours per year of "health nursing services." The District employees explained that these health nursing services were the same as the "specialized physical health care services" in the "stay put" IEP. The December 4, 2006 IEP contained the same provision for eight hours per year of "health nursing services." The district nurses testified that eight hours of health nursing services included three hours of training of school staff by the school nurse regarding Student's health needs and five hours thereafter as needed to follow up with the school staff.

54.    The evidence supports a finding that there was no elimination of specialized physical health services in the August and December 2006 IEP offers. The change of name did not change the fact that the service was offered. The evidence does not support a finding that the District eliminated physical health services without an assessment.

14

55.    Student also contends that the District failed to sufficiently assess Student's health needs during the 2006-2007 school year. The evidence does not support this contention.

56.    On June 30, 2006, Dr. Dewan, one of Student's treating physicians at Children's Hospital, sent a letter discussing Student's PKU needs, his G-Tube feeding and his osteoporosis/osteopenia. On July 5, 2006, the District sent Student's parents a release form to obtain medical information from Student's doctors with respect to his various health conditions, including PKU, epilepsy, and osteoporosis. The names of the physicians on the form were left blank to permit Student's mother to fill in the names of the appropriate doctors. Student's mother responded with a fax stating:

> At this time, I am disinclined to sign any medical release. The district's MS, Dr. Howard Taras, the district doctor, should be appropriate to offer whatever general information the district needs in order to provide a FAPE to [Student].

On July 10, 2006, Student's mother apparently changed her mind and signed a release permitting the District to obtain information from Dr. Dewan.

57.    On July 12, 2006, Student's physician Dr. Reich signed an authorization for G-Tube feeding by the District at 7:00 – 7:30 a.m. and 2:30 – 3:00 p.m. The amount of formula and procedure for the feeding were specified in the order.

58.    Prior to June 25, 2006, Dr. Carolynne Casey, a school nurse working for the District, conducted a health assessment of Student and prepared a report. The assessment was based on information provided by Student's mother, Casey's observation of Student's G-Tube feeding, and a review of available medical records. The report addressed Student's health needs with respect to his PKU and G-tube feedings. The report made recommendations for specialized health care services and accommodations to be provided for Student in order to enable him to access his education.

59.    Around the end of June, Casey withdrew from Student's assessment team because of problems with her health. Dr. Casey's assessment was later finalized by other District personnel. Portions of her report, including some of the information provided by Student's mother to Casey and Casey's description of the G-Tube feeding, were redacted prior to the time the report was finalized. The report did not state that material had been redacted, and Casey was not aware of the redactions until months later. The final report also included additional information regarding osteoporosis that was not in Casey's original report.

60.    The District did not provide a satisfactory explanation during the hearing for why Casey's report of her observations of the G-Tube feeding was removed from the final assessment. Dr. Casey testified that the feeding observation information was "extremely

critical information," and she could not understand why it was redacted.[10]

61.    Despite the redactions to Dr. Casey's report, the evidence supports a finding that, as of August 30, 2006, when the first IEP proposal at issue in this case was made, the District had sufficiently assessed Student regarding Student's health care needs. While Casey's information about the G-Tube feeding was important, the District had that information included in the orders received from Student's doctors. The District's medical expert Dr. Howard Taras testified that the District had enough information to prepare a health plan for Student as of August 30. None of Student's witnesses contradicted this.

62.    After the triennial assessment, there was further interaction between the parties regarding Student's health needs. In approximately October or November 2006, Sheila Doctors, the District's case manager for Student, attempted to contact Dr. Dewan to obtain information regarding the relationship between PKU and sensory motor integration difficulties. She learned that Dr. Dewan was no longer working at Children's Hospital. Student's mother did not know that Dewan was no longer at Children's Hospital until Sheila Doctors told the IEP team about it during an IEP meeting.

63.    Prior to November 15, 2006, Student requested an independent health evaluation to be done at District expense. In mid-November, the District staff consulted with Dr. Taras to determine which types of specialists would be appropriate for the independent medical evaluation. On November 15, 2006, the District faxed a letter to Student's counsel agreeing to fund such an assessment. On the same day, after receipt of the District's letter, Student's counsel sent a letter withdrawing the request.

64.    On November 17, 2006, the District sent a proposed assessment plan for medical assessments by a pediatric gastroenterologist and orthopedist, including a release for medical information form and agreement to authorize payments for the medical assessment. The cover letter stated in part:

> ...while [Student's mother] has withdrawn her request for an independent health assessment, the District nonetheless believes medical assessments, performed by both a pediatric gastroenterologist and orthopedist, are necessary. This will ensure proper identification of [Student's] PKU related needs, ensure the District is addressing all of [Student's] health related needs,

---

[10] The redaction of Dr. Casey's draft assessment was not even discovered by Student until the testimony of Jennifer Gorman, a nursing administrator for the District. During cross-examination, Nurse Gorman admitted that during a conversation with Dr. Casey in preparation for this hearing, Casey told Gorman that the assessment report had been changed and faxed Gorman a copy of the original assessment report. When Gorman was asked during her testimony if she had a copy of the original report, she first answered that she did not have it with her. Upon follow-up questioning, she admitted that the faxed report was in her purse next to the table where District's counsel was sitting. Apparently, District's counsel knew about Dr. Casey's unredacted report prior to the hearing, but never produced a copy to Student's counsel, despite a records request by Student's counsel, because the District believes that drafts of assessment reports are not educational records that must be produced under state or federal law.

and address [Student's mother]'s concerns with the District's health assessment.

Dr. Taras explained that the District had requested the outside medical assessment in November because Student's mother insisted that the District could not keep her child safe at school. The District did not believe that it lacked sufficient information to provide for Student's needs.

65.     Around November 21, 2006, Student experienced some medical problems. As part of a series of email messages regarding the scheduling of an IEP meeting, the District requested that Student's mother sign the assessment plan for the independent medical evaluation "especially given this new information about [Student's] health." Later that day, Student's mother agreed to the proposed assessment plan, and her counsel's office sent an email requesting the names of the independent doctors that the District wished to use for the assessment so the parents could schedule the appointments.

66.     Student's mother sent a separate letter on November 21, 2006, in which she revoked her release for the District to obtain information from Dr. Dewan. She testified at hearing that she did so because the District had not complied with her request that they provide her with a written statement regarding anything discussed with the doctor.

67.     On December 4, 2006, Dr. Taras met with Student's mother during a break in the IEP meeting. He asked her to sign medical releases to let the District obtain medical information from Student's current physicians. Based on his understanding that signed releases would be forthcoming, he determined that an independent medical assessment was not necessary. Dr. Taras believes that obtaining an outside medical evaluation is not as good as obtaining information directly from the child's treating physicians. It is important to make certain that Student's medical needs are being addressed in a consistent manner at both school and home.

68.     On December 15, 2006, Dr. Taras sent a letter to Student's counsel's office explaining that no further medical assessment was necessary at that time "because I could not determine what, if any, specific differences there were between the District's and the parent's positions on a suitable health plan for [Student]."

69.     As of January 16, 2007, Student's mother had not signed any releases, and the District had not scheduled the independent medical assessment. On January 16, 2007, District's counsel sent a letter to Student's counsel requesting that Student's mother sign the releases for medical information that Dr. Taras would bring to the meeting with Student's mother.

70.     On January 17, 2007, Student's counsel replied with a letter explaining that Student's family was in the process of establishing a new medical treatment team for Student's treatment. On January 19, 2007, Dr. Taras met with Student's mother to discuss

17

the development of a health care service plan for Student. He also discussed the need for medical releases at that meeting.

71.    On February 5, 2007, the District's counsel sent a letter explaining the need for Student's mother to submit releases so the District could obtain recent health information from Student's physicians. The letter states that either the parents should sign the releases, or the District would have to continue with the independent health assessment signed by Student's mother on November 21, 2006.

72.    On February 7, 2007, Student's mother signed a release for the District to obtain medical information from Dr. Cohen and Dr. Reich. The release was limited to providing that information from Dr. Taras, another doctor or a school nurse. On February 14 and 15, 2007, Dr. Taras telephoned these doctors. The doctors gave him inconsistent information about the amount of Phenex 2 formula[11] student received in his G-Tube feedings each day. When Taras tried to clarify with them regarding the correct amount of Phenex, they referred Taras to Dr. Cederbaum as the physician who was actually dealing with Student's PKU issues.

73.    On March 13, 2007, the District sent release forms to Student's mother to obtain medical information from Dr. Cederbaum and other doctors who had seen Student (Dr. Newfield, Dr. Pring and Dr. Serena). On April 5, 2007, Student's mother signed the releases, but limited her authorization to verbal communications with the physicians only, not transfer of patient records. Those signed releases were transferred to the District on April 6, 2007. The restrictions on these releases made it cumbersome for Dr. Taras to deal with these doctors when he contacted them by telephone. For example, Dr. Cederbaum wanted to send Taras a written report regarding Student. When Taras explained that he could not under the terms of the release, Cederbaum was annoyed and never provided the information Taras needed. Taras did not obtain the correct dose of Phenex from Cederbaum.

74.    On April 27, 2007, Student's mother revoked her consent for the District to contact Dr. Cederbaum. The reason stated in counsel's letter was that the District had "misrepresented the facts of this case, as well as the contents and quality of the District's various offers for [Student's] placement and services...." During the hearing, Dr. Taras denied that any such misstatements were made.

75.    On May 2, 2007, the parties held an IEP meeting to discuss Student's ESY placement for the 2006-2007 school year. Dr. Taras prepared a draft of a health care service plan for Student, but was unable to finalize it, because he still needed specific information regarding how much Phenex formula Student was taking during each G-Tube feeding and he needed to know which school Student would be attending. After the meeting, the District sent another medical assessment plan to Student's parents. Counsel's letter explained that

---

[11]  Phenex 2 is the type of PHE-free formula used in Student's G-Tube feedings.

this new assessment plan was not precisely the same as the November 21, 2006 assessment plan to which Student's mother had consented.

76.    On June 28, 2007, Student's counsel sent a reply letter questioning whether a medical assessment was necessary in light of the documents which the District subpoenaed in connection with this administrative hearing. The District sent a responsive letter on July 2, 2007, explaining that the District needs current doctors' orders before providing services, and needs authority to discuss any questions regarding those orders with the physician. If the parent will not provide the releases, then the District needs an assessment.

77.    On July 17, 2007, Student's counsel wrote back explaining that Student's mother would sign releases "now that the due process proceeding is drawing to a close and the District cannot use information obtained from [Student's] physicians against [Student's parents] in the proceeding…."

78.    The evidence supports a finding that, at all times, the District was aware of the four health needs of Student – his PKU/dietary needs, G-Tube feeding, seizures and osteoporosis/osteopenia. These basic health needs did not change as the 2006-2007 school year progressed and there was no need for additional medical testing or assessments to determine if Student had those needs. Instead, what the District required was current medical information from Student's doctors regarding the details of Student's treatment – things such as the time of Student's G-Tube feedings each day and the amount of Phenex formula in each feeding. Those matters should have been obtained through medical releases signed by Student's mother and orders provided by the doctors. The limitations on the releases by Student's mother and refusal to provide releases hampered the District's efforts to prepare a health plan, but did not invalidate the District's prior assessment.

79.    The District's subsequent assessment plans to conduct independent health assessments in November and May do not change this. As Dr. Taras explained, the District only made those offers because of the complaints by Student's mother that the District could not keep her child safe at school. They wanted an outside opinion about whether it was safe. While there was nothing improper about the District's wish to satisfy parental concerns, it was not necessary for the District to do so in order to understand Student's health needs.

80.    The evidence does not support a finding that the District denied Student a FAPE during the 2006-2007 school year by failing to assess Student in the area of health, including dietary needs.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student's behavioral needs and failing to develop an appropriate behavior plan?*

81.    There is no dispute that Student has behaviors which impede his learning. Both the August 30 and December 4 IEPs contain behavior support plans designed to address Student's behavioral needs. However, Student contends that the behavior support plans developed by the District were not sufficient to address Student's behaviors. Student

19

contends that the District should have conducted a Functional Analysis Assessment (FAA) and prepared a Behavior Intervention Plan (BIP). A district is supposed to develop a BIP when a child exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives in his IEP. Serious behavior problems include those which are self-injurious, assaultive, cause serious property damage, and other severe behavior problems that are pervasive and maladaptive for which the instructional/behavioral approaches in the child's IEP are found to be ineffective. In order to develop a BIP, a district must first conduct an FAA. An FAA is conducted when the IEP team finds that the instructional-behavioral approaches in the IEP have been ineffective.

82.    Student's behaviors which impede his learning include difficulty sustaining attention, making "decontextualized comments" such as silly talk or growling, and eloping (leaving the instructional area or remaining in the bathroom for an extended length of time). He also engages in behaviors such as rubbing his eyes when frustrated or overwhelmed, hitting his head with his hand, hitting his head on objects, and hitting objects. These behaviors were recorded in the District's behavior support plan (BSP) in the two IEPs, and the BSPs were designed to address those behaviors.

83.    Student's experts do not dispute that Student engages in these behaviors or that the BSP accurately lists them. Student's psychoeducational expert Dr. Patterson agreed that the predictors of the behaviors in the BSPs were in part correct, although he believed that additional things could have been added. However, Patterson was concerned that the BSPs did not include any baselines for behaviors and believed that an FAA was necessary to establish those baselines. For example, he explained that the BSPs talk about eloping behavior but did not specify when that eloping behavior occurred – did it occur when Student was engaged in preferred activities? In his opinion, Student exhibits self-injurious behaviors such as hitting his head when frustrated, which require an FAA. He does not believe that an FAA is restricted only to those situations in which a child is exhibiting self-injurious behaviors, but can be used any time a District wants to find out what the baseline is for the behavior.

84.    The District witnesses were consistent in their testimony as to the thoroughness of the District's behavioral assessment and the appropriateness of the BSPs. Michele Bronson, the school psychologist for the District who conducted the social emotional portion of the triennial assessment, has conducted thousands of assessments of Students and done about 20 FAAs. She testified as to the appropriateness of the triennial assessment and Student's needs in social/emotional areas. Although she had previously recommended an FAA in 2005 (prior to her assessment of Student), once she conducted her 2006 assessment and reviewed the behaviors he exhibited, she did not believe an FAA was necessary. She explained that the two BSPs contained no baseline for behavior because the District personnel would have to gather that information in the new school setting. Even Dr. Patterson admitted that the District could not obtain baselines for Student's behavior in a classroom until Student was actually in a classroom setting.

20

85.    Mathew Howarth, a District employee who supervises the District's applied behavior analysis (ABA) program, agreed that there was no need for an FAA. He explained that a District looks at the frequency, intensity and duration of behaviors in order to determine if an FAA is necessary. In this case, frequency and duration were never an issue, and there was no indication that intensity was a problem. Behavior must be severe before an FAA is warranted. There was no severe behavior by Student. A BSP must include descriptors of the behaviors, level of frequency of the behaviors, predictors, environmental factors, behaviors that need to be taught to the Student and reactive strategies. The August 30 BSP and the December 4 BSP contained all of these elements.

86.    Student's OT expert Christian Vinceneux felt the District's assessment and resulting BSP in the August IEP were flawed because they did not take in account the motor deficits that affect Student's behaviors. Instead, the District's BSP was based on sensory and avoidance behaviors. In his experience, Student's behavior and attention issues were, at least in part, motor based. A BSP which focused solely on sensory and avoidance issues would not be sufficient to address those issues.

87.    Student's motor problems include things such as his difficulty holding a pencil and writing words, getting dressed or using fine movements to pour his Phenex formula. In Vinceneux's opinion, what appears to be avoidance behavior by Student, such as putting his head down on the desk, may instead by caused by fatigue due to his motor difficulties. Vinceneux believes that different approaches are necessary to address Student's behavior issues depending on the cause.

88.    Vinceneux assisted the District with the development of the BSP in the December 4, 2006 IEP. At his urging, sensory-motor factors were placed into that BSP and he believed the December 4 BSP was sufficient to address those issues.

89.    Vinceneux's opinion is not sufficient to invalidate the August 30 BSP. Even if Vinceneux was correct that some of Student's behavior was caused by motor problems, the majority of evidence at the hearing pointed to sensory and avoidance issues as being the primary basis for Student's behavior problems. An ACES report sent to the District around the time of the August 30 meeting stated that "the function of all these behaviors appears to be primarily escape or avoidance."

90.    Part of Vinceneux's opinion was based on his determination that a "token" system in which Student was given rewards for on-task behavior was not entirely effective with Student. However, the evidence at hearing showed that Student did respond favorably to a token reward system. Many of the NPA reports affirmed that a token system was effective with Student. Dr. Patterson testified that Student "works for reinforcement" and was on a "reinforcement paradigm" using a reward system during Patterson's testing.

91.    A comparison of the August 30 BSP and the December 4 BSP shows that there were few differences in the actual interventions proposed regarding the behaviors. Mathew Howarth explained that the differences between the two were not substantive. The additional

21

information regarding motor deficits provided extra details regarding the hypotheses of what led to Student's behaviors, but was not necessary for an adequate behavior plan. Vinceneux's testimony is not sufficient to show that the August 30 BSP was inappropriate.

92.     Student also challenges the District's BSP based on a letter from ACES dated September 13, 2006, in which Nicole Luke states that the BSP misrepresented the information provided in the ACES report. However, that letter did not elaborate on the nature of the misrepresentations. During the hearing, Luke explained that her concerns had to do with the numerical data that ACES had collected which she thought would be helpful to include in the BSP. However, she could not state whether the failure to include that data affected the August 30 BSP. She also could not give an opinion as to whether Student's mother should have accepted the BSP. A review of the August 30, 2006 BSP shows that it incorporated much of the information and strategies listed in Luke's report.

93.     The parties dispute whether Student's behaviors are self-injurious to the extent that an FAA is necessary. Although ACES dutifully recorded incidents of eye rubbing and Student hitting his head, they seemed to be mild incidents which were easily handled by ACES staff. Luke, the ACES representative who testified at the hearing, stated that she would not classify Student's eye rubbing as self-injurious. ACES did not find his other behaviors (hitting his head, etc.) to be severe in a home environment. ACES never needed to use any type of restraint to stop Student's behaviors, but could simply redirect him by giving him a break, such as stretching or taking a walk.

94.     Dr. Patterson's own experience with Student demonstrates the mild nature of Student's behavior problems. During his assessment of Student, he was able to divert Student from hitting his head with his hand, merely by stating "we don't do that" and moving Student's hand. He gave no indication that Student repeated his conduct after Patterson's comment.

95.     The evidence does not support a finding that Student engaged in self-injurious behaviors of the type or extent that require an FAA. Dr. Patterson is a highly qualified and credible witness and he does believe strongly that Student requires an FAA. However, there are factors which lessen the persuasiveness of his testimony on this occasion. Dr. Patterson based his opinion, in part, on mistaken information. For example, he believed that Student had been expelled from his summer 2006 placement at Coronado Academy because he was a "basket case." There was no evidence whatsoever that Student had been expelled from Coronado for that reason or that Student had exhibited such extreme behaviors as to classify him as a "basket case" while at Coronado. Sheila Doctors, who observed Student at Coronado testified that he had good days and bad days while he was there. Although Students behavior problems did escalate during the time he was at Coronado, his one-to-one aide was able to redirect him by giving him breaks.

96.     The District witnesses, on the other hand, were consistent in both their testimony and their findings. Student failed to meet his burden to show that the social/emotional assessment and resulting BSP prepared by the District were inappropriate.

Student has failed to show that an FAA was required or that the District failed to properly assess Student with respect to behavior.

*Did the District violate IDEA by failing to reimburse Student's parents for the Independent Educational Assessments (IEEs) obtained by the parents, as requested by Student's mother at the October 9, 2006 IEP meeting?*

97.    In October 2006, Student's mother expressed dissatisfaction with the District's assessment and requested that the District fund independent educational evaluations (IEEs). In response to the District's request for additional information regarding her request, her counsel sent a letter of clarification on November 15, 2006. The District denied that request and filed for due process to defend its assessments on November 29, 2006.

98.    As stated above in Factual Findings 1-96, the District's assessment was valid and addressed all of Student's areas of unique need. As set forth in Legal Conclusions 12-13, if a District's assessment is upheld in a due process hearing, the parent is not entitled to an independent assessment at public expense. Student has failed to meet his burden of showing that the District violated IDEA by failing to reimburse Student's parents for the IEEs that the parents obtained.[12]

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have an IEP in place at the commencement of the school year on September 5, 2006?*

99.    Student contends that the District denied Student a FAPE by failing to have an IEP in place at the commencement of the 2006-2007 school year. The law requires a school district to have an IEP in effect for each individual with exceptional needs within its jurisdiction at the beginning of each school year. An IEP meeting must be held at least annually to review the Student's progress.

100.    As discussed in Factual Finding 10 above, prior to July 17, 2006, Student was being educated in a home program, with various services provided by NPA providers. At the time of the triennial assessment in June and July 2006, Student and the District began discussions to try to find an appropriate school placement for Student.

101.    During these discussions, the parties had an informal agreement that IEP discussions would be handled in the following manner: The District would draft a proposed IEP, which would be forwarded to Student's counsel for review. Student would suggest changes to that IEP document. The District would make revisions and return the revised document to Student's counsel. Eventually, if the Student approved of the draft IEP, the parties would meet at an IEP meeting to finalize and sign the IEP document.

---

[12] For this reason, it is not necessary to address the District's contention that some of the IEEs obtained by the parents were not true assessments but were instead records reviews done by expert witnesses in preparation for this litigation.

102.    Student's last agreed-upon and implemented IEP was signed on July 17, 2006. It was agreed upon using the informal IEP procedure discussed in Factual Finding 101, and provided placement, services, and goals for Student for the extended school year (ESY) session of the summer of 2006. The IEP placed Student in a non-severe special day class (SDC) at Coronado Academy. Coronado Academy is a public school, but is not part of the San Diego Unified School District. Student was permitted to attend Coronado Academy through an inter-district agreement. The IEP called for Student to attend the SDC class 20 hours per week, along with a continuation of some of his NPA services.

103.    At the time Student began at Coronado Academy, there were only 12 days left for the ESY summer session, but Student would not be attending on the final day, because of a personal commitment. The IEP team agreed that after the end of Student's 11-day program, Student would return to his home program, with services provided by NPA providers. The IEP also provided which of those services would constitute "stay put" in case the parties were unable to agree upon an IEP for the 2006-2007 school year.[13]

104.    Student attended the Coronado Academy for only five out of the 11 days anticipated in the IEP. On the fifth day, July 26, 2006, Coronado Academy asked Student to leave the program. Student's termination from Coronado has already been litigated by the parties before the California Department of Education (CDE) and is not at issue in this proceeding. Student's current due process claims relate to the events which occurred after Student's termination from Coronado Academy.

105.    The District personnel were shocked by Coronado's termination of Student's placement. Prior to July 26, 2006, the District had hoped that Student would continue to attend Coronado Academy after the start of the new school year. After the termination, District personnel immediately contacted Student's NPA providers to allow the "stay put" home program to begin early. Then the District began to look for another appropriate school placement for Student.

106.    During the July 17, 2006 IEP meeting, the parties agreed to meet again at an IEP meeting prior to August 31, 2006, to determine Student's placement and services for the 2006-2007 school year. On July 28, 2006, the District's counsel sent a letter to Student's counsel proposing August 25 and August 30 as possible IEP meeting dates. Toward the end of July, the parties exchanged a series of emails discussing meetings dates. Student requested a meeting date in mid-August, but the District explained that a late August date was necessary to give the District time to prepare and send a draft IEP to Student's counsel in accordance with the parties' informal agreement. District's counsel asked via email for Student's availability for an IEP meeting during the last week of August, and Dona Wright, a paralegal working for Student's counsel, replied that she was available that entire week.

---

[13]    The specific DIS services called for in the July 17, 2006 IEP and the subsequent "stay put" placement are discussed below, in connection with Student's contentions that the District failed to provide the stay put services called for in that July 17, 2006 IEP.

Wright planned to attend the meeting instead of Student's attorney, because of the attorney's other commitments.

107.    On August 1, 2006, Wright informed the District personnel via email that Student's mother would not agree to another school placement until she could see the classroom in session during the school year. In addition, Student's mother wanted all the NPA providers who were currently providing Student with services to attend the IEP meeting.

108.    The District personnel attempted to prepare a draft IEP to send to Student's counsel in advance of a late August meeting in accordance with the parties' informal agreement. However, the District staff was hampered by the need to find another placement on short notice after Student's termination from Coronado Academy while at the same time trying to respond to the CDE litigation brought by Student regarding the Coronado termination, trying to get input from the NPA providers on the proposed IEP, and trying to respond to Student's correspondence. In addition, because it was the summer, some District staff members were on vacation.

109.    On August 22, 2006, the District sent written formal notice of an IEP meeting set for August 25, 2006. The District had arranged with Student's three NPA providers to attend the meeting as the parents requested. Student's mother and Dona Wright were also scheduled to attend the meeting.

110.    On August 23, 2006, Student's counsel sent a letter to the District. Counsel complained about the short notice for the meeting and about the fact that counsel had not yet received a draft copy of the proposed IEP. He stated, "I have advised [Student's mother] to not sign the IEP meeting notice, dated 8/22/06, in order to reserve her rights regarding the scheduling of this IEP meeting."

111.    On the afternoon of that same day, the District's counsel sent a letter by fax explaining that the District still intended to send Student proposed goals and services for review prior to the meeting, and might have to push the meeting back to the following week to permit sufficient time for review. The following day, August 24, 2006, the District's counsel sent another letter explaining that they would be sending a draft of the proposed IEP by August 25, and would move the meeting to August 30, 2006, to give Student time to review the draft IEP.

112.    After receiving the District's August 24, 2006 letter, Student's counsel sent an email that same day, insisting that the District "provide a written, complete draft IEP, not just goals and objectives." The letter went on to state:

> After we have reviewed the draft IEP, and assuming that we are close, we will respond, and then an IEP can be scheduled. As previously indicated, we will advise our client not to attend an IEP unless the District arranges for [Student's] current service providers to be present. If the District cannot

comply with this simple and very reasonable request, the District can hold an
IEP without [Student's] mother or his counsel, and then send us a copy for our
review.

The letter went on to state that Sierra Academy, the placement the District was
considering at that time, was of concern to Student's mother, because of bad experiences she
had had in the past at that school with Student's brother. The email also confirmed that
Student's mother wished to visit any proposed placement while school was in session before
agreeing to the placement.

113.    On August 25, 2006, the District sent Student's counsel a draft copy of the
proposed IEP for the 2006-2007 school year. On August 29, 2006, the District followed up
with a draft of a proposed transition plan to accompany the August 25 IEP offer. The
District's letter accompanying the transition plan requested feedback regarding the August
25 IEP proposal.

114.    On August 29, 2006, the District faxed formal notice of an August 30, 2006
IEP meeting to Student's mother. Student's mother signed the notice and faxed it back the
same day. Student's mother checked the box on the notice form that stated: "I will not attend
the meeting; hold the meeting without me." Student's counsel sent an email with the notice
explaining that Student's parents and the NPA providers would not have sufficient time to
review the draft IEP prior to the meeting and the NPA providers were not available for the
meeting. Student's counsel told the District to go ahead with the meeting without the parents
and send the final IEP developed at the meeting to Student's counsel for review after the
meeting was over. Counsel once again stated that Student's mother wanted to see the
proposed Sierra Academy placement while school was in session before she agreed to any
placement. The letter stated: "We believe that because school is just starting at Sierra
Academy, on [sic] observation should be scheduled for a date when the teachers and the
students have had some time to settle into their routines."

115.    On August 30, 2006, the District held the IEP meeting. There was no
appearance at the meeting by Student, his parents or their counsel. A representative from
Student's NPA speech/language provider was in attendance at the meeting. The other two
NPA providers did not attend the meeting, although the District had invited them to attend.
The District staff and the NPA provider in attendance at the meeting reviewed the proposed
placement, services and goals set forth in the draft IEP and made minor revisions to some
portions of the draft IEP in accordance with the discussions at the meeting.

116.    On September 6, 2006, the District's counsel sent a letter to Student's counsel
describing the minor revisions that had been made to the proposed IEP and enclosed a
complete copy of the IEP with the changes highlighted. The document was called a "draft"
because the District still anticipated that Student's counsel would propose changes to the IEP
which the parties would discuss in accordance with their informal agreement. However,
despite the designation of the document as a "draft," it was a complete IEP proposal. Had

26

Student agreed to the proposal, the District would have been prepared to provide services in accordance with its terms.

117.    The evidence does not support a finding that the District violated IDEA by failing to have an IEP in place at the commencement of the school year on September 5, 2006. To the contrary, the evidence shows that the District sent Student a draft IEP prior to August 30, and then held an IEP meeting on August 30. Student refused to participate in the IEP meeting on August 30, 2006, and insisted that the District go ahead with the meeting in Student's absence rather than rescheduling the meeting. Student refused to sign any IEP until Student's mother had a chance to review the proposed placement *after school was in session.* While it is understandable that Student's parents might wish to view a placement after school had begun, Student's choice to visit the proposed placement after school began made it impossible for the parties to agree on a proposed placement prior to the start of school.

118.    Although the parties had an informal arrangement in which the District would send a draft IEP to Student for review, there was no legal requirement for the District to do so. The District's failure to send a draft IEP to Student's counsel in mid-August was based on circumstances beyond the District's control, including the unexpected termination at Coronado, the scramble to find another appropriate placement, the need to deal with the CDE complaint, and the need to address the issues set forth in the lengthy correspondence from Student about the triennial assessment. Further, even if the District had prepared the draft IEP earlier, Student's parents still would not have signed it until they could view the placement after school had begun. Any failure of the District to have an IEP in place by the start of the school year was caused as much by the choices of Student's parents as by the District's delay in preparing a draft IEP.

119.    Student also contends that the August 30, 2006 proposal was only a draft and not a final IEP proposal, so the District missed the deadline for creating a proposal. That contention is not well taken. The District called its document a draft because the District hoped to receive input from Student's parents. The District was trying to cooperate with the parents even after the parents refused to participate in the IEP meeting. There was nothing wrong with that, and the label given to the document did not change the fact that it was a full IEP proposal that the District was prepared to implement if and when it was signed. There was no procedural violation by the District.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have appropriate team members – including Student's parent(s) – at the IEP meeting convened on August 30, 2006?*

120.    According to the special education law, an IEP team must include, among other people, the parents of the child and a regular education teacher of the child if the child is or may be participating in the regular education environment. As stated above in Factual Finding 114, Student's mother signed the IEP notice for the August 30, 2006 IEP stating that

she would not attend the meeting and that the District should go ahead with the meeting without her.

121.    Student's mother, on advice of counsel, chose not to attend the IEP meeting and directed the District to finalize the IEP proposal without her. She did not request to reschedule the meeting, nor did she indicate she would attend a meeting if rescheduled. As discussed in Legal Conclusions 20 - 23, although the law requires school districts to go to great lengths to ensure parental attendance at IEP meetings, those laws are designed to protect unrepresented parents who do not fully understand the importance of their participation in the IEP process. They were not designed for a parent who chooses, on advice of counsel, not to participate. These laws are not intended to be a "trap" for a district which relies on a letter from a sophisticated parent instructing the district to hold the meeting without her. There was no procedural violation by the District because the District chose to go forward with the meeting under these circumstances.

122.    There is a factual question as to whether a general education teacher attended the August 30, 2006 IEP meeting. No individual signed the attendance sheet of the IEP in the capacity of a general education teacher and the IEP itself indicated that a general education teacher was "not needed." During the hearing, MarySue Glynn testified that more than one person in attendance at the meeting was trained as a general education teacher and could give input to the IEP team regarding the possibility of a general education placement.

123.    However, it is not necessary to resolve this factual dispute for purposes of this Decision, because even if there was no general education teacher at the August 30, 2006 IEP meeting, there was still no violation by the District. As of August 30, 2006, no one believed that Student would be capable of moving into a general education program. Student had been out of school in a home program for approximately three years and was far behind his grade level in reading, writing and math. His placement at Coronado had been in an SDC, not a general education classroom, and his proposed placement on August 30, 2006, was in an SDC. Even the IEP four months later in December 2006, which proposed a comprehensive campus placement for Student, proposed that Student start in an SDC, and then gradually transition to collaborative education classrooms (taught by a combination of general and special education teachers) only after it was determined how well he tolerated an SDC. Student's experts testified at hearing that Student was not ready for a general education classroom in any fashion. Based on the information that the District had on August 30, 2006, there was no indication that Student would be participating in the general education environment. There was no procedural violation.

124.    In Student's written closing argument, Student also contends that the IEP was inappropriate because two of Student's NPA providers were not present. An IEP meeting may include personnel who provide related services to a student or other individuals when appropriate. However, the law does not mandate their attendance. The District had a full assessment of Student at the time of the August 30, 2006 IEP meeting and numerous reports from the NPA providers. The evidence does not support a finding that the District committed a procedural violation by holding a meeting without the NPA providers.

125.    The August 30, 2006 proposed IEP called for Student to be placed at Sierra Academy, a nonpublic school (NPS). Student contends the IEP meeting violated the law because no representative of Sierra Academy was at the meeting. If a District is proposing a private placement, the District should have a representative of the private school at the meeting or in contact with the IEP team by telephone or other means.

126.    Sheila Doctors testified that a representative of Sierra Academy was invited to attend the IEP meeting, but did not attend. The District did not contact the Sierra representative by telephone during the meeting, but the District personnel in attendance at the meeting were well aware of the programs and services offered at Sierra Academy and could address those services at the meeting. As discussed in Legal Conclusions 24-25, even if there was a procedural violation in this regard, it did not cause a denial of FAPE.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose an appropriate placement for Student in the August 30, 2006 IEP?*

127.    The August 30, 2006 IEP proposed that Student be placed in an SDC at Sierra Academy for 30 hours per week, with 90 minutes per week of speech/language services, 90 minutes per week of occupational therapy, 30 minutes per week of physical therapy and 8 hours per year of health nursing services. The nursing services consisted of three hours of training for the Sierra staff related to Student's health needs and five hours of consultation as needed. There was also training/consultation time included for assistive technology, consultation time for speech/language, occupational therapy and physical therapy, and ABA services and supervision provided by Resources for Students with Autism, a District program.

128.    Sierra Academy has approximately 40 students on the campus. Student would be in a middle-school group of approximately six to 12 pupils, but his classes would be limited to about six pupils. All pupils bring their own lunches to the school. Although the campus does not have any other pupils with PKU, they do have other pupils with dietary restrictions. The program proposed for Student would call for collaboration by the various DIS providers with the classroom teacher, and each pupil on campus has access to computers and assistive technology. Student would have a one-to-one behavior support aide to assist him for at least the first three months of his time at Sierra.

129.    The evidence supports a finding that placement in an SDC was appropriate to meet Student's unique needs as they were understood on August 30, 2006. Both the District's and Student's expert witnesses raised concerns about Student going into a general education classroom on a comprehensive campus after three years of home schooling. All the experts agreed that Student needed a smaller, structured environment in which to learn. Both parties also agreed that Student should be in some type of school environment rather than his home school.

29

130.     The parties stipulated that all District witnesses would testify that the District's proposed August 30, 2006 IEP offered Student a FAPE. Implicit in that stipulation is the finding that the District witnesses were all of the opinion that the Sierra SDC was the appropriate placement for Student as of August 30, 2006. Student's goals and objectives from the proposed August 30, 2006 IEP could be implemented at Sierra and Student could make educational progress there.

131.     Student's experts, on the other hand, disagreed with each other about what would be an appropriate placement for Student. Student's NPA providers questioned whether Student could make educational progress in a small classroom and testified that Student needed one-to-one teaching in order to learn. However, Student's expert Dr. Patterson testified unequivocally that the only appropriate placement for Student at this point was a small, structured SDC with plenty of support. Student's unique needs require him to be in a classroom with other children to develop the social skills he lacks.

132.     The evidence supports a finding that Student's goals and objectives could be implemented at Sierra and that Student could make educational progress there.[14] Dr. Patterson's testimony and the stipulated testimony from the District's experts are persuasive in this regard. Some of Student's goals and objectives relate to social skills, which cannot be dealt with in a one-to-one situation. The NPA providers who testified that Student could only learn through one-to-one instruction each focused on the narrow fields in which they provide services, not on Student's needs as a whole. To the extent that Student needed one-to-one assistance, Student would have a behavioral aide to assist him.

133.     Student is correct that the IEP could be more artfully worded in terms of the one-to-one aide services that would be available to Student. The IEP states the following regarding aide support: "In class support daily 9/5/06 – 12/15/06 then reviewed, until data indicates fading support. Data to be reviewed at monthly collaboration meetings." There are no specific hours for aide services listed on the cover page of the IEP. However, the District witnesses testified that the intent was to have a one-to-one aide with Student at all times during the first three months of his time at Sierra. If Student's only objection to the IEP was lack of clarity about the aide services, that could have been cleared up by attending the August 30 meeting or sending a letter.

134.     Student's mother testified that, during her visit to Sierra, she was informed that one-to-one services were not available for any children there, but her testimony does not prove that a one-to-one behavioral aide would not have been provided by the District. The evidence indicates that Student's mother had already made up her mind to reject Sierra before she even visited the facility. Her attorney's letter sent prior to the August 30 IEP meeting stated that she had had problems with Sierra with one of her other children. Sheila Doctors reported that Student's mother told the Sierra representatives when she arrived for the site visit that she had no intention of letting her child attend Sierra. Instead, she made the site visit to talk about possible placement for other disabled children for whom she acts as a

---

[14] The specific goals and objectives proposed in the August 30, 2006 IEP are discussed below.

special education advocate. The evidence does not support a finding that the one-to-one aide services called for in the August 30 IEP would be unavailable if Student attended Sierra.

135.    Student contends that the Sierra Academy was not an appropriate placement for Student because of the stairs on campus and because the campus has no full-time nurse or nursing office. The Sierra Academy is located in a facility that used to be a church and has a long row of stairs that leads up to the classrooms. There is no elevator to allow access between the levels.

136.    The parties dispute whether Student has difficulty climbing and descending stairs. When the District staff conducted their assessments of Student, they observed that Student was able to climb stairs with no apparent fear or difficulty. Christian Vinceneux, student's NPA occupational therapist, on the other hand, noted that Student is nervous about descending stairs. He did not believe it would be safe for Student to climb or descend stairs at Sierra Academy when there are a lot of other students on the stairs at the same time.

137.    The evidence does not support a finding that the presence of stairs made the Sierra campus inappropriate for Student. As stated in Factual Findings 7-8, above, the parties dispute whether Student has osteoporosis or osteopenia sufficient to make it dangerous for him to climb stairs. However, the August 30, 2006 IEP offer must be evaluated in light of what the District knew at that time. At the time of that IEP meeting, the only report that the District had was Dr. Dewan's report stating that Student had osteoporosis and osteopenia. But the District's knowledge of Dr. Dewan's report does not change the appropriateness of the placement as of August 30, 2006. Even if the District believed that Student had osteoporosis/osteopenia and was uncertain when climbing stairs, the August 30, 2006 IEP called for Student to have a behavioral aide assigned to him during his first three months at Sierra. After that first three months, the need for the aide would be reviewed. That aide would be able to assist Student on the stairs and prevent other students from jostling him or frightening him.[15]  There was no danger to Student.[16]

138.    The evidence also does not support a finding that the lack of a full-time nurse or nursing office on the Sierra campus would make it an inappropriate placement. The IEP called for the District's nurses to provide training for all the Sierra staff regarding Student's dietary restrictions and G-Tube feedings. Although the evidence was undisputed that Student needs adult supervision for his G-Tube feedings, there was no evidence that the supervision must be provided by a registered nurse. For example, as discussed in Factual

---

[15]  Patricia La Bouff, the District's PT expert, testified that she is familiar with Sierra and that there are seldom more than five or six pupils on the stairs at any time. However, even if all 40 of Sierra's pupils ran down the stairs at the same time, Student's aide would be there to protect Student from being jostled by other children.

[16]  It is also interesting to note that the initial report issued by Student's psychoeducational expert Dr. Patterson in May 2007, reported on Student's history that, "He has no difficulty with climbing stairs and falls appear to no longer be an issue." Dr. Patterson later corrected that report at the request of Student's mother to state that Student "has difficulty descending stairs."

Finding 236, the District has two classifications of special education technicians that can provide assistance with G-Tube feedings. If Sierra did not have appropriate personnel to assist with the feedings, the District could have provided that personnel. There was evidence that Student occasionally experiences nausea after his G-Tube feedings and must lie down, but there was no evidence that Student required a trip to the nurse's office when that happened. Student's NPA providers testified that there had never been a medical emergency or need to call in health care personnel at any time while they were providing services to Student. Student presented no evidence to show that Sierra Academy was completely devoid of rooms where a child could sit or lie down if not feeling well. The District's failure to specify who would be providing the G-Tube services at Sierra in the IEP was a problem, but that issue will be discussed below in connection with Issue 14 involving the failure to have an appropriate health plan.

139.    Student raised the issue of the Sierra placement and has the burden of proof on the issue. Student has failed to meet his burden. The evidence does not support a finding that the proposed placement in the August 30, 2006 IEP was inappropriate for Student.[17]

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose appropriate goals and objectives in the August 30, 2006 IEP?*

140.    Student also contends that the goals and objectives in the August 30, 2006 IEP were not appropriate for Student. The law requires an IEP to include a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the disability to enable the child to be involved in and make progress in the general curriculum and meet the child's other educational needs that result from the child's disability. The IEP must include a description of the manner in which the progress of the child toward meeting the annual goals will be measured. As more particularly set forth in Legal Conclusions 32-35, the law does not require perfection in goals, nor does it require adherence to the rigid structure of a mathematical calculation. Goals are simply a way to determine whether a Student is making educational progress.

141.    The proposed IEP dated August 30, 2006, contained 26 annual goals for Student. The goals were designed to address areas of need including reading comprehension, mathematics, gross and fine motor skills, self-help skills, behavior, and social skills.

142.    As stated in Factual Findings 27-30, Student's needs in the area of reading comprehension involve the ability to go beyond the literal text to make inferences and determine the main idea of the story. The District's reading goals in the IEP focused on the

---

[17] Student's due process request also raised the curious assertion that the District's later IEP offers, which proposed a different placement for Student, proved that "the District itself recognized that the proposed placement at Sierra was not appropriate for Student." Student's position is not well taken. The changes in the District's offer after August 2006, were due to discussions with and input from Student's parents and the NPA providers. The District's good faith effort to work with the parents as part of the IEP process did not constitute an admission of prior wrongdoing. Just because one placement is appropriate does not automatically mean that all other placements are inappropriate.

need for Student to draw inferences in text and to learn to address words with multiple meanings in the context of a story.

143.   The August 30, 2006 IEP also contained goals that addressed Student's unique needs with respect to writing and written expression. These goals involved skills related to outlining and writing compositions with proper organization.

144.   Student's unique needs with respect to mathematics were addressed with goals involving word problems requiring addition, subtraction, multiplication or division, knowledge of graphs and money, fractions, and decimals.

145.   The IEP also contained goals to address Student's behavioral, social/emotional, and speech/language needs. These included teaching Student to ask for breaks and use "self-advocacy" strategies when he became stressed, to self-monitor completion of tasks, to communicate his personal needs, to tell a cohesive narrative about his personal experiences, to read "nonverbal" cues of a listener in a conversation and modify his behavior accordingly, to maintain a relevant topic while engaged in conversation with a small number of peers, to follow multiple-part directions in a classroom setting, and to respond appropriately to negative peer behavior.

146.   Student's OT and APE needs were addressed through goals designed to help Student improve his motor skills and core strength. These goals included tasks such as typing, using handwriting for functional tasks, eating properly with utensils, maintaining an upright posture at this desk, throwing a ball properly, performing push-ups, and dribbling a basketball.

147.   The parties stipulated that all District witnesses, if called to testify on direct examination, would testify that the goals in the proposed IEPs were appropriate at the time proposed, were measurable, and addressed all areas of need. Based on this stipulation, it is unnecessary to recite the testimony of each District witness regarding the goals in this Decision. Instead, it is appropriate to look at the criticisms specifically raised by Student.[18]

148.   Student contends that the "baselines" for most of the goals were improper. Student believes that goals must have "baselines" containing quantitative data in order to be measurable. However, as set forth in Legal Conclusions 32-35, there is no requirement in law for baselines containing "quantifiable data." The goals properly describe the level at which Student is functioning at the time of the IEP. The various objectives state measurable methods for determining Student's progress toward his goals and the goals themselves contain standards to determine if they have been met. The evidence supports a finding that the goals set forth in the August 30, 2006 IEP were measurable, were designed to address Student's unique needs and were designed to help him make educational progress.

---

[18]   Because Student is challenging the goals in the August 30, 2006 proposed IEP, Student has the burden of proof on that issue, even without the stipulation.

149.    Student also raises criticisms to specific goals. Student's reading expert Lynne Thrope raised objections to the reading and writing goals (goals one through seven and fifteen). She found goal one difficult to understand because it refers to two types of text (narrative or expository) and two types of procedures (listening and reading). She had the same problem with goals two through five, because they included "narrative or expository" text. She thought the goals should have been split into two separate goals. She objected to the statement in the baseline of some of the goals that Student read "instructionally at the 4th-6th grade level…." She believed that because a specific grade level was not stated, it was not clear which grade level content standards would be used in teaching Student. She felt that goal seven was not appropriate for Student because of his autism – autistic children have difficulty with point of view. She objected to goal 15, because cursive writing was difficult for Student and he had the aid of a computer. She also criticized the goals because they did not cover all areas of Student's needs. She created her own goals when she worked with Student.

150.    Student's speech/language expert Joanne Hein disagreed somewhat with Thrope with respect to goal one. She stated that a speech/language pathologist will sometimes put listening and reading into a single goal, but she was concerned about putting them together in one goal unless a speech/language pathologist was involved. She objected to goal three because she did not believe Student had the ability to make inferences. She also felt there was no baseline to determine where he started, so it was hard to measure his progress.

151.    The testimony of Christian Vinceneux, the OT from the NPA who worked with Student, was also somewhat at odds with Thrope's opinions. He objected to goal 15 because Student had already met that goal.

152.    Student has not met his burden of proving that goals one through seven and fifteen were inadequate. While Thrope may have preferred to split goals to make them more specific, combining narrative and expository text did not make the goal confusing or prevent it from being measurable. Even Student's speech/language expert admitted that listening and reading goals are sometimes combined together. The statement in the baseline that Student reads at the 4th-6th grade level instructionally did not make the goal improper – it was clear that Student's instruction would start at the 4th grade level. Thrope's criticisms that cursive writing and point-of-view narratives would be hard for Student do not make the goals improper. The point of the goals is to help Student make progress. Goal 15 only talks about having Student use cursive writing to fill out a form. Thrope herself found that writing was one of Student's areas of unique need. Thrope's opinion regarding cursive writing is directly contradicted by Vinceneux's testimony that Student had already met goal 15. In light of the disagreement between Student's own experts regarding Student's ability to accomplish goal 15, there was nothing wrong with including it in the August 30, 2006 IEP. If Student had already mastered it, further goals could be drafted.

34

153.    Student's psychoeducational expert Dr. Robert Patterson objected to the math goals in the IEP (goals eight through ten). He said that goal eight was improper because Student did not have the ability to do multiple digit multiplication. He objected to goal nine because the baseline did not match the goal and the goal was compound. However a review of that goal shows that it dealt with activities related to solving math word problems. The baseline activities were related and it was capable of measuring progress. Dr. Patterson criticized goal 10 because Student could not do it and the baseline was not measurable. His criticisms do not invalidate those goals – the point of goals is to push a pupil beyond what he can currently do. If the goals prove to be too hard, they can be modified later.

154.    Student's occupational therapy expert Christian Vinceneux testified regarding the OT goals (numbers 11-19). He believed that goal 11 (regarding the need for breaks) was very complicated and did not address Student's sensory needs. The goal addressed self-regulation, but at times Student's difficulties in performing a task involved motor difficulties, not self-regulation. He objected to goal 12 because there were too many variables and expectations for him to make sense of the goal. He believed that goal 13 was too vague because it did not include the amount of time Student should take to type the information. He objected to goal 14 because it was not specific enough regarding which utensils Student would use with different foods. He disagreed with goal 16 because he did not think Student could achieve it in one year. He thought goal 17 was reasonable, but wanted to make sure the physical activity was permitted by a physician. He believed goal 18 was a reasonable goal. He believed that goal 19 (dribbling a basketball) was inappropriate. Vinceneux also testified that the OT goals did not address postural stability, multisensory processing, safety awareness and body mechanics.

155.    Student has not met his burden of proving that the OT goals in the August 30, 2006 IEP were improper. Despite Vinceneux's concerns about Student's sensory needs, the evidence supports a finding that self-regulation strategies were effective for Student on many occasions. Almost every NPA provider report at one time or another pointed out the effectiveness of a "token" reward system with respect to Student's attentiveness to tasks. Even if goal 11 lacked sensory needs, it was still a proper goal. Likewise, even if the goals did not directly address multisensory processing, they still met Student's basic needs. Vinceneux's criticism of goal 12 is not well taken – although the goal is complicated, it is clear what is being taught and how to measure it. While Vinceneux may have preferred goal 13 to include time limits, there was nothing improper about the goal focusing on accuracy of typing rather than speed. Goal 14 is very specific about the tasks to accomplish – any specifics about which utensil to use with a given food could be addressed by the OT helping Student. Goal 16 dealt with postural stability, which Vinceneux recognized as an area of need for Student. Vinceneux's criticism that Student could not achieve 30 minutes of postural stability in one year did not invalidate the goal. If it was too hard, it could be modified in future IEPs. Finally, the goal regarding basketball was not improper. The goal did not call for full contact basketball with other boys, but simply dribbling a basketball. The evidence indicated that Student enjoyed playing basketball with his brother, so the District would have no reason to believe dribbling a ball would be harmful to him. The physical

35

activity goals dealt with body form and position and were sufficient to address concerns regarding academic instruction in the areas of body mechanics and safety awareness.

156.    Joanne Hein also testified regarding the speech/language and social goals (goals 20-23). She objected to goal 20 because she felt having adults prompt Student about his needs would not develop independence. With goal 21, she objected that a receptive language goal was embedded in an expressive language goal. She objected to goal 22 because she thought they should work on language skills before non-verbal skills. She believed that goal 23 tried to cover too much and the benchmarks did not match the goal.

157.    Robin Lipton, the speech/language pathologist from the NPA who has been working with Student, disagreed with Hein. Lipton testified that the speech/language goals set forth in the August 30, 2006 IEP were appropriate. She said that she read goal number 21 around the time of the IEP meeting and it looked like a good goal to her. She told the IEP team at that meeting that the proposed goals and objectives were appropriate. When Student's counsel specifically asked her about measuring progress from the baselines of the goals, she said she could not, but she later affirmed that the benchmarks and annual goal would let her measure Student's progress.

158.    The evidence does not support a finding that goals 20-23 were improper. Robin Lipton is not a District employee and was working directly with Student. She attended the August 30 IEP and gave input to the team that the goals were appropriate. Her testimony, coupled with the stipulation that the District witnesses would testify that the goals were proper, is strong evidence that they were appropriate.

159.    In his written closing argument, Student contends that goals 24-26 "do not contain any baseline whatsoever." That contention is not supported by a review of the goals. They do talk about where Student is generally functioning in those areas. Any specific percentage data needed will be collected once Student starts school. The benchmarks and the goals themselves are measurable and address Student's unique needs.

160.    On September 13, 2006, Nicole Luke of ACES, one of Student's NPA providers, sent a letter to the District with questions about the proposed goals in the August 30, 2006 IEP, and concerns that Student might not have the skills to master some of them. These questions and concerns, sent to the District after the August 30 IEP meeting, do not invalidate the goals. If the goals proved too hard for Student, they could be modified later.

161.    Finally, Student contends that the August 30, 2006 IEP should have contained goals regarding Student's PKU needs, his retention of primitive reflexes, and goals to remediate Student's auditory processing needs.

162.    As set forth in Factual Finding 37 above, the evidence does not support a finding that direct auditory processing remediation is effective for a pupil of Student's age. Even Atkins' 2005 report recommended accommodations rather than remediation. The August 30 IEP contained numerous accommodations design to address Student's auditory

36

processing needs. The District did not fail to offer a FAPE in the August 30 IEP due to the lack of auditory processing remediation goals.

163.    Likewise, the evidence does not support a finding that the District failed to provide a FAPE because of the lack of goals relating to integration of primitive reflexes. As set forth in Factual Findings 42 – 43, the parties dispute whether Student even has a problem with integration of primitive reflexes and whether interventions designed to integrate primitive reflexes are effective. However, even if Student does have a problem with primitive reflexes and even if interventions are effective, there was no denial of FAPE due to the lack of specific integration goals. Even Vinceneux, Student's OT expert, who opined very strongly about the lack of integration, focused his own OT efforts with Student on core strength and stability first, not primitive reflexes. Dr. Robert Sanet, Student's vision expert, who also testified regarding integration of primitive reflexes, confirmed that Vinceneux's recommendation had been to build up core strength first and that Vinceneux delayed several months before working on primitive reflexes. The August 30 IEP contained postural and exercise goals specifically related to core strength. Any failure to include reflex integration goals did not invalidate the IEP.

164.    Although the August 30 IEP did not specifically contain a goal related to Student's PKU needs or calculating the PHE in foods, it did contain goals related to mathematics and reading, the underlying skills Student needs to accomplish the PHE calculations. Student's expert Dr. Patterson did not believe that Student had the mathematical ability to meet even those basic math goals. In his opinion, student also lacked the underlying mathematical skills necessary for preparing his G-tube formula. While a functional, self-help goal regarding PHE calculations would have been appropriate, the lack of one did not invalidate the District's offer of FAPE in light of the educational areas covered in the August 30 IEP.

165.    Student failed to meet his burden of proving that the goals in the August 30 IEP were improper or failed to address Student's needs.[19]

*Did the District's education programming offer, memorialized in the proposed December 4, 2006 IEP, offer Student a FAPE designed to meet his unique needs and allow him to benefit from his education?*

166.    The District contends that its proposed December 4, 2006 IEP offered Student a FAPE. During the hearing, the parties stipulated that the District witnesses would all testify that the December 4 proposed IEP met all the elements required by law and provided Student with a FAPE. Therefore, it is not necessary for this Decision to consider every element necessary for an appropriate IEP. Instead the Decision will focus on the issues

---

[19] In Student's written closing brief, Student for the first time raises the argument that the August 30, 2006 IEP did not offer the level of DIS services necessary to achieve the goals. That issue was not raised in Student's due process request or at the time of Prehearing Conference. The District was not properly put on notice about this issue and it will not be considered in this Decision.

raised by Student challenging the IEP. As more particularly set forth in Factual Findings 190-241, the District's December 4, 2006 IEP did not appropriately address Student's health needs and did not contain an appropriate transition plan, so it did not offer Student a FAPE.

167.    The evidence supports a finding that, except as discussed below, in all other respects, the District's December 4, 2006 IEP properly offered a FAPE to Student. After refusing the Sierra placement, Student informed the District that Student would be willing to discuss a placement for Student in an appropriate program on a comprehensive District campus, rather than a private school. The District complied with that request by developing a program for Student at Wangenheim Middle School, a comprehensive middle school campus within the District. The District's proposed program called for Student to be educated in SDC classes for English, reading, and math, in a collaborative science class taught by a general education and special education teacher, and a co-taught world history class taught by a general education and special education teacher.[20] Student's parents objected to Student receiving "pull-out" DIS services during the school day, because they did not want to remove Student from his academic classes. Therefore, the Student's proposed program at Wangenheim included a "sixth period" after school in which Student would go to the school's learning center to receive as many of his DIS services as possible each week, as well as "pre" and "post" teaching to assist him with his other classes. Wangenheim Middle School was not Student's "home school," but it had a learning center where Student could receive after-school DIS services. Student's home school does not have an appropriate learning center.

168.    During the hearing, Dr. Patterson raised concerns about Student's placement on a comprehensive campus. He believed that Student required a small campus such as the District's Del Sol campus. However, he admitted that his opinion in that regard differed from the opinion of Student's parents. The District witnesses all testified that the Wangenheim placement was appropriate. The December 4 IEP included a one-to-one behavioral aide to assist Student for 32.5 hours per week, and the opportunity for Student to be taken to a one-to-one setting during the school day as needed. The evidence supports a finding that the Wangenheim Middle School was an appropriate placement for Student for the 2006-2007 school year.

169.    The December 4 IEP called for Student to receive the following DIS services: speech-language pathology – 90 minutes per week; OT – 90 minutes per week; APE – 60 minutes per year; assistive technology services of 8 hours per year; vision therapy – 48 hours per year; physical therapy – 30 minutes per week; and behavior support services for 32.5 hours per week. All school staff would receive training regarding Student's health needs prior to Student beginning school.

---

[20] There are differences in the structure and operation of the co-taught and collaborative classes, but those differences are not significant for this Decision.

170.    During the hearing Student raised concerns that the December 4 IEP did not provide one-to-one behavioral aide hours during the time Student would be receiving DIS services in the learning center.  However, the District's witnesses testified that Student's time in that program would be with DIS providers or for pre and post teaching.  There would be no need for a behavioral aide, as there would be in class.  Student's NPA providers gave inconsistent testimony on whether it was necessary to have a behavioral aide with Student during their one-to-one sessions.  Some testified it was helpful to have the Student's mother or a behavioral aide present during sessions, while others testified that they were able to conduct sessions without another adult present.  Student provided no evidence that trained District educators would require a behavioral aide when working with Student on his DIS services or during pre and post teaching.

171.    Student contends that the level of DIS services, including OT, speech-language and vision therapy, in the December 4, 2006 IEP is insufficient to meet Student's goals.  While Student is correct that the amount of DIS services was cut significantly from the hours provided in the stay put IEP, the District witnesses testified that there would not be a need for so many hours of DIS services once Student was in school – his school program would contain instruction related to these services throughout the school day.  The testimony of the District witnesses was persuasive on this issue.  With Student in a school program with trained educators collaborating to address all of his needs, there would not be the need for the same hours of service that his current, fragmented program requires.

172.    Student also contends that the APE program proposed in the December 4 IEP was not appropriate.  In Student's proposed resolutions, Student wants more time in APE each week and wants swimming included as part of his program.  However, the District witnesses explained that the program was set up in compliance with Dr. Dewan's restrictions on physical activity due to Student's osteoporosis.  As stated in Factual Findings 7-8, it is questionable whether Student actually suffers from osteoporosis, but the District reasonably believed that Student did at the time of the August and December IEPs.  Although Dr. Newfield had issued his report questioning whether Student had osteoporosis in September, Student's mother did not inform the District of that report at the time of the December IEP meeting.  The District's limitations on APE were designed to meet Student's needs and were appropriate at the time they were offered.  There is also no requirement that the District include swimming as part of Student's program – while Student's mother may prefer a swimming program, the program proposed by the District was adequate to meet Student's needs without swimming.

*Did the District deny Student a FAPE in the proposed December 4, 2006 IEP, by failing to develop annual goals and objectives that would enable Student to make educational progress and access the grade level general curriculum?*

173.    Student contends that many of the goals and objectives proposed in the December 4, 2006 IEP were improper.  The evidence does not support that finding.

174.    The December 4, 2006 IEP contained more than 30 goals for Student. Many of these goals are very similar to those in the August 30, 2006 IEP, except that they were modified to provide greater clarity. For example, while it was implied in the August 30 goals that Student would be taught using the 4th grade curriculum, the December 4 goals state that specifically. Additional goals were added at the request of Student's mother and/or the NPA providers. To the extent that the goals are the same or are clarified versions of the goals from the August 30 IEP, they are valid for the same reasons stated in Factual Findings 140-165 above. While clarification was not necessary to make these valid goals, there was certainly nothing wrong with clarification.[21] The parties stipulated that the District witnesses would testify the goals were appropriate.

175.    Lynne Thrope criticized goal four, because in her opinion the goal inaccurately states that spelling is an area of strength for Student. She also disagreed that the teacher should be given a choice of using a visual, verbal or written prompt with Student, because Student was a visual learner. She objected to goals 6, 29 and 31 because she does not believe Student is capable of accomplishing them.

176.    The evidence does not support a finding that the goals are improper. Just because spelling is listed as a "relative strength" in the "baseline" section of the goal does not make the goal improper. Student cites to no legal authority whatsoever that allowing a credentialed teacher to decide what type of prompting to use with a Student makes a goal improper. If Student is unable to make progress on goals 6, 29 and 31, they can be altered.

177.    Dr. Patterson testified that goals seven through nine were not couched in the California content standards for math, but his main criticism was that Student was not capable of performing the mathematical skills necessary for the goals.

178.    The evidence does not support a finding that these goals were improper. If Student was not capable of performing these mathematical calculations, they were clearly an area of need for Student and the goal addresses that need. If Student is able to master these basic mathematical problems, he will have made educational progress. He cannot reach seventh grade curriculum until he first masters the fundamental steps along the road.

179.    The December 4, 2006 IEP incorporated some of Vinceneux's proposed OT goals for Student. For example, the IEP contains goals related to climbing stairs, safe body mechanics and breath control. Although Vinceneux agreed with many of the December 4, 2006 OT goals, he testified that the goals do not address the areas of sensory processing, "multisensory processing and praxis on command," and integration of primitive reflexes. However, as set forth in Factual Finding 163 above, even Vinceneux believed it was important to work on core stability prior to dealing with the primitive reflexes, and the IEP

---

[21]  Because most of Student's objections to the goals were discussed earlier, only the new issues raised in Student's written closing argument as to the December goals will be addressed here. For example, Carol Atkins' criticism of the District's failure to include goals related to remediation of Student's auditory processing problems is addressed in Factual Findings 37 and 162.

goals address core strength. As for sensory processing, the IEP has goals specifically related to visual processing and attention. With respect to "multisensory processing and praxis on command," Vinceneux's suggested goals to address this area included a goal requiring Student to negotiate an obstacle course and a goal requiring him to "maintain both visual and auditory attention" on an instructor giving verbal and visual directions and follow those directions. Although there is no "obstacle course" goal in the December 4 IEP, there is a goal specifically related to following oral or written directions.

     180.   The evidence supports a finding that the goals proposed in the December 4 IEP met Student's unique needs and were appropriate to help him make educational progress.

*Did the District deny Student a FAPE in the proposed December 2006 IEP by failing to provide adequate staff development and training in the use of Student's specialized software programs which Student needs to access the curriculum?*

     181.   Student contends that the amount of AT services called for in the December 4, 2006 proposed IEP are inadequate to meet Student's unique needs. In particular, Student contends that because the District's AT expert was not sufficiently familiar with Student's Kurzweil software, Clicker 4 software, or PKU Life program, she could not know how long it would take to train personnel in those programs.

     182.   The December 4, 2006 proposed IEP calls for eight hours of AT services to be provided per year. This would consist of three hours of consultation/training for Student's instructors to be provided prior to Student starting school and five hours of consultation/training for the remainder of the school year, as needed. The assistive technology devices called for in the proposed IEP include: "Scan read software for reading; Speaking spell check device; content authoring software; graphic organizers modified for written language along with hardware to run them. FM system provided by audiology. Slant Board." The "special factors" page of the IEP also calls for "training for staff related to health needs and use of assistive technology."

     183.   Anne Callies, the District's AT coordinator, has a degree in speech pathology and a master's degree in special education. She has an AT certificate from California State University at Northridge. She has worked as the District's AT coordinator since the department began in 1999. She has assessed and provided AT services for hundreds of pupils. She has been involved with providing AT services to Student since 2005.

     184.   In 2005, Callies went to Student's home to provide training in the Kurzweil and Clicker 4 software. Student's mother was already familiar with the programs, so they discussed other types of programs. Callies has gone through training to use the Clicker 4 software. She is familiar with PKU Diet Manager brand of software. She tried to find the PKU Life brand of software which Student's mother prefers, but learned that it was discontinued. She subsequently learned that PKU Life is now an internet-based system. In July 2006, she conducted the AT portion of Student's triennial assessment and made the recommendation for the eight hours of training per year.

41

185.   Student has not met his burden of showing that the December 4 IEP proposed inadequate AT training and support. Contrary to Student's claims about Kurzweil and Clicker 4, Callies is familiar with those programs and could provide training. Callies is also familiar with Student's needs based on her assessment of Student in July 2006. While she was unfamiliar with the parents' preferred brand of PKU software, she was familiar with the brand available to the District. Her undisputed testimony was that she tried to find the parents' preferred software to purchase and could not because it is no longer being sold. There was no violation by the District.

*Did the District deny Student a FAPE by failing to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP?*

186.   Student contends that the December 4 IEP document is confusing because it states on the front page that Student will be in an SDC for 30 hours per week, but the detailed class schedule on the second page does not add up to 30 hours per week in an SDC.

187.   The December 4, 2006 IEP calls for Student to gradually transition to a full day at Wangenheim. Once the transition period is complete, it is anticipated that Student will attend six periods of school, five days a week, with three SDC classes, two classes taught by a combination of general and special education teachers, and a final period at the learning center in which Student will receive as many of Student's DIS services as possible. During the Student's classes Student would be assisted by a one-to-one behavioral aide. The "sixth period" at the learning center was crafted by the District to address the concerns raised by Student's mother that Student would miss out on his academic studies if he was pulled out for DIS services. The District staff explained this offer, including the sixth period, to Student's mother at the December 4, 2006 IEP meeting and they testified about it at hearing. The evidence does not support a finding that there was genuine confusion by Student's parents as to what was offered and the manner in which it was offered.

188.   Student also contends that the District's failure to offer a specific time period when each of the DIS services would be given during the school day made the IEP confusing. However, the undisputed testimony at hearing confirmed that the DIS services were left fluid so that the majority of DIS services could be provided in the learning center. As stated above, this was designed to address the concerns of Student's mother and was specifically explained to her on that basis. There was no confusion as to what was offered.

189.   Student has not met his burden to show that the December 4 IEP failed to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP. There was no denial of FAPE on that basis.[22]

---

[22] Student raises an additional concern that it was not possible to tell who would be providing the DIS services while the transition plan was being implemented. That concern will be dealt with in the discussion of the transition plan below.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop and implement an appropriate transition plan to transition Student from a home school program to a school based program?*

190.    Both the August 30 IEP and the December 4 IEP provided a transition plan to help Student transition from his home program to a school program. Student contends that these two transition plans were inadequate and that District denied Student a FAPE by failing to propose an adequate transition plan.

191.    The transition plan in the August 30 IEP called for Student to transition to the Sierra placement over a period of three weeks. During the first week, Student would attend school only half days and would continue to receive behavior support at home from an NPA known as "ACES" for two hours a day. During the second week, his school day would be increased to include lunchtime and his two hour home program would continue. During the third week he would attend school full time and his home program would be discontinued. At all times during the transition, he would have access to a special area of the classroom for one-to-one support as he needed it. The transition plan called for collaboration between home and school with the District's case manager acting as a liaison to the parent. The plan stated at one point: "Should any member of the district team believe the Transition Plan needs modification, a meeting may be called for that purpose. Reasonable notice would be required to accommodate schedules."

192.    Although the language of the August 30 transition plan provides for a definite time period for the transition, Sheila Doctors, the District's case manager for Student, testified that the intent was to have a gradual transition that might take more than three weeks, depending on the Student's readiness to move from one step to the next. She explained that in a best case scenario the transition could take three weeks, but only if, based on the data, the collaborative team determined he was ready to move. She said that Student would keep his NPA DIS providers until the transition was complete. Contrary to her testimony, the transition plan does not specify that Student would keep his NPA DIS providers during the transition, except for the ACES services outlined in the plan. A reading of the plan makes it appear that Student's NPA DIS services would end at the time the plan began. In addition, the plan does not provide for the fluid, data-driven transition that Sheila Doctors described. If Doctors' interpretation of the plan is correct, the plan also fails to describe who will review the data to determine if Student is ready to progress to the next step.

193.    The transition plan in the December 4 IEP does provide for the flexible approach for Student's transition from one phase of the transition plan to another that Doctors described. The plan contained extensive information regarding the types of staff training that would occur prior to Student starting school. The plan was broken into four phases. Between each phase, a collaboration team consisting of District personnel and NPA providers would meet to determine if Student was ready to move on to the next phase. The determination of whether Student was ready to move on would be made based on data collected during the previous phase.

194.    Student's parents were not members of the collaboration team. The IEP provided that decisions would be made by the team "with parent input." Sheila Doctors testified that even if all the data indicated Student should move on to the next phase, but Student's parents did not agree, Student would not move on. However, the language of the transition plan does not specify that. Other District witnesses testified that the parents could request an IEP meeting if they objected to the decision of the collaboration team. There was no mechanism in the transition plan for the parents to receive notice of a collaboration team decision, except through contact from Sheila Doctors.

195.    In the first phase of the December 4 transition plan, Student would attend school for two hours in an SDC and continue with a partial ACES home program. In the second phase, Student would extend his school day to a third period collaborative science class, taught by both a special education teacher and regular education teacher. Student's home ACES program would continue, but the hours would be reduced. In the third phase, a lunch hour and SDC math class would be added to Student's day and his ACES home program would be reduced to two hours per day. During phase four, a co-taught world history class and the "sixth period" learning center would be added. During sixth period, Student would receive DIS services, work on discrete tasks and receive pre and post teaching. A collaboration team meeting would be held during the third week of Student's phase four to see whether Student was progressing appropriately and determine if any changes needed to be made to his program. The transition plan called for Student to have access to one-to-one instructional areas within and outside the classroom as needed.

196.    The December 4 transition plan does not specify whether any of Student's DIS services given by the NPA providers besides ACES would continue during the transition period. It also does not specify when and to what extent District-provided DIS services would begin during the transition period. According to the District's written closing argument the transition plan would "…maintain [Student's] in-home aide and his current DIS providers/levels of service until he was fully transitioned into school." MarySue Glynn and Sheila Doctors confirmed during their testimony that the District intended to have the NPA providers continue to give DIS services during the early phases of the transition plan. However, that is not specified in writing in the plan or in the IEP pages describing services.

197.    In Student's written closing argument, Student raises several objections to the two proposed transition plans: 1) that they were based on an inadequate behavior support plan; 2) they did not spell out how Student's DIS services would be provided during the transition period; 3) the transition plans provided that Student would move on to the next phase of the transition based on data collected, but provided no mechanism for what would happen if the collaboration team disagreed; and 4) they excluded Student's mother from the collaboration team decisions on whether to move Student to the next phase of the transition except by giving input to the case manager.

44

198.    As set forth in Factual Findings 81-96, the behavior support plans in both IEPs were adequate, so Student's first contention is without merit.

199.    With respect to the remaining issues, Student has met his burden of showing that the transition plans are incomplete and confusing. The language of the August 30 transition plan is directly contradictory to what Sheila Doctors testified the District intended. It does not state that the NPA DIS services will continue until the transition is complete, and it does not provide for a transition from one step to the next only when the data states the transition will be made. It does not state who will make the determination that Student needs to move from one step to the next or whether Student's parents will be part of that decision making process. However, to the extent that it did provide for those things, it suffers from the same problems as the December 4 transition plan, as discussed below.

200.    The December 4, 2006 transition plan does propose the flexible plan that Sheila Doctors discussed. However, the plan is still confusing, because it does not specify who would provide the DIS services during the transition period (the school or the NPA providers), whether those services would decrease to the number of minutes per week set forth in the December IEP, and where they would be provided. The undisputed evidence shows that the District intended to continue all DIS services through the home program unchanged (except ACES services), but that should have been memorialized in the IEP to avoid confusion and later disputes. As set forth in Legal Conclusions 49-54, because of the open-ended nature of the transition program, any phase of the transition could, in effect, become Student's placement for the remainder of the school year. Therefore, the failure to specify the DIS services Student would receive denied Student a FAPE.

201.    The evidence also supports a finding that the transition plan was inadequate because it did not provide for Student's parents to be part of the decision-making process for determining whether to move to the next phase. This is not just a question of teaching methodology or whether Student needs one-to-one time during a school day. This is not a collaboration meeting to develop proposed goals that will ultimately be presented to the parents for approval. Instead, Student's placement and ACES services are changed every time a new phase is added. If Student's mother agrees to the IEP, but disagrees with the decision of the transition team that Student is ready to move on, will she have a remedy in due process? How will she even learn that the decision has been made? If the District's intent was truly to give Student's mother veto power over the collaboration team's decision of whether to move to the next phase, that should have been specified in the IEP. Simply specifying "parent input" when the parent is not even at the meeting is not sufficient. The evidence supports a finding that Student's mother should have been part of the collaboration team meetings to determine if Student was ready to move from one phase to the next. The failure to include her rendered the transition plan improper and denied Student a FAPE.

202.    Once Student's mother is part of the collaboration team meetings, Student's other objections to the transition plan are easily dealt with. Student is correct that the transition plan does not specify how decisions will be made if the transition team disagrees that Student is ready to move on, but that is only troubling if Student's mother is not part of

the team. If she is part of the team, she will have notice and an opportunity to seek a due process hearing no matter how the decision is made.

203.    The District contends that transition plans are not required to be part of an IEP and that problems with a transition plan cannot cause a denial of FAPE. However, as discussed in legal Conclusions 49 – 54, the August 30 and December 4 plans were not simply transition plans that would occur over a few days or a week. Because of the open-ended nature of these plans, in which Student would not move on to the next phase until the data supported movement, any phase of the plan could, in effect, become Student's placement for the entire school year. Under these circumstances, it was critical for the plans to be complete and provide for parental involvement. The evidence supports a finding that the August 30, 2006, and December 4, 2006 transition plans were not appropriate, and the failure to have appropriate transition plans in the IEPs denied Student a FAPE.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop an appropriate health care plan that would enable Student to attend school safely?*

204.    Student contends that the District failed to develop an appropriate health care plan to enable Student to attend school safely. The law requires an IEP to include a statement of the special education and related services to be provided to the pupil. Related services (also known as DIS services in California) include health and nursing services necessary for a child to benefit from special education. These health and nursing services may include, among other things, providing services by qualified personnel and managing the individual's health problems on the school site. Health and nursing services may also include services referred to as "specialized physical health care services." Specialized physical health care services are health services prescribed by a child's physician requiring medically related training for the individual performing the service and which are necessary during the school day to enable the child to attend school.

205.    The District's assessment identified four health related areas that could affect Student's education – his PKU and special dietary needs, his G-Tube feedings, his seizures and his osteoporosis/osteopenia. Student contends that the August and December IEPs did not offer appropriate health care services to address Student's needs with respect to his special diet and G-Tube feedings. Student contends that the IEPs should have included dietician services to help Student maintain his special diet, as well as specific information about his G-Tube feedings.

206.    Because of Student's PKU, he requires a special diet at all times. Different foods contain varying amounts of PHE. Individuals with PKU must calculate the amount of PHE in the foods they eat to make certain that they do not go above their daily limit. Most adults with PKU can estimate the amount of PHE in foods based on their knowledge and experience with the foods. The evidence is undisputed that, in Student's case, the only way to adequately determine the amount of PHE Student ingests in a day is to calculate the food Student is about to eat, weigh the food before he eats, and then weigh what is left over at the end. Student is a picky eater and does not always finish his food. The amount of PHE must

then be calculated based on the food he has actually eaten. That way his parents know how much PHE he must ingest at dinner in order to maintain the appropriate levels of PHE in his system.

207.  It is not clear from the evidence exactly how fragile Student's condition is with respect to his food intake at this time. Dr. Cederbaum, Student's expert on PKU, testified that Student's blood levels are very good and it would probably not hurt him if he were to accidentally ingest too much PHE on one or two days. However, over time the buildup of PHE could be harmful to him.[23]  Conversely, if Student does not get sufficient PHE each day, his body could begin to break down the tissue in his system, causing him harm.

208.  Even if the evidence does not establish that Student would be in jeopardy from a single day of ingesting too much or too little PHE, the evidence does establish that it is necessary to monitor and control his PHE intake. If Student will be eating food at school, the District must take steps to ensure he has a proper diet. Given the need for Student's specialized diet and the danger to Student if the school staff does not provide appropriate food, Student's PKU does require health care services if Student will be eating at school. Student also requires adult supervision to make certain that he does not eat foods from other children that are not permitted in his diet.

209.  The August 30, 2006 IEP provides information about Student's health needs on the page regarding present levels of performance. It states that "PKU – requires low protein foods; All staff require training re: diet and g-tube feedings; Awareness of high/low levels of PHE and effects; [Student] needs adult support as he learns to monitor all food intake at school." The IEP also attached Dr. Casey's redacted assessment which describes his dietary needs.

210.  The August 30, 2006 IEP proposal at Sierra Academy did not call for any food to be prepared for Student on the campus. Instead, Students at Sierra Academy bring their own lunches to school. Therefore, there was no need for procedures regarding food preparation for Student in the IEP.

211.  The July 2006 "stay put" IEP included a series of pages prepared by Student's mother regarding the details of PKU and Student's dietary needs. The District did not include them in the August 30, 2006 IEP because they intended to cover all that material in training provided to the Sierra staff.

212.  Glynn testified that the intent of the IEP was to have training in Student's diet, PKU needs, and G-Tube feeding provided to all staff at Sierra before Student started school there. Student's one-to-one behavior support aide would monitor his food intake and assist Student with his G-Tube feeding after being trained by a District school nurse. Jennifer

---

[23]  Dr. Cederbaum declined to state a specific time period after which ingestion of too much PHE would be harmful for Student.

Gorman, a District nursing supervisor, testified that the eight hours of nursing services per year would cover three hours of training for the Sierra staff and a half-hour per month for the school nurse to monitor the G-Tube feedings, diet and other health care issues that needed to be reviewed with staff on a periodic basis. The school nurse would visit the school site once a month.

213.    The evidence supports a finding that the August 30, 2006 IEP adequately provided health services to address Student's PKU and dietary needs. Student would be bringing his lunches to campus and the IEP called for training for all Sierra staff regarding his diet. Student's one-to-one aide and other adults would be able to monitor his food intake to make certain he was not given improper foods to eat by a classmate. Because there was no food being prepared for him on campus, no detailed PHE information was necessary.

214.    The evidence also supports a finding that the December 4 IEP sufficiently provided for health services to meet Student's dietary needs. The "special factors" page of that IEP describes step-by-step food preparation requirements for Student and identified the category of employee who would provide those services. Brenda Reynosa, a registered dietician working for the District, testified that she would be responsible for meal planning and training of staff at Wangenheim regarding Student's dietary needs. She would also act as a support for Wangenheim cafeteria staff if they had any questions. Reynosa has been a registered dietician for 23 years and has supervised meal plans for over a thousand students. She was involved with Student's meal planning when he attended District schools prior to the time Student's mother pulled him from school in 2003. Student's mother praised the way the District's food services handled Student's dietary needs in the past.

215.    Student contends that the December 4 IEP should have contained the multi-page PKU information provided by Student's parents that had been included in the July 17, 2006 "stay put" IEP. However, the evidence does not support that contention. The information in the December IEP is adequate to set forth Student's PKU needs, particularly in light of the training and oversight to be provided by Ms. Reynosa. Student also contends that if Reynosa is absent, there would be no back-up individual to maintain Student's diet. However, Reynosa would be preparing a meal plan for Student. There is no indication the cafeteria staff would be unable to follow that plan in Reynosa's absence. The evidence supports a finding that the District properly offered Student a FAPE in this regard.

216.    Student's G-Tube feeding is done through a surgically implanted vessel that leads from a plug on the surface of his skin through a tube into his stomach. It is referred to as "syringe" G-Tube feeding. Student's formula is prepared according to the amount of Phenex 2 prescribed by his doctor. Student is capable of mixing his own formula if he has adult supervision and prompting. The formula is poured into the G-Tube and then the tube is flushed with a cup of water. Student has difficulty pouring and it can take a while for him to accomplish the procedure, even with adult supervision. He often spills the formula and requires a change of clothes when he is finished. The formula has a foul odor, and Student's mother believes it would not be considerate of others to perform a G-Tube feeding in a

classroom. Student used to require two G-Tube feedings a day. On April 17, 2007, Student was changed to three G-Tube feedings a day on the advice of Dr. Cederbaum.

217.    The District's nurses disagreed about whether Student's G-Tube feeding would properly be classified as a physical health DIS service. Dr. Casey testified that it is a specialized health care procedure and can be considered a physical health DIS service. Nurse Gorman agreed that a G-Tube feeding is considered a specialized health care service. Nurse Vergara, on the other hand, testified that in Student's case, the G-Tube procedure would not be a physical health DIS service, because Student was doing the procedure himself with adult supervision.

218.    In 1990, the California Department of Education produced a book entitled "Guidelines and Procedures for Meeting the Specialized Physical Health Care Needs of Pupils." The book, also known as the "Green Book," provided guidelines that school districts could follow. These guidelines were not mandatory, and are largely outdated now. A G-Tube syringe feeding was included within the part of the book dealing with "specialized physical health care services procedures requiring a physician's authorization." The District's website also lists G-Tube feedings under "specialized physical health care services." The District's procedures, which were approved by Dr. Taras on August 30, 2006, include the following statement in bold type:

> THIS PROCEDURE SHALL BE PERFORMED BY THE CREDENTIALED SCHOOL NURSE IN ACCORDANCE WITH PHYSICIAN'S ORDERS. A STAFF MEMBER MAY PERFORM THIS PROCEDURE UNDER THE SUPERVISION OF THE CREDENTIALED SCHOOL NURSE OR SPECIAL EDUCATION ITINERANT NURSE AFTER THEY HAVE BEEN INSERVICED AND CAN DEMONSTRATE COMPETENCY IN PERFORMING THE PROCEDURE. THIS PROCEDURE WILL BE MONITORED AND DOCUMENTED BY A CREDENTIALED SCHOOL NURSE.

219.    The evidence supports a finding that a G-Tube feeding, if required to be provided during the school day by District personnel, is properly considered a specialized phsyical health care service.

220.    The parties dispute whether and to what extent an IEP must specify the health services provided by the District to a pupil. The District used to include specialized physical health care services in the IEP document, but about five years ago began preparing separate individual health support plans (IHSP).[24] These IHSPs are prepared for all children who need health care services at school, even those who have no IEP. They are specific to a certain school and provide detailed information for health procedures, medication doses and similar information. These are generally drafted by the school nurse in conjunction with the parent, but they do not require parental approval in the same way an IEP does. They

---

[24] These are also referred to as individualized school health care plans (ISHP).

generally require a doctor's prescription or order authorizing the school to provide the medication or services. These IHSPs are generally kept in the nurse's office at the school the child attends.

221. The District believes that an IHSP can only be developed after the placement has been agreed upon in the IEP. The District did not develop an IHSP for the August 30, 2006 IEP, because Student's mother made it clear that she would not agree to have Student attend Sierra Academy.

222. The District's position is not well taken. As discussed more fully in Legal Conclusions 40 – 48, Student's G-Tube feeding was a specialized physical health care service and was required to be included in the IEP as a related service. A parent is entitled to know and approve of the general procedure by which health care services will be provided. This does not change just because Student will be attending an NPS. By taking the G-Tube feeding procedure out of the IEP, the District deprived Student's mother of the opportunity to consent to the manner of delivery of service through the IEP process. It is not an excuse that the District does not have a set placement until the parent signs the IEP. The District is required to make a placement offer in a proposed IEP. The specialized physical health services that are "related services" are part of that offer. If a district wishes to set forth detailed information regarding those services in a separate document or IHSP, there is nothing improper about that, as long as general nature of the services and the manner in which they will be provided is included in the IEP document.

223. The evidence supports a finding that, prior to the August 30, 2006 IEP, the District had sufficient information to include specialized physical health services related to Student's G-Tube feedings in the IEP. The District had a release for information from Dr. Dewan and the information provided by Dr. Casey's assessment. Even though Dr. Casey's observation notes of Student's G-Tube feeding were redacted from the final assessment report, the District had the physician orders from Dr. Reich, which described the G-Tube procedure in detail. Even Dr. Taras admitted that the District had sufficient information to draft an IHSP dealing with Student's Phenex formula as of August 30, 2006.

224. The August 30 IEP does not describe general procedures for G-Tube feeding, where that procedure would take place on the Sierra campus, or identify the category of employee who would assist Student with the feedings. There is a mention of the need for adult supervision in Dr. Casey's assessment report. However, Casey's report does not identify the type of employee (e.g. behavioral aide; special education health technician, school nurse, etc.) who would assist Student.

225. The evidence supports a finding that the August 30, 2006 IEP proposal did not provide Student a FAPE because it failed to include specialized physical health care services with respect to Student's G-Tube feedings necessary for Student to attend school and access his education.

226.    The December 4, 2006 proposed IEP called for 8 hours of health nursing services a year. These services included the training of staff at Wangenheim regarding Student's PKU and G-Tube needs. The special factors page of the IEP states "District Nurse will prepare an IHSP and Health Profile folder prior to [Student] starting school, and staff training will be provided as indicated in the Transition Plan…." The transition plan contains the statement "Health/Safety training will include the following areas…G-tube feeding and demonstration with model…." The transition plan goes on to state:

> G-tube feeding will be scheduled to occur daily in the Nurse's room. Timing will be determined in collaboration with the school nurse and parent, in order to fit g-tube feeding into [Student's] schedule at an appropriate time and to clarify which staff member will assist until [Student] becomes independent.

227.    The IEP does not specify which category of District staff would be responsible for the G-Tube feeding. During the hearing, there was disagreement among the District witnesses as to which type of employee would assist Student with the procedure. Glynn and Nurse Linda Vergara testified that Student's one-to-one behavioral aide would assist with G-Tube feedings. The school nurse would teach the aide how to assist Student.

228.    Matthew Howarth, the District supervisor for behavioral aides, testified that Student's one-to-one behavioral aide was not responsible for assisting with Student's G-Tube feedings under the December 4, 2006 proposed IEP. Instead, it was contemplated that Student would go to the nurse's office every day for the G-Tube feeding and the nurse would direct the feeding. Howarth explained that health was not in the scope of his duties. He was told that his staff should be trained to assist the nurse in implementation of the health plan.

229.    During the December 4 IEP meeting, Nurse Vergara, an itinerant school nurse whose territory included Wangenheim, expressed concerns that the amount of nursing time set forth in the IEP would not be sufficient to cover the nursing time actually needed for Student. The District staff members attending the IEP meeting were "bowled over" by her comments and did not ask her to explain her concerns at that time. During the hearing, Vergara explained she had been concerned that the eight hours of nursing services would not be enough to include activities such as writing the IHSP, getting physician orders for the current school year, seeing if there was any training on site, and evaluating the competency of his G-Tube feedings. She later learned that many of these services were already covered in his transition plan and would not count as part of the eight hours of nursing services.

230.    The evidence supports a finding that the December 4, 2006 IEP did not offer Student a FAPE because it failed to set forth appropriate specialized physical health care services related to Student's G-Tube feeding. The IEP should have specified which category of employee would assist with the G-Tube feedings. One of the reasons for the IEP process is to give a parent notice and the ability to object to the District's basic program and services for the Student. While an IEP is not required to specify teaching methodologies or the individual names of staff members who will provide services, it does specify the job classifications of those employees. By taking the G-Tube procedure out of the IEP and

placing it in a separate document, the District took away the parents' ability to object as part of the IEP process. What would happen if the parent signed the December 4 IEP and then the school nurse and parent disagreed about which staff member would assist with the G-Tube feeding? What would stop the District from implementing the IEP with the behavioral aide assisting the G-Tube feedings against the parental wishes? How would the parent challenge that District's decision if the G-Tube feeding information was not contained within the IEP? The District could defend any due process proceeding simply by asserting that it was in full compliance with the IEP.

231. The problem with the District's IHSP theory is highlighted in the present case, in which even the District staff members disagreed about the appropriate category of employee to assist with the feedings. It is also highlighted by Nurse Vergara's concerns expressed at the December 4 meeting about the sufficiency of the nursing time specified in the IEP.

232. As set forth in Factual Findings 62-77, the District's task of preparing an appropriate health plan for Student was hampered by the reluctance of Student's parents to sign releases for medical information. If a child needs a district to provide specialized physical health services in order to access his or her education, it is critical that the IEP *team*, not just selected District employees, have access to relevant health information from the Student's doctors. In this case, the parents' insistence that only certain employees talk to Student's doctors or that no written information be provided was not reasonable and hampered the IEP process. This was particularly true in light of the discrepancies between doctor's orders that came to light after the December IEP meeting.[25]

233. However, as of December 4, 2006, the District had physician orders detailing the G-Tube feeding procedure and Dr. Casey had observed the G-Tube feeding. The District could have specified the basic G-Tube feeding procedure in the proposed IEP, but did not do so. Because of the failure to specify the specialized physical health services necessary for Student to access his education, the December 4, 2006 IEP failed to offer Student a FAPE.

234. Student also contends that a behavioral aide is not an appropriate category of employee to assist Student with the G-Tube feeding.[26] The evidence supports Student's contention in this regard.

235. The law provides that two types of school employees may provide specialized physical health care services to children with special needs: 1) qualified persons who possess

---

[25] In addition, it is troubling that Student's mother withheld important medical information from the District at the December 4, 2006 IEP meeting. Student's mother did not inform the District about Dr. Newfield's opinion contradicting part of what Dr. Dewan had stated regarding osteoporosis/osteopenia. Student's mother, no matter how long she has cared for Student, is not a doctor, and she should not withhold critical physician information from the District at the same time she expects the District to provide health-related services to her child.

[26] Because this relates to Student's proposed resolutions, it is appropriate to make Factual Findings on this issue, even though the IEP did not specifically call for a behavioral aide to assist with the G-Tube feeding.

an appropriate credential; and 2) qualified designated school personnel trained in the administration of specialized physical health care performing the services under the supervision of a school nurse or licensed physician. A school nurse falls under the first category and may provide specialized physical health care services. In order for an individual to become a qualified designated school employee, the individual must meet the training requirements set forth in law. As set forth in Legal Conclusions 40-47, medically related training must be in an approved program in standardized procedures. Those standardized procedures are protocols and procedures developed through collaboration among school or hospital administrators and health professionals.

236. The District has two job classifications which are clearly intended to be "qualified designated school personnel." The first is entitled "Special Education Technician." The essential functions of that position state the technician will: "Perform specialized health care procedures under direction of school nurse." There is also a job classification known as "Special Education Health Technician." The essential functions for that position state the technician will "Perform specialized physical health care for pupils such as…gastrostomy feedings…or other services that require medically related training." The Special Education Health Technician position requires training or experience to equal one year of experience as a Health Assistant I or Special Education Technician.

237. The essential functions of the job classification for "Behavior Support Assistant" do not make any mention of performing health related services, either with or without the direction of a school nurse. In addition, the District provided no evidence to show that the three hours of training for the behavioral aide called for in the IEP would be sufficient to constitute the training in an approved program in standardized procedures required by law.

238. The testimony of Nurse Gorman supported the differences between these classifications. She explained that, when she was a school nurse at the school Student used to attend (prior to the time his mother pulled him from the District schools), either Nurse Gorman herself or a special education health technician performed the G-Tube feedings for Student.

239. Dr. Taras explained that District job classifications are for personnel purposes. From a medical point of view, it does not matter if an employee providing the G-Tube feeding is classified as a Behavior Support Assistant or Special Education Health Technician. Unless the employee is a school nurse, the employee must work under the direction of a school nurse.

240. Despite Dr. Taras' testimony, the evidence does not support a finding that the behavioral aide should assist with the G-Tube feeding. Howarth, the supervisor for the behavioral aides, testified that he does not handle health matters. The District's own job classifications do not state that behavioral aides will assist with health functions. If Dr. Taras is correct that any District employee can perform G-Tube feedings, why have two special job classifications which are authorized to perform this function? A G-Tube procedure is an

invasive medical procedure with possible complications. The District has not met its burden of proving that a behavioral aide was qualified to assist Student with his G-Tube feeding without the physical presence of the school nurse to oversee the process.

241.  The District failed to meet its burden of proving that the December 4 IEP offered Student a FAPE. Student met his burden of proving that the District failed to develop an appropriate health care plan that would enable Student to attend school safely.

*Did the District violate the provisions of the Individuals with Disabilities Education Act (IDEA) by failing to implement a "stay put" placement as of July 25, 2006?*

242.  Prior to July 2006, Student was receiving his education in a home program, with various DIS services provided by the District. When the parties agreed to the July 17, 2006 IEP that placed Student at Coronado Academy during ESY, they also agreed that, in the event they could not agree upon a placement for the 2006-2007 school year, Student would return to his home program with the following DIS services paid for by the District: 1) ACES behavioral training provided by an ACES supervisor for school staff and parents of two hours per month; 2) ABA supervision services to be provided by a Board certified behavior analyst of eight hours per month; 3) ABA Clinic attended by ACES one-to-one behavioral aide(s) two times per month; 4) Occupational therapy four hours per week at the School Options facility; 5) Speech/language therapy four hours per week at Laurie Silverman & Associates; 6) Assistive technology of one hour per month at "[Student's] Home if not in school"; 7) Transportation reimbursement for parent transporting Student to DIS providers' offices; 8) ABA one-to-one aide(s) provided by ACES NPA for 41.5 hours per week in Student's home.

243.  Student contends that the District failed to comply with "stay put" in the following respects: 1) the District failed to provide AT services in Student's home; 2) the District failed to provide Student with the services of a credentialed special education teacher; and 3) the District failed to reimburse Student's mother for transportation costs.

244.  The evidence supports a finding that the District provided AT services to Student's family during the "stay put" period. As set forth in Factual Finding 184, Anne Callies, the District's AT expert, had visited Student's home in 2005 to provide training to Student's mother in the use of the AT devices. Although Callies did not visit Student's home once a month during the 2006-2007 "stay put" period, she was available on an as needed basis to handle technology questions and concerns. For example, Student's family contacted her when a laptop computer needed repair. During the "stay put" period, Callies tried to respond to every AT request the parents made. Because Student's home program and technology did not change before and after his short Coronado placement, there was no need to perform further training. AT services provided on an "as needed" basis were appropriate. There was no violation of stay put.

245.    Student also contends that the District was required to provide a credentialed special education instructor to teach Student his curriculum during the stay put period. The evidence does not support this contention. There is nothing in the stay put provisions in the July 17 IEP indicating a credentialed special education was required to come to Student's home to teach Student during the stay put period. Instead the District witnesses testified that the stay put was intended to be a continuation of Student's home program that had operated since Student's mother pulled Student from the District schools in 2003.

246.    Alternatively, Student's mother contends that the District failed to implement the "stay put" provisions by refusing to give Student's mother a copy of the District's curriculum. Student's mother contends that she was providing Student's academic education, while ACES provided behavioral support. On October 28, 2006, Student's mother requested a copy of the District's curriculum so she could use it to provide Student's academic instruction. The District refused to provide it to her.

247.    The District disputes Student's contention that Student's mother was providing him with academic instruction. The evidence is unclear as to how much actual instruction Student's mother provided to Student. It appears that much of her time with Student during the week was spent driving Student to his various NPA providers. She also frequently took him to "Starbucks" coffee shop. Student's mother testified that she was able to instruct Student even while driving or visiting Starbucks.

248.    Even if Student's mother did provide extensive academic education to Student, there was no violation of "stay put" due to the District's failure to provide her with a curriculum. Student's mother insisted on the home program as "stay put" and it was merely a continuation of the same home program she had employed for Student ever since she pulled him from his District classroom in 2003. There was no evidence that she had relied upon the District to provide her with a "curriculum" in the past, and there was no requirement that the District provide her with a "curriculum" in the stay put IEP. Even if Student had not been terminated from Coronado, the stay put IEP called for Student to return to his home placement as soon as Coronado's summer program ended. If Student's mother had needed a written curriculum from the District, she could have asked for one at the July 2006 IEP meeting. There was no stay put violation by the District.

249.    Student also contends that Student's parents were not reimbursed for transportation costs as set forth in the stay put agreement. During the hearing, the District employees did not dispute that the District had agreed to reimburse those costs, but explained that Student's parents had to submit the paperwork necessary for reimbursement. On July 18, 2007, Student's mother testified that she resubmitted the paperwork during one of the breaks in the hearing. To the extent that the District has not yet reimbursed her for her transportation costs, it is appropriate for the District to do so now. However, Student did not meet his burden of proving that the appropriate paperwork was submitted earlier, so there is no showing of a violation by the District of stay put. Therefore, the District will still be considered the "prevailing party" on this issue.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to allow meaningful participation in the IEP process by Student's parents?*

250.    Student contends that the District failed to allow Student's parents to have meaningful participation in the IEP process based on three grounds: 1) the District sent Student's parents too many revisions of the various IEPs prior to the IEP meetings and sent them too close in time to the meetings; 2) the District held "collaboration meetings" between August 30 and December 4, 2006, which specifically excluded Student's parents; and 3) the District refused to consider the input provided by Student's mother to the IEP team, including proposed goals and objectives and other concerns. The law requires that parents be afforded a meaningful opportunity to participate in the IEP process.

251.    As stated above in Factual Finding 101, Student and the District agreed to an informal procedure in which the District would send drafts of proposed IEPs to Student's counsel for review prior to IEP meetings. During the time period relevant to this case, there were IEP meetings held on July 17, 2006, August 30, 2006, October 9, 2006, October 27, 2006, November 16, 2006, December 4, 2006, and May 2, 2007. At least one of Student's parents attended each of these IEP meetings, except the August 30 meeting. Between July 2006 and May 2007, the District sent many IEP drafts to Student's counsel.

252.    The District witnesses testified that these drafts were sent in an attempt to comply with the informal procedure established by the parties. The District would draft an IEP. After comment by Student's parents, their counsel or the NPA providers, the District would modify that IEP and then send a copy of the modified IEP to Student's counsel for further comment. There was nothing improper about the District's conduct in this regard. Instead, the District was attempting to cooperate with Student's parents and consider their input. It is true that some of these drafts were sent close to the date of the IEP meetings, but that was due to the ongoing, collaborative nature of the process, not an attempt to harass Student's parents. There is no legal requirement for a District to send a draft IEP to a parent before a meeting or to make changes before a meeting. Student requested that the District send him draft IEPs. There was no procedural violation because his request was granted. It certainly did not prevent the meaningful participation in the process by Student's parents.

253.    The evidence does not support a finding that the District prevented participation by Student's parents in the IEP process by excluding them from the District's collaboration meetings.[27] After the October 9, 2006 IEP meeting, Sheila Doctors organized a few "collaboration meetings" between District staff and the NPA providers. These meetings were informal gatherings in which staff members and NPA providers would meet to discuss certain aspects of the IEP, such as the transition plan or speech/language goals. The input from the meeting participants was considered by the District in drafting the IEP proposals sent to Student's counsel prior to the IEP meetings. There were at least three collaboration meetings of this type held between October 9, 2006, and December 4, 2006.

---

[27] These collaboration meetings have no connection to the collaboration meetings in the proposed transition plan discussed in Factual Findings 193-194.

254.    At the collaboration meetings, Sheila Doctors asked the participants to sign a paper stating their "level of agreement to the revision of the plan." She did this because she wanted to know clearly what everyone thought. Some of the NPA providers felt uncomfortable about signing this paper, and either signed with a qualifying statement or signed only for attendance at the meeting. The District took no action against the providers who signed attendance only or qualified their signatures.

255.    Student's parents were not invited to these collaboration meetings, despite a request by their counsel that they be permitted to attend. The District personnel did not invite the parents because they considered these meetings to be pre-planning meetings which are often held by District staff to help develop an IEP proposal. Student's parents were not happy to be excluded.

256.    The evidence supports a finding that the exclusion of Student's parents from these meetings did not prevent them from participating in the IEP process. Under the circumstances of this case, in which the parents objected to virtually every goal and objective, placement and service proposed by the District, and in which there had been multiple meetings of many hours already, it was very reasonable for the District to hold pre-IEP meetings to try to craft language such as speech/language goals that could then be presented to the parents. The parents insisted that the NPA providers be part of the IEP process, and the District incorporated them in a much more active role by holding the collaboration meetings. No IEPs were signed at these meetings and the parents still had a full opportunity to (and did) contest the proposed goals and transition plan at IEP meetings. Rather than being harassment, these meetings were a good faith attempt by the District to craft language that would meet Student's needs and be acceptable to everyone involved.

257.    The evidence also does not support a finding that there was anything improper when the District asked the participants of these collaboration meetings to sign a document indicating whether they agreed with what was proposed. The District was trying to create a consensus among the experts to assist it with drafting IEP goals and other portions of the IEP. If the NPA providers seemed to agree at the collaboration meeting, but then disagreed at the IEP meeting, it would defeat the purpose of collaborating. There was no failure by the District to allow meaningful participation by the parents.

258.    Likewise, the evidence does not support a finding that the District failed to consider the parents' input in the IEP process. In fact, the evidence shows that the District was constantly modifying the IEP documents in order to try to arrive at a proposal that would be agreeable to the parents. The District added goals to the December 4, 2006 IEP to address Student's PKU and stair climbing, both of which the parents had raised as concerns. During the IEP meeting, when Student's mother objected that the proposed IEP did not contain enough time for physical education, the District increased the amount of APE time. After Student's parents had rejected the proposed Sierra placement and requested a comprehensive campus for Student, the District crafted a program at a comprehensive campus in accordance with their wishes. When the parents raised concerns that Student would be pulled from

57

academic classes for his DIS services, the District made an arrangement for Student to receive many of these services at the learning center after class.

259.    Student's mother and her counsel wrote continual correspondence and emails to the District with comments, suggestions and complaints about the District proposals. The District dutifully answered these concerns. Student objects that these discussions should have taken place during an IEP meeting, but the evidence shows that the parties chose to conduct much of their IEP discussion by correspondence rather than at an IEP meeting. The administrative record contains dozens of email messages, letters and other documents that were exchanged between the parties and their counsel.[28] There was nothing improper in the District's actions.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to consider the goals and objectives proposed by Student's parents?*

260.    Student contends that the District failed to consider the goals and objectives proposed by Student's mother. On October 24, 2006, Student's mother sent an email to the District with approximately 12 pages of proposed goals and objectives. On November 27, 2006, District's counsel sent a 13-page letter with a detailed response regarding each of the proposed goals.

261.    Student does not deny that the response was sent, but instead contends that the goals should have been discussed during an IEP meeting instead of through correspondence. The evidence does not support Student's contention.

262.    As stated in Factual Finding 259 above, both parties in this case chose to conduct much of their dialogue by correspondence rather than at an IEP meeting. Having decided to operate in that fashion, Student cannot complain now about that process.

263.    Further, the evidence supports a finding that the District did incorporate parental input into the proposed IEP goals. For example, at the December 4, 2006 IEP meeting, Student's mother stated that the District's proposed PKU goal was based on her proposed goal. There was no violation by the District.

---

[28] Although the time period at issue in this case was only one school year, there are over 500 pieces of documentary evidence. Much of the evidence consists of communication of one form or another between the parties or their counsel.

## LEGAL CONCLUSIONS

*Burden of Proof and Applicable Law*

1.     The burden of proof in this proceeding is on the party seeking relief. (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528].)  Because this is a consolidated case, in which both parties have brought claims, each party has the burden as to those issues for which the party is the petitioner.

2.     Pursuant to the Individuals with Disabilities Education Act (IDEA) and California Law, children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (20 U.S.C. § 1400(d); Ed. Code, § 56000.)  FAPE consists of special education and related services that are available to the student at no charge to the parent or guardian, meet the state educational standards, include an appropriate school education in the State involved, and conform to the child's IEP. (20 U.S.C. § 1401(9).)  The federal regulations promulgated pursuant to IDEA were amended, effective October 13, 2006.  For those events in the instant case which took place prior to October 13, 2006, the older version of the regulations is applicable. (See *Ms. S. v. Vashon Island School District* (9th Cir. 2003) 337 F.3d 1115, 1119, fn. 3.)

*Is the District's Multidisciplinary Assessment dated July 14, 2006, appropriate?*[29]

3.     Before any action is taken with respect to the initial placement of a special education student, an assessment of the student's educational needs must be conducted. (Ed. Code, § 56320.)  Thereafter, a special education student must be reassessed at least once every three years. (Ed. Code, § 56381, subd. (a).)  No single procedure may be used as the sole criterion for determining whether the student has a disability or determining an appropriate educational program for the student. (20 U.S.C. § 1414 (b)(2)(B); Ed. Code, § 56320, subd. (e).)

4.     The tests and materials use in the assessment must be valid for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's primary language or other mode of communication unless this is clearly not feasible. (20 U.S.C. § 1414(b)(3)(A)(i)-(iii); Ed. Code, § 56320, subd. (a).)

5.     Assessments must be conducted by individuals who are both "knowledgeable of [the student's] disability" and "competent to perform the assessment, as determined by the school district, county office, or special education local plan area." (Ed. Code, §§ 56320,

---

[29]  Because the same legal analysis applies to issues two and three (regarding whether the District failed to assess in all areas of need and whether the District failed to conduct a proper physical health assessment), the Legal Conclusions for those two issues will also be discussed under this heading.

subd. (g), 56322; see, 20 U.S.C. § 1414(b)(3)(A)(iv).) A psychological assessment must be performed by a credentialed school psychologist. (Ed. Code, § 56324, subd. (b)(3).)

6. In California, a district assessing a student's eligibility for special education must use tests and other tools tailored to assess "specific areas of educational need" and must ensure that a child is assessed "in all areas related to" a suspected disability, such as vision, hearing, motor abilities, language function, general intelligence, academic performance, communicative status, self-help, orientation and mobility skills, career and vocational abilities and interests, and social and emotional status. (Ed. Code, § 56320, subd. (c), (f).)

7. As set forth in footnote 6 above, the parties stipulated that the District witnesses would testify that the District's assessments met all the requirements of law and assessed Student in all areas of need. Student contended that certain assessments were not properly done and that certain areas of need were not assessed. However, as set forth in factual Findings 1 - 50, the evidence does not support Student's contentions. The District's assessments were comprehensive, thorough, and addressed all areas of need for Student. As set forth in Factual Findings 51 - 80, the evidence supports a finding that the District's health related assessments were sufficient to determine Student's health-related educational needs and there was no elimination of health related services without an assessment.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student's behavioral needs and failing to develop an appropriate behavior plan?*

8. When a child's behavior "impedes the child's learning or that of others," a school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." (20 U.S.C. § 1414(d)(3)(B)(i).) When a child "exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives" of the child's IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) Serious behavior problems are defined as "behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective." (Cal. Code Regs., tit. 5, § 3001, subd. (aa).) Before a BIP is developed, the district must conduct a functional analysis assessment (FAA). (Cal. Code Regs., tit. 5, § 3052, subd. (a)(3).) An FAA is a detailed assessment of a child's behavior, which includes, among other things, systematic observation of the occurrence of the targeted behaviors, systematic observation of immediate antecedent events associated with the behavior and the consequences of the behavior. (Cal. Code Regs., tit. 5, § 3052, subd. (b)(1).)

9. As discussed in Factual Findings 81-96, there is no evidence in this case that Student's behavior is serious enough to warrant an FAA or BIP. Although there is evidence of mild self-injurious behavior, such as Student rubbing his eyes or hitting his head with his hand, the evidence shows that the interventions practiced by ACES staff and others have been successful at diverting Student whenever the behaviors begin. For example, when

60

Student started to hit his head in Dr. Patterson's office, Patterson was able to stop him with a comment and a gentle touch. At this point, there is no reason to believe that the behavioral approaches taken by the District's proposed BSPs would be ineffective. Of course, should Student's behaviors escalate when he begins school, it might be appropriate to conduct an FAA in the future. However, at this point, there is no need for an FAA or BIP.

10.    A behavior support plan is not the formal, detailed document that a BIP is. Student cites to no authority that a behavior support plan must contain quantitative baseline data regarding frequency and duration of behaviors. The behavior support plans in the August 30 and December 4 proposed IEPs address the behaviors that impede Student's learning and are based on interventions that have been proven to work with Student.

11.    As set forth in Factual Finding 45, the District's social/emotional assessment of Student was appropriate and properly identified Student's behavioral needs. Student has not met his burden to show the District failed to properly assess Student.

*Did the District violate IDEA by failing to reimburse Student's parents for the Independent Educational Assessments (IEEs) obtained by the parents, as requested by Student's mother at the October 9, 2006 IEP meeting?*

12.    When a parent disputes a school district's assessment and requests that the district pay for an independent educational evaluation (IEE) at public expense, the district must either agree to fund that IEE or "without unnecessary delay" file for a due process hearing to defend the propriety of its assessments. (34 C.F.R. § 300.502(b)(2) (2006).) If the district prevails in proving that its assessments were appropriate, the parents still have the right to an IEE, but not at public expense. (34 C.F.R. § 300.502(b)(3) (2006).)

13.    As set forth in Factual Findings 1-98, the District's triennial assessment was appropriate and addressed Student's areas of need. Within days after Student's mother clarified her request for IEEs, the District filed its request for due process regarding its assessment. The District properly defended its assessments in this hearing and there is no basis to require the District to reimburse Student's parents for the IEEs that they obtained.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have an IEP in place at the commencement of the school year on September 5, 2006?*

14.    There are two parts to the legal analysis in due process actions brought pursuant to the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. (*Bd. of Educ. of the Hendrick Hudson Sch. Dist v. Rowley* (1982) 458 U.S. 176, 206 – 207 [102 S.Ct. 3034].) Second, the court must assess whether the IEP developed through those procedures was designed to meet the child's unique needs and was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

15.    Not every procedural violation of IDEA constitutes a denial of FAPE. (*W.G. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484.) According to Education Code section 56505, subdivision (f)(2), a procedural violation may constitute a substantive denial of FAPE only if it did any of the following:

(A)    Impeded the child's right to a free appropriate public education;

(B)    Significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a free appropriate public education to the parents' child;

(C)    Caused a deprivation of educational benefits.

16.    The law requires a district to have an IEP in place at the beginning of each school year for every child who is eligible for special education. (20 U.S.C. § 1414(d)(2)(A); Ed. Code, § 56344, subd. (b).) This is a recognized procedural requirement of IDEA. (*Ms. S. v. Vashon Island School District, supra*, 337 F.3d at p. 1130.)

17.    As more particularly set forth in Factual Findings 99 – 119, the failure to have a signed IEP in place for the 2006-2007 school year was not the District's fault. After the Coronado placement was terminated, the District employees scrambled to find a new placement, respond to Student's CDE case and address Student's lengthy correspondence. As a result, the District was not able to prepare a draft IEP in accordance with the parties' informal agreement until the end of August. However, Student's counsel made it clear that Student's mother would not consent to the District's proposed placement until she could view it *after school was in session*. That choice by Student's mother prevented any IEP from being signed before the start of the new school year.

18.    Student contends that the District's proposal of August 30, 2006, was only a draft, not a final IEP offer. While it is true that the copy sent to Student's counsel was called a "draft," as set forth in Factual Findings 116 – 119, it was only called that because the District was still attempting to cooperate with Student's parents and consider Student's input. No matter what it was called, it did constitute a final IEP offer, and it was developed prior to the start of the school year. The only thing it lacked was parental approval and signature. There was no procedural violation by the District.

19.    Student contends that the "final" IEP offer was not identified as such until September 15, 2006, 10 days after the start of the school year. Even if it was true that the District missed the deadline by 10 days, Student has not made a showing that the delay impeded Student's right to a FAPE, caused a deprivation of educational benefits, or impaired the right of Student's parents to participate in the IEP process. Student's parents would have refused to sign the proposed IEP until they could arrange a site visit after school started even if a final IEP had been sent two weeks before. There was no denial of FAPE from any delay.

62

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have appropriate team members – including Student's parent(s) – at the IEP meeting convened on August 30, 2006?*

20.     Under IDEA, the IEP team consists of: (1) the parents of a child with a disability; (2) "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)"; (3) "not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child"; (4) a representative of the local educational agency who is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; is knowledgeable about the general education curriculum; and is knowledgeable about the availability of resources of the local educational agency; (5) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team already described; (6) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and (7) whenever appropriate, the child with a disability. (20 U.S.C. § 1414(d)(1)(B).)

21.     Federal regulations require a district to hold an IEP meeting before placing a child in a private school or facility and require that the private school participate in the meeting: "The agency must ensure that a representative of the private school or facility attends the meeting. If the representative cannot attend, the agency must use other methods to ensure participation by the private school or facility, including individual or conference telephone calls." (34 C.F.R. § 325(a)(2) (2006); 34 C.F.R. § 300.349(a)(2) (1999).)

22.     A parent is an important part of the IEP process, and a school district is required to undergo considerable effort to see that a parent attends the IEP meeting. (Ed. Code, § 56341.5; *Honig v. Doe* (1987) 484 U.S. 305, 311 [108 S.Ct. 592]; *Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F.3d 877, 882.) If a district is unable to convince the parent to attend the meeting, the district may go forward with the meeting in the parent's absence. (Ed. Code, § 56341.5, subd. (h).)

23.     As set forth in Factual Findings 120-126, the District invited Student's NPA providers to the meeting, and one of them (Student's NPA speech/language provider) did attend. The District had information and reports from the other providers and was aware of their input with respect to Student's progress in their individual areas of service. There was no violation based on the failure to have those individuals at the meeting. Student's mother specifically waived her attendance at the meeting based on advice of counsel. While a District is normally supposed to go to great lengths to convince a parent to attend a meeting, including telephone calls and similar efforts, the laws requiring those efforts were designed for unrepresented parents who do not understand the importance of the IEP process. They were never designed to be a trap for a District when a legally sophisticated parent waives attendance at the meeting based on advice of counsel. There was no procedural violation by the District.

24.    There is no dispute that no representative from Sierra Academy attended the August 30 meeting, and the District did not contact Sierra by telephone during the meeting. However, the District invited a representative from Sierra to attend, and there were District personnel in attendance at the meeting with personal familiarity regarding Sierra.

25.    Even if there was a procedural violation based on the failure to have a Sierra representative at the meeting, there was no denial of FAPE. As set forth in Legal Conclusions 15-17, Student's parents had no intention of signing this IEP at the August 30 meeting no matter who was or was not in attendance, because Student's mother wanted to visit Sierra after the school year had begun. Before Student's mother made her decision to reject the Aug 30 proposal, she had personally visited Sierra. The failure to have a Sierra representative or the NPA providers at the meeting did not impede Student's education, result in a deprivation of educational benefit, or prevent Student's parents from participating in the process. There was no violation of IDEA.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose an appropriate placement for Student in the August 30, 2006 IEP?*

26.    A school placement is appropriate for a Student if it will meet a child's unique needs, will allow the child to make progress on the IEP goals and objectives and is reasonably calculated to enable the child to receive educational benefit. (*Rowley, supra*, 458 U.S. at pp. 206-207.) In addition, a special education student must be educated with nondisabled peers to the maximum extent appropriate and may be removed from the regular education environment only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. (20 U.S.C. § 1412(a)(5)(A).) This is often referred to as the "least restrictive environment."

27.    An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (*Adams v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) An IEP "is a snapshot, not a retrospective." (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*)

28.    There is no dispute that, as of the August 30, 2006 IEP meeting, no one believed that Student could be educated in a general education classroom. Even Student's own psychoeducational expert Dr. Patterson recommended placement in an SDC at a small campus. Student does not contend that Sierra was not the "least restrictive environment" appropriate as of August 30, 2006.

29.    As set forth in Factual Findings 127-139, Student's concerns about the physical facilities at Sierra and the lack of one-to-one education are not supported by the evidence. The August 30 IEP called for Student to have a one-to-one aide for at least the first three months at Sierra, and the need for the aide would be evaluated after that. As long as Student had the one-to-one aide, the aide could guard the Student against any injury from

64

rambunctious children on the stairs and could provide one-to-one time as necessary. Had the District attempted to withdraw the aide before it was safe to do so, Student's mother could have sought due process protection at that time. Although Sierra does not employ a full-time nurse, had the District proposed an appropriate health care plan in the IEP, the correct personnel could have been present at Sierra to assist Student with the G-Tube feedings each day.

30.    The IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* 458 U.S. at pp. 198-200; see, *Seattle Sch. Dist. No. 1 v. B.S.* (9th Cir. 1995) 82 F.3d 1493, 1500.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the student. (*Rowley,* at p. 201.)

31.    Student did not meet his burden of proving that he would be unable to make educational progress at Sierra. Even if Student would have preferred entirely one-to-one instruction or believed that one-to-one instruction would help Student make more progress, the evidence still supports a finding that Student could make progress at Sierra.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose appropriate goals and objectives in the August 30, 2006 IEP?*

32.    Both California and Federal law require an IEP to contain "a statement of measurable annual goals, including academic and functional goals," which are designed to "meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum" and "meet each of the child's other educational needs that result from the child's disability." (20 U.S.C. § 1414(d)(1)(A)(i)(II); Ed Code, § 56345, subd. (a)(2).) The IEP must also contain "a description of how the child's progress toward meeting the annual goals...will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided." (20 U.S.C. § 1414(d)(1)(A)(i)(III); Ed. Code § 56345(a)(3).)

33.    Although the law requires goals to be "measurable," the law does not set rigid standards for the way in which a goal must be written. Student contends that a goal must include a "baseline" containing "quantifiable data" regarding a student's ability to perform the specific task set forth in the goal in order to measure progress. Student cites no authority to support this interpretation of the laws and regulations. Goals are not intended to be mathematical equations, in which any minor error in structure or calculation invalidates the goal. Instead, the goals are simply intended to assist the IEP team in determining if a pupil is making progress. Student wishes to hold the District to a goal writing standard that would be impossible for any district to meet. As set forth in Factual Findings 140-165, the goals

proposed in the August 30 IEP were appropriate to help the District determine if Student was making educational progress.

34.    Student also contends that the August 30 IEP goals do not align to California content standards for the 7th grade general education curriculum. It is unclear if Student contends that every child, no matter what that child's unique needs might be, must have IEP goals requiring the child to meet a grade level equivalent for his or her age. Although the law requires that goals be designed to help a child make progress in the general education curriculum, it does not require a district to ignore a child's actual needs, if the child is not yet ready for grade-level general education curriculum. There is no dispute that, as of August 30, 2006, Student's independent reading and math levels were at approximately a third grade level and he had been out of school in a home program for three years (with the exception of a few days at Coronado Academy). If the District had proposed goals which met 7th grade general curriculum standards, the District would not have addressed Student's unique needs. Indeed, as set forth in Factual Findings 150 - 160, Student's own experts testified that several of the District's goals *were too hard for Student*. Dr. Patterson doubted that Student could come up to grade level in one year's time.

35.    The case of *Student v. San Francisco Unified School District*, OAH case number N2006070837, cited by Student, does not change this. While that case cites the general proposition that the ultimate goal of special education is to enable a child with disabilities to access the general education curriculum, it does not say the District should ignore a child's unique needs in the process. The August 30 goals were designed to build the fundamental skills and knowledge in core academic areas of reading and math, beginning at a fourth grade level, which Student would need in order to progress through the grades. Anything else would not have met Student's unique needs. Student did not meet his burden of showing that the August 30 IEP goals were improper.

*Did the District's education programming offer, memorialized in the proposed December 4, 2006 IEP, offer Student a FAPE designed to meet his unique needs and allow him to benefit from his education?*

36.    As stated in Factual Findings 190-241, and Legal Conclusions 40-54, the District failed to meet its burden of proving that the December 4 IEP provided Student a FAPE, because it failed to provide for specialized physical health care services Student would need to access his education and failed to provide an appropriate plan to transition Student from his home placement to a school placement. However, as set forth in Factual Findings 166-189, the December 4 IEP proposal did offer Student a FAPE in all other respects.

*Did the District deny Student a FAPE in the proposed December 4, 2006 IEP, by failing to develop annual goals and objectives that would enable Student to make educational progress and access the grade level general curriculum?*

37.    As set forth in Factual Findings 173-180, and Legal Conclusions 32-35, the goals and objectives in the December 4 IEP were an appropriate means of determining if Student had made educational progress. They are not required to have the mathematic precision called for by Student.

*Did the District deny Student a FAPE in the proposed December 2006 IEP by failing to provide adequate staff development and training in the use of Student's specialized software programs which Student needs to access the curriculum?*

38.    As set forth in Factual Findings 181-185, the evidence supports a finding that the December 4, 2006 IEP called for sufficient staff development and training in the use of Student's specialized software programs.

*Did the District deny Student a FAPE by failing to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP?*

39.    The law requires an IEP to contain a statement of the special education and related services and supplementary aids and services to be provided to the child. (Ed. Code, § 56345, subd. (a)(4); 34 C.F.R. § 300.320(a)(4) (2006).) As set forth in Factual Findings 186-189, the December 4 IEP was clear as to the program and services provided. To the extent that Student's objections relate to the transition plan, they will be dealt with below.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop an appropriate health care plan that would enable Student to attend school safely?*

40.    The "related services" which must be specified in an IEP include "other supportive services," such as school nurse services, which "may be required to assist a child with a disability to benefit from special education...." (20 U.S.C. § 1401(26).) In California, related services are called DIS services (Ed. Code, § 56363, subd. (a)), and include "health and nursing services." (Ed. Code, § 56363, subd. (b)(12).)

41.    Health and nursing services may include specialized physical health care services if necessary to meet a child's unique educational needs. (Cal. Code. Regs., tit. 5, § 3051.12, subd. (b).) Specialized physical health care services "means those health services prescribed by the child's licensed physician and surgeon requiring medically related training for the individual who performs the services and which are necessary during the school day to enable the child to attend school." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(A).) California regulations provide that "Specific continuing specialized physical health care services required in order for the individual to benefit from special education *will be included* in the individualized education program." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(3)(A), italics added.)

42.    As set forth in Factual Findings 216-219, the evidence supports a finding that Student's G-Tube feeding was a specialized physical health care service. It was prescribed by a physician and was necessary for Student during the school day. The District's own website and several District witnesses recognized it as a specialized physical health care service.

43.    The District contends that it can prepare an IHSP and provide for specialized physical health care services outside an IEP. The District believes that an IHSP is specific to a placement, so it cannot be developed until an IEP is signed. [30] The District cites to out-of-state authority to support its position that no health plan need be incorporated into an IEP. Because the requirement to include these health services in an IEP is specific to California regulations, these out-of-state cases have little value in determining this issue.

44.    The District argues that the reference to the G-Tube feeding in the IEP was sufficient, and that it was not necessary to include the details of that procedure in the IEP. The District contends that the issue is whether an entire IHSP form must be included in an IEP. That is not the issue. Nothing in this Decision requires a District to include its IHSP form in an IEP or that every detail, such as the amount of formula, must be in the IEP. The real issue is whether important matters, such as the job classification of the employee who will provide the service, can be removed from the IEP (and therefore the parents' ability to object through the IEP process). As the court found in the case of *Union School District v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526: "The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later" and "will greatly assist parents in 'presenting complaints with respect to any matter relating to the …educational placement of the child.'"

45.    The District's written closing brief argues that "Where all of [Student's] health needs are addressed in his IEP and nursing services offered to meet those needs, the District has discharged its IEP obligations." The problem with this statement is that *nursing services* were not offered. Neither IEP states who will perform the services. The parties have a dispute about who is qualified to perform those services. By taking the decision of who would perform the service out of the IEP process, the District has taken away the rights of Student's mother to object to the category of employee who would perform the service. As set forth in Factual Findings 227 – 229, even the District employees were confused as to who would provide the G-Tube services. The District nurse said the behavioral aides who do it and the supervisor of the behavioral aides said the nurses would do it. At least one nurse raised concerns that the amount of nursing time in the IEP might not be sufficient.

---

[30]  The District also argues that Student's position regarding this medical information is inconsistent, because Student does not want to provide medical releases for use by the IEP team. The District is correct that the position is inconsistent. If a child requires specialized physical health care services in connection with an IEP, the parent should provide medical releases to enable the IEP team to contact the Student's doctors if necessary. However, the inconsistency in Student's position does not change the clear requirements of California law that the specialized physical health care services be included in the IEP.

46.    California law permits only two types of employees to provide specialized physical health care services: 1) qualified persons who possess an appropriate credential; and 2) qualified designated school personnel trained in the administration of specialized physical health care if they perform those services under the supervision of a credentialed school nurse or licensed physician. (Ed. Code, § 49423.5.) Medically related training required for employed designated school personnel is "training in an approved program in standardized procedures provided by a qualified school nurse…to enable the person to provide the specialized physical health services necessary to enable the child to attend school." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(E)(2).) "Standardized procedures" are defined as "protocols and procedures developed through collaboration among school or hospital administrators and health professionals…to be utilized in the provision of the specialized physical health care services." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(B).) The regulation also discusses the different levels of supervision required for the designated employee when performing the specialized health care service. For example, "direct supervision" means that the "supervisor shall be present in the same building as the person being supervised and available for consultation and/or assistance." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(D)(2).)

47.    The District made no showing that Student's one-to-one behavioral aide is a qualified designated school employee who has been trained to perform G-Tube procedures pursuant to California law or that the three hours of training provided by the nurse in the December IEP was sufficient to meet the training in "standardized procedures." The District has two technician employee classifications whose job functions include performing specialized physical health care procedures, and their duties specify the level of supervision that each classification requires. Because the IEP did not specify which classification of employee would be performing the G-Tube feeding, Student's parents had no way to be sure that an appropriate employee would be assisting their child.

48.    As set forth in Factual Findings 204 – 241, Student has met his burden of proving that the District's two proposed IEPs did not contain sufficient specialized physical health care services to meet Student's unique needs and therefore did not offer Student a FAPE. Student also met his burden of proving that the one-to-one behavioral aide was not the appropriate person to assist Student with his G-Tube feeding.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop and implement an appropriate transition plan to transition Student from a home school program to a school based program?*

49.    California law provides that an IEP should include, if appropriate: "Provision for the transition into the regular class program if the pupil is to be transferred from a special class or nonpublic, nonsectarian school into a regular class in a public school for any part of the school day…." (Ed. Code, § 56345, subd. (b)(4).) That transition plan should include a "description of activities provided to integrate the pupil into the regular education program" and a description of the activities provided to support the transition of the pupil. (Ed. Code, § 56345, subd. (b)(4)(A), (B).)

50.    No one disputes that Student needs a transition plan, whether or not his situation falls under the specific requirements of Education Code section 56345, subdivision (b)(4). Both the August and December proposed IEPs included detailed transition plans for Student. However, the District contends that it is not appropriate to impose substantive requirements on a transition plan when the law does not set forth substantive requirements.

51.    It is not necessary to decide the legal issue of whether substantive requirements may be imposed on a standard transition plan, because the evidence set forth in Factual Findings 190-203 shows that the two transition plans in the August 30 and December 4 IEPs were not standard transition plans. In each case, they provided for distinct phases of Student's transition from his home program into the school in question, with transfer from one phase to another only when the data indicated Student was ready to move on. If Student took months to go from one phase to another, these two transition plans could, in effect, become his placement for the entire 2006-2007 school year. Therefore, it was necessary for the proposed transition plan to specify what his services would be during each phase in order for the District to meet its legal requirement of presenting a clear written offer of the proposed placement and services. (*Union School District v. Smith, supra,* 15 F.3d. at p. 1526.) As set forth in Factual Findings 190-203, neither of the transition plans adequately states what will happen to Student's DIS services during each phase of the plan. The District employees testified that Student's NPA DIS services would continue during some of the phases, but that is not at all apparent from the language of either plan. For example, absent the testimony of Sheila Doctors, the language of the August 30 transition plan appears to have the NPA DIS services stop as soon as the plan begins, except for the ACES services specified in the plan.[31]

52.    In addition, the transition plans were not sufficient because the parents were not included in the collaboration teams that would decide when to move Student from one phase of the project to the next.[32] The law states that a parent is supposed to be included in groups that make decisions on placement. For example, federal regulations provide unequivocally that "...each public agency must ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." (34 C.F.R. § 300.327 (2006); 34 C.F.R. § 300.501(c) (2006); 34 C.F.R. § 300.501(c) (1999).)

---

[31]  It is unclear from Student's papers whether Student contends that the transition services should have been included in both the transition plan <u>and</u> in the earlier pages of the IEP that describe Student's services. If so, the contention is not well taken. There is no need to have such a duplication of language. Because the plan was included as part of the IEP, there was no requirement for the services to be repeated in two parts of the IEP. The problem in the instant case is that neither the earlier pages of the IEP describing services nor the transition plan itself specified what would happen to the DIS services during the transition, except for the ACES services.

[32]  These collaboration team meetings called for in the transition plan should not be confused with the collaboration meetings held during the fall of 2006, discussed in Factual Findings 253-256. Although the District used the same name for both, the two types of "collaboration team" meetings were very different. The fall 2006 collaboration meetings were informal gatherings that discussed proposals to bring to an IEP meeting. The transition plan collaboration team, on the other hand, made determinations regarding placement.

53.    Each collaboration team that reviewed the data collected regarding Student's progress in a previous phase, would be making a decision regarding a change in Student's placement. Neither transition plan provided that the parents would be part of the team making the decision on whether to go to the next phase. In fact, it appears that the collaboration meetings were set up to exclude the parents from the decision. Contrary to Sheila Doctors' testimony, the December 4 IEP does not give Student's mother a veto over whether to move Student to the next phase. It just gives her the opportunity to give input through Sheila Doctors.

54.    The failure to include the parents in the collaboration teams constituted a procedural violation of IDEA. Therefore it is necessary to determine whether that procedural violation also caused a substantive denial of FAPE. The failure to include Student's parents on the transition team significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to Student. If they are not part of a team that decides when to change their child's placement, they are not participating in the decision making process. Student met his burden of proving that the District's proposed August 30 and December 4 IEPs denied him a FAPE because they failed to include appropriate transition plans which identified the services to be performed during the operation of the plan and failed to permit Student's parents to be part of the decision making process on the educational placement of their child.

*Did the District violate the provisions of the Individuals with Disabilities Education Act (IDEA) by failing to implement a "stay put" placement as of July 25, 2006?*

55.    The IDEA requires that during the pendency of due process proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." (20 U.S.C. § 1415(j).) This requirement is commonly referred to as "stay put." As set forth in Factual Findings 242-249, the evidence does not support a finding that there was any failure by the District to implement the "stay put" placement. To the extent that the parents have now submitted appropriate paperwork for reimbursement of transportation costs, the District should be required to reimburse those costs.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to allow meaningful participation in the IEP process by Student's parents and by failing to consider the parents goals and objectives?*

56.    Both IDEA and California law contemplate that the parents of a child will be part of the IEP team and that the school district will consider input from those parents. (See, e.g., 34 C.F.R. 300.501 (2006); 34 C.F.R. 300.501 (1999).) As set forth in factual Findings 250-263, Student's parents participated fully in the IEP process and had a tremendous amount of input. The District carefully considered each of the many suggestions, comments and criticisms made by Student's mother. Just because the District adopted some of the mother's suggestions and not others does not mean the parent had no input.

71

*What is the appropriate remedy for the District's denial of FAPE for the 2006-2007 school year?*

57.    The law provides for broad discretion in fashioning an appropriate remedy if a Student prevails in a due process hearing, as long as that relief is "appropriate" in light of the purpose of IDEA. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996].) Permissible awards of relief include things such as orders for compensatory education for a child and reimbursement to the parent for a private educational placement of the child.

58.    Student's Prehearing Conference Statement lists almost six full pages of proposed resolutions for this matter.[33] As set forth in Legal Conclusions 12-13, the request that Student's parents be reimbursed for the cost of IEEs is denied. As set forth in Factual Finding 249 and Legal Conclusion 55, Student's request that the District reimburse for transportation costs as provided in the stay put IEP is appropriate, assuming that Student has now submitted complete paperwork.

59.    Student requests that the December 4, 2006 IEP be modified in certain respects. Because only the transition plan and specialized physical health care services relating to Student's G-Tube feeding were inappropriate, those are the only parts of the December 4 IEP that need modification. There is no need to modify the IEP to require the District to create an SDC class at Student's home school for Student. As set forth in Factual Findings 167-172, the Wangenheim placement was appropriate for Student. Student's home school did not have the learning center Student needed. Likewise, there is no reason to require the District to hire ACES or another outside company to provide behavioral services. The District behavioral aides are adequate for that task. There is no need for the District to require a licensed dietician to be on campus. The December 4 IEP and the health training in that IEP adequately provided for Student's dietary needs.

60.    The evidence also does not support a finding of any need for compensatory education or instruction. Although it is true that Student was unable to attend a school based program due to the inappropriate IEPs, there was no evidence that he lost educational benefit as a result of his "stay put" placement. Student contends that Student made significant educational progress in his home program, and the District does not dispute that contention. Student's "stay put" program was a continuation of his home program of the three previous years, and the District provided a panoply of DIS services and one-to-one behavioral assistance/ instruction. In fact, Student was receiving more hours of DIS services during stay put than he would have received under the December 4 IEP. Student made no showing that he lost any educational benefit from continuing in his home program while this case was pending. Indeed, Student insisted that his home program remain his "stay put" placement when he signed the July 2006 IEP.

---

[33]  The Prehearing Conference Statement was marked as Exhibit 498. In order to make a clear record, the District's written closing argument was marked as Exhibit 592, and the Student's written closing argument was marked as Exhibit 593.

61.    Student requests that the December IEP be modified to require that a registered nurse provide one-to-one implementation of Student's IHSP, and take responsibility for Student's health related goals. There is no need for such a drastic change to the December 4 IEP. The District educators and other personnel, after receiving training from the school nurse as provided for in the IEP, are fully qualified to provide the educational and related services Student requires in accordance with the IEP -- only the specialized physical health care procedures regarding Student's G-Tube feeding need to be altered.

62.    Because the District did not propose an appropriately qualified designated employee to assist with the G-Tube feeding, it is appropriate to modify the December IEP to require a school nurse to personally assist with the feeding. However, nothing in this Decision is intended to prevent the District from proposing, in a future IEP, that another classification of employee assist Student with the feedings, provided that the assistant meets the requirements of Education Code section 49423.5. In addition, nothing in this Decision is intended to limit the classification of employee that may be designated pursuant to that code section. This Decision is simply based on the finding that, at the present time and in the present case, the District failed to make an evidentiary showing that the three hours of training provided for District staff in the December 4 IEP would qualify Student's one-to-one behavioral aide to perform specialized physical health care services.

63.    It is also appropriate to modify the December 4 IEP to include at least one of Student's parents in the transition plan collaboration meetings and to clarify that Student's District-funded home services will continue to be provided until phase four of the transition plan. Because both parties agree that the transition plan intended to provide DIS services in that fashion, there is no need to refer this matter to an IEP team for further consideration.

64.    Student requests monetary compensation for his mother's time spent in teaching him in the home program and reimbursement for materials purchased for use in the home program. Student's request is supported by neither the law nor the facts of this case. Student cites to no authority requiring a District to pay a parent a salary for educating his or her child at home. The District cites to one case, *Bucks County Department of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania* (3d Cir. 2004) 379 F.3d 61, in which a court awarded a parent monetary compensation for providing services to her child. However, that case was very unusual because the parent had received training to become a DIS service provider when she was unable to find another DIS service provider to give services to her child. The court limited its holding to a situation in which "a trained service provider was not available...." (*Id.* at p. 75.)

65.    In addition, there is no factual basis for reimbursing Student's parents for home program expenses or paying Student's mother a salary. As set forth in Factual Findings 246-248, there is a question as to how much of Student's educational time with his mother was spent in dedicated instruction and how much was spent transporting him to his various NPA providers and going to places such as Starbucks coffee shops. Although Student's mother sincerely believes that she was able to instruct Student during the time he

73

was at Starbucks and while she was driving in the car, it is doubtful that much education occurred there, particularly in light of the testimony by Student's own experts about how easily Student is distracted by his surroundings. Further, even if Student's mother is correct that she, not the NPA providers, provided Student's academic education, the evidence shows that Student's mother chose that course by insisting on Student's home placement as stay put. She was the one who pulled Student from his school placement in 2003, and she has been educating him at home since that time, except for a few days at Coronado Academy. Many parents choose to home school their children. No matter how excellent their instruction may be, they are not entitled to payment of a teacher's salary at public expense or reimbursement for their purchases.

ORDER

1.    The December 4, 2006 IEP is hereby modified to include the following language on page 2 under the heading of health nursing services:

> G-Tube feeding will be scheduled to occur daily in the nurse's office. A school nurse will be present and will personally assist the student with the student's G-Tube feeding. The G-Tube feeding will occur at the time(s) and in the manner designated in a doctor's order from Student's current physician. Student's mother will be responsible for providing the school nurse with a current doctor's order specifying the time(s) of the G-Tube feeding and the amount of formula to be used in the feeding(s), and for providing updated doctor's orders whenever there is any change in the G-Tube feedings.

2.    The December 4, 2006 IEP transition plan is hereby modified to include Student's mother as a participant in each of the collaboration meetings described in the transition plan which will occur prior to Student's movement from one phase of the plan to the next.

3.    The December 4, 2006 IEP transition plan is hereby modified to provide that, until Student reaches phase four of the transition plan, Student's District-funded DIS services will continue with his current NPA providers and at his current levels of service, except for the services of ACES. The District will continue to reimburse Student's mother for her transportation costs in transporting Student to and from those services during that time. Student's one-to-one behavioral services will be provided by the District in accordance with the December 4 IEP and transition plan, although references to ACES in the transition plan may be changed to another NPA provider of the District's choosing which offers comparable services to ACES.[34]

---

[34] During the hearing, it was learned that ACES is no longer willing to provide services to Student, so it is necessary for another NPA to take over the services that ACES would provide under the transition plan.

4.    If the District has not already done so, the District will reimburse Student's parents for their transportation costs as provided under the "stay put" IEP of July 17, 2006, upon proper documentation being submitted to the District by the parents.

5.    The District's triennial assessments conducted in July 2006, met all the requirements of law, and Student's parents are not entitled to reimbursement for any independent educational evaluations they obtained.

6.    In all other respects, the District's August 30, 2006, and December 4, 2006 IEPs offered a FAPE to Student and all other resolutions proposed by Student are denied.

## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with this statute: The Student prevailed on issues 10, 14 and 15. The District prevailed on the remaining issues.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated:  October 3, 2007

SUSAN A. RUFF
Administrative Law Judge
Special Education Division
Office of Administrative Hearings

**PROOF OF SERVICE**

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks, Suite 200**
**Sacramento, CA 95833-4231**

On **October 05, 2007**, I served a copy of the following entitled action:

**DECISION - OAH CASE NO. – 2006120002/2007010848**

to each of the person(s) named below, at the address set out next to each name, by the following method:

Allison and Robert Brenneise
11085 Canyon Point Court
San Diego, CA 92126

Steven Wyner, Esq.
Dana Wilkins, Esq.
Wyner & Tiffany
970 W. 190th Street, Suite 302
Torrance, CA 90502

Elizabeth Estes, Esq.
Sarah Sutherland, Esq.
Miller Brown & Dannis
750 B Street, Suite 2310
San Diego, CA 92101

☒  **US MAIL** – by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

XX  Regular Mail

☒  **FACSIMILE TRANSMISSION** – by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 263-0554, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**4:26 PM** on the **5** of **October**, 2007.  _____
                                                                      Rosie Ruiz

Case 3:08-cv-00039-WQH-WMC    Document 1    Filed 01/04/2008    Page 88 of 93
Received:                          Nov 21 2007 04:5
Wednesday 21 of Nov 2007, Faxination    ->310 792  988    Page  2 of 4

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Consolidated Matter of:<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>           Petitioner,<br><br>v.<br><br>STUDENT,<br><br>           Respondent; | OAH CASE NO.  N2006120002<br><br><br>**ORDER DENYING MOTION FOR CLARIFICATION** |
| STUDENT and PARENTS,<br><br>           Petitioners,<br><br>v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>           Respondent. | OAH CASE NO.  N2007010848 |

On November 8, 2007, the District filed a Motion for Clarification of the Decision issued on October 3, 2007, in the consolidated cases herein. After requesting and receiving an extension of time to respond to the District's motion, Student filed an opposition to the motion on November 19, 2007.

The District contends that the Decision is unclear with respect to Order Number Three:

        3.     The December 4, 2006 IEP transition plan is hereby modified to provide that, until Student reaches phase four of the transition plan, Student's District-funded DIS services will continue with his current NPA providers and at his current levels of service, except for the services of ACES. The District



will continue to reimburse Student's mother for her transportation costs in
transporting Student to and from those services during that time. Student's
one-to-one behavioral services will be provided by the District in accordance
with the December 4 IEP and transition plan, although references to ACES in
the transition plan may be changed to another NPA provider of the District's
choosing which offers comparable services to ACES.

In particular, the District believes that the language "will continue with his current
NPA providers" is unclear.

The District's position is not well taken. Both the Factual Findings and Legal
Conclusions make it clear that the order required the District to continue with Student's
*current NPA providers* during the transition phases.

The Factual Findings include the following paragraph:

196.   The December 4 transition plan does not specify whether any of
Student's DIS services given by the NPA providers besides ACES would
continue during the transition period. It also does not specify when and to
what extent District-provided DIS services would begin during the transition
period. According to the District's written closing argument the transition
plan would "...maintain [Student's] in-home aide and his current DIS
providers/levels of service until he was fully transitioned into school."
MarySue Glynn and Sheila Doctors confirmed during their testimony that the
District intended to have the NPA providers continue to give DIS services
during the early phases of the transition plan. However, that is not specified in
writing in the plan or in the IEP pages describing services.

The Legal Conclusions include the following paragraph:

63.   It is also appropriate to modify the December 4 IEP to include at
least one of Student's parents in the transition plan collaboration meetings and
to clarify that Student's District-funded home services will continue to be
provided until phase four of the transition plan. Because both parties agree
that the transition plan intended to provide DIS services in that fashion, there
is no need to refer this matter to an IEP team for further consideration.

There is nothing unclear about the Factual Findings, Legal Conclusions or Order.

Alternatively, the District asks that the Decision be modified based on facts which
occurred after the hearing. That relief is not proper.

Finally, the District argues that it was improper to order the District to continue to
fund the occupational therapy company which had been providing services to Student
because the company is not state certified. However, the District's own witnesses testified

2

that the District intended to continue the Student's current non public agency (NPA) providers in the December IEP's transition plan.  The Decision simply reflected what the District's own witnesses (and written closing argument) said was offered in the December 4, 2006 IEP.

The District's motion is denied.

Dated:   November 21, 2007

Susan Ruff
Administrative Law Judge
Special Education Division
Office of Administrative Hearings

3

Case 3:08-cv-00039-WQH-WMC    Document 1    Filed 01/04/2008    Page 91 of 93

Received:
Wednesday 21 of Nov 2007 Faxination

Nov 21 2007 04:5
->310 792   88

Page  1 of 4



State of California  •  Department of General Services  •  Arnold Schwarzenegger, Governor

## OFFICE OF ADMINISTRATIVE HEARINGS

**General Jurisdiction Division:**

| | | | | |
|---|---|---|---|---|
| Sacramento : | 2349 Gateway Oaks, Suite 200 | Sacramento, | Ca 95833 | (916) 263-0550 | (916) 263-0554 fax |
| Los Angeles | 320 W. Fourth Street, 6th Floor, Suite 630 | Los Angeles, | Ca 90013 | (213) 576-7200 | (213) 576-7244 fax |
| Oakland | 1515 Clay Street, Suite 206 | Oakland, | Ca 94612 | (510) 622-2722 | (510) 622-2743 fax |
| San Diego | 1350 Front Street, Rm. 6022 | San Diego, | Ca 92101 | (619) 525-4475 | (619) 525-4419 fax |

**Special Education Division:**

| | | | | |
|---|---|---|---|---|
| Sacramento | 2349 Gateway Oaks, Suite 200 | Sacramento, | Ca 95833 | (916) 263-0880 | (916) 376-6319 fax |
| Van Nuys | 15350 Sherman Way, Suite 300 | Van Nuys, | Ca 91406 | (818) 904-2383 | (916) 376-6319 fax |
| Laguna Hills | 23046 Avenida De La Carlota, Suite 750 | Laguna Hills, | Ca 92653 | (949) 598-5850 | (916) 376-6319 fax |

## FAX TRANSMITTAL INFORMATION PAGE

**Date:**  11/21/07                          **Time:**  5:03 pm

**To:**  Steven Wyner
**Fax number:**  1-310-225-2881

**From:**  Ruiz, Rosie

**Subject:**  Tyler Brenneise v. San Diego 2006120002-2007010848

**Number of pages:**  4

Please find the attached order Denying Motion for Clarification in the above-referenced matter.  Thank you,

Rosie Ruiz

Office of Administrative Hearings

2349 Gateway Oaks Drive, Suite 200

Sacramento, CA 95833-4231

916-263-5791 / 916-263-0890 (fax)

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 146187   — BH
* * C O P Y * *
January 07, 2008
16:11:08

## Civ Fil Non-Pris

USAO #.: 08CV0039 CIVIL FILING
Judge..: M. JAMES LORENZ
Amount.:                    $350.00 CK
Check#.: BC# 39115

Total–>   $350.00

FROM: CIVIL FILING
      S.D. UNIFIED SCHOOL DIST. V. T
      ET AL.

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**FILED**

**I. (a) PLAINTIFFS**

San Diego Unified School District

**DEFENDANTS**

T.B., a minor, Allison Brenneise and Robert Brenneise, his parents, Steven Wyner, and Wyner and Tiffany

JAN -4 2008

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Sarah Sutherland, Miller Brown & Dannis, 750 B Street, Suite 2310, San Diego, CA 92101, (619) 595-0202

Attorneys (If Known)

Steven Wyner, Wyner and Tiffany, 970 W 190th Street, Suite 302 Torrance, California 90502

**'08 CV 0039 L RBB**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury - Med. Malpractice | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 365 Personal Injury - Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 320 Assault, Libel & Slander |  | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** |  |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 340 Marine | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 862 Black Lung (923) |  |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 360 Other Personal Injury |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  |  |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Individuals with Disabilities Education Act, 20 U.S.C. Section 1415(i), 20 U.S.C. Section 2201

Brief description of cause:
Appeal from administrative hearing under the IDEA and declaratory relief

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE                    DOCKET NUMBER

DATE  1/7/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 146187    AMOUNT $350 - 1/7/08 PH    APPLYING IFP    JUDGE    MAG. JUDGE