# EXHIBIT A
# Part 1

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Consolidated Matter of:<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>      Petitioner,<br><br>v.<br><br>STUDENT,<br><br>      Respondent; | OAH CASE NO. N2006120002 |
| STUDENT and PARENTS,<br><br>      Petitioners,<br><br>v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>      Respondent. | OAH CASE NO. N2007010848 |

## DECISION

Administrative Law Judge (ALJ) Susan Ruff of the Office of Administrative Hearings (OAH), Special Education Division, State of California, heard these consolidated matters on May 14 - 18, 21 - 25, 29 - 31, June 1, 11 - 13, 19, 20, and July 11 - 13, and 16 - 20, 2007, in San Diego, California.

Steven Wyner, Esq., and Dana Wilkins, Esq., of Wyner & Tiffany, represented Student (Student) and Student's parents. Student's parents were present for most of the hearing. Student was not present.

EXHIBIT A

Elizabeth Estes, Esq., and Sarah Sutherland, Esq., of Miller Brown & Dannis, represented the San Diego Unified School District (District). MarySue Glynn, Director of Special Education for the District, appeared on behalf of the District.

On November 29, 2006, the District filed a due process hearing request in case number N2006120002. The District requested and received leave to file an Amended Due Process Request on January 9, 2007. On January 29, 2007, Student filed his request for a due process hearing in case number N2007010848 and requested that the two cases be consolidated. On February 1, 2007, OAH granted Student's request to consolidate the two cases and continued the hearing dates. The hearing began on May 14, 2007. At the close of the hearing on July 20, 2007, the parties requested the opportunity to file written closing argument. That request was granted. The matter was deemed submitted upon receipt of written closing argument on September 17, 2007.

ISSUES[1]

Issues Related to Assessments

1.    Is the District's Multidisciplinary Assessment dated July 14, 2006, appropriate?

2.    Did the District fail to assess Student in all areas of unique need during the 2006-2007 school year, particularly in the areas of speech and language, learning disabilities related to reading, writing, and math, assistive technology, listening comprehension, physical therapy and social/emotional?[2]

3.    Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student before eliminating physical health services?[3]

---

[1] Issues number one and ten were raised by the District. The other issues were raised by the Student. These issues have been reorganized from the way they were listed in the Prehearing Conference Order to provide greater clarity in this Decision.

[2] In the Prehearing Conference Order, issue two also included Student's claim that the District failed to assess in the area of behavior. However, that issue has been removed from issue two because it is already addressed in issue four which specifically relates to behavior. Likewise, issue two originally contained an allegation that the District failed to assess in the area of health, including dietary restrictions. The District's health assessment of Student will be addressed in issue three, regarding the District's alleged failure to assess before eliminating physical health services.

[3] Issue three originally read: "Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student before eliminating music therapy and physical health services?" Student withdrew the part of the issue involving music therapy during the hearing. Apparently Student did so in the belief that the failure to assess in the area of music therapy would then be included as part of Student's claim of failure to assess in issue two, above.

EXHIBIT A

2

4.     Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student's behavioral needs and failing to develop an appropriate behavior plan?

5.     Did the District violate IDEA by failing to reimburse Student's parents for the Independent Educational Assessments (IEEs) obtained by the parents, as requested by Student's mother at the October 9, 2006 IEP meeting?

Issues Related to the August 30, 2006 Proposed IEP

6.     Did the District deny Student a free appropriate public education (FAPE) during the 2006-2007 school year by failing to have an individualized education program (IEP) in place at the commencement of the school year on September 5, 2006?

7.     Did the District deny Student a FAPE during the 2006-2007 school year by failing to have appropriate team members – including Student's parent(s) – at the IEP meeting convened on August 30, 2006?

8.     Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose an appropriate placement for Student in the August 30, 2006 IEP?

9.     Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose appropriate goals and objectives in the August 30, 2006 IEP?

Issues Related to the December 4, 2006 Proposed IEP

10.     Did the District's education programming offer, memorialized in the proposed December 4, 2006 IEP, offer Student a FAPE designed to meet his unique needs and allow him to benefit from his education?

11.     Did the District deny Student a FAPE in the proposed December 4, 2006 IEP, by failing to develop annual goals and objectives that would enable Student to make educational progress and access the grade level general curriculum?

12.     Did the District deny Student a FAPE in the proposed December 2006 IEP by failing to provide adequate staff development and training in the use of Student's specialized software programs which Student needs to access the curriculum?

13.     Did the District deny Student a FAPE by failing to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP?

Issues Related to Both IEPs

14.     Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop an appropriate health care plan that would enable Student to attend school safely?

EXHIBIT A

3

15.    Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop and implement an appropriate transition plan to transition Student from a home school program to a school based program?

16.    Did the District violate the provisions of the Individuals with Disabilities Education Act (IDEA) by failing to implement a "stay put" placement as of July 25, 2006?

17.    Did the District deny Student a FAPE for the 2006-2007 school year by failing to allow meaningful participation in the IEP process by Student's parents?

18.    Did the District deny Student a FAPE during the 2006-2007 school year by failing to consider the goals and objectives proposed by Student's parents?

FACTUAL FINDINGS

*Is the District's Multidisciplinary Assessment dated July 14, 2006, appropriate?*

1.    The District conducted a triennial assessment of Student and issued a report dated July 14, 2006. The parties dispute whether that assessment was appropriate and whether the District assessed Student in all areas of unique need during the 2006-2007 school year.

2.    A school district is required to assess a special education student in all areas of educational need at least once every three years. This three year assessment is often referred to as a "triennial assessment." In order to meet the requirements of the law, an assessment must be performed by the appropriately qualified individuals, must include tests and assessment materials that are tailored to assess the student's areas of unique need, and must not be racially, culturally, or sexually discriminatory.

3.    Student is a 13-year-old boy who has needed special education services since he first entered school. During the 2006-2007 school year (the school year relevant to this proceeding), he was eligible for special education services under the category of autism. Student has a serious health condition known as Phenylketonuria (PKU). Student was born without the ability to metabolize the amino acid called Phenylalanine (PHE). This amino acid naturally occurs in food proteins and is essential for life. However, if too much PHE builds up in an infant's body, over time it can cause brain damage and other ailments. An individual who has PKU must carefully monitor food intake to maintain a certain level of PHE (but not more). In addition, every day the individual with PKU must drink a special formula that provides necessary nutrients, but is free of PHE. This formula has an unpleasant taste, but infants who grow up drinking the formula are used to it.

4.    There is a blood test given to newborn infants to check for PKU. Once the condition is discovered, immediate dietary steps can be taken to make certain that the infant's PHE levels never rise high enough to cause brain damage to the infant. Individuals

with PKU also undergo periodic blood testing throughout their lives to make certain that the levels of PHE in their blood are within acceptable limits.

5.    Due to medical error, Student's PKU condition was not noted at birth and was not diagnosed until Student was three years old. For this reason, Student suffered irreversible brain damage and other physical difficulties caused by the late-diagnosed PKU.

6.    Because of Student's age and impaired condition when his PKU condition was discovered, he was unwilling to drink the special PHE-free formula that contains the nutrients essential for children with PKU. After unsuccessful attempts to entice Student to drink the formula, Student's physicians fitted him with a gastrostomy tube (G-Tube) through which the formula could be poured directly into his stomach. At the start of the 2006-2007 school year, Student had G-Tube feedings twice a day, but later in the year his physician recommended G-Tube feedings at least three times a day. Student also suffers from a mild seizure disorder, exhibits autistic-like behaviors, and has difficulty with gross and fine motor skills as a result of his late-diagnosed PKU.

7.    The parties dispute whether Student suffers from osteoporosis or osteopenia which is significant enough to affect his school activities. Osteoporosis is a weakening of the bone structure which leads to bone fractures. Osteopenia is one step short of osteoporosis. It refers to a weakness in the bones, but not bones that are ready to fracture at any moment. It is necessary to take medication to combat osteoporosis, but not osteopenia.

8.    Medical testing in 2005 indicated that Student suffered from osteoporosis or osteopenia. Later physician evaluations indicated that he did not have osteoporosis, and questioned whether his osteopenia was significant enough to restrict his daily activities. However, it is not necessary to decide the question for purposes of this Decision, because the evidence shows that at the time of the 2006 triennial assessment, the August 30, 2006 IEP offer, and the December 4, 2006 IEP offer, the District reasonably believed that Student had osteoporosis and osteopenia, and made its IEP offers accordingly.[4]

9.    In addition to Student's significant health needs, he also has educational needs as a result of his late-diagnosed PKU and resulting brain damage. Student has needs in the areas of reading, writing, mathematics, daily living skills, keyboarding and computer use, speech/language and social/emotional skills. Student reads independently at a third grade level, is at approximately a third grade level in math calculations, and has extremely poor writing skills. Student has auditory and visual processing problems that affect his ability to learn in a regular classroom environment, as well as attention issues, difficulty maintaining focus on tasks, and some behavioral difficulties such as hitting his head and rubbing his eyes.

_____

[4] On September 18, 2006, prior to the December 4, 2006 IEP meeting, Dr. Ron Newfield conducted a follow-up examination of Student and concluded that the testing did not show osteoporosis or any significant osteopenia. He found no need to restrict Student's activities beyond what he would restrict for any typical child. He recommended that Student stop taking the osteoporosis medication. However, Student's mother did not inform the District of Dr. Newfield's opinion before or during the December 4, 2006 IEP meeting,

EXHIBIT A

5

10. Student's parents and the District have a history of disputes about Student's education. In 2003, Student's parents pulled Student from the District schools and began educating him at home. As a result of due process proceedings and settlement agreements, as of July 2006, Student was being educated in a home program which involved services provided by non-public agency (NPA) providers, some of which were paid for by the District.

11. In July 2006, Student was due for his triennial assessment. The District conducted that assessment during June and July 2006. The assessment included a psychoeducational assessment, including cognitive and achievement tests, a social skills and adaptive behavior assessment, an academic assessment in the areas of reading, writing and math, a speech/language assessment, an occupational therapy assessment, which included testing in the area of visual perception, an adaptive physical education assessment, and an assistive technology assessment. The District's assessment report was dated July 14, 2006. The District also performed separate health and auditory assessments.

12. On July 17, 2006, the parties held an IEP meeting to receive the assessor's reports and discuss the assessments. At that meeting, Student's counsel explained that Student's mother would be sending the District a written letter with comments regarding the report.

13. On that same day, the parties agreed to an IEP which placed Student in Coronado Academy for an extended school year (ESY) program, during the summer of 2006. Coronado Academy is a public school, but it is not a school within the District. That July 17, 2006 IEP became the "stay put" IEP which will be discussed later in this Decision. The two IEP proposals in dispute in this case, which will also be discussed later in this Decision, were presented at IEP meetings held on August 30, 2006, and December 4, 2006.

14. The District faxed Student a revised assessment report on August 18, 2006, based on the input received during the July 17, 2006 meeting. That revised report is the multidisciplinary assessment report at issue in this case.[5]

15. On August 18, 2006, Student's mother sent an email to MarySue Glynn, the District's Director of Special Education, with 31 pages of questions, concerns and comments about the original July 14 assessment report. Student's mother explained in her cover email that she had not had time to review the revised report yet. On September 29, 2006, the District's counsel faxed a 31 page letter to Student's counsel responding to the questions and concerns Student's mother raised in the August 18 email. On October 7, 2006, Student's counsel's office sent another email to the District with additional comments about the assessment.

---

[5] It will be referred to as the "triennial assessment."

EXHIBIT A

6

16.    The evidence supports a finding that the District's July 2006 assessment of Student met the requirements of the law.[6] Testing was performed by trained and knowledgeable personnel and administered in accordance with the test manufacturer's instructions. The tests were selected to assess specific areas of Student's educational needs. The school psychologist administered the tests relating to intellectual and emotional functioning. The testing and other assessment materials were selected and administered so as not to be racially, culturally or sexually discriminatory. No single measure or assessment was used to determine Student's eligibility for special education services or what services he requires. The tests were administered in Student's native language (English), and they were used for the purposes for which they were valid and reliable.

17.    Dr. Robert Patterson, Student's psychoeducational expert, testified that the triennial assessment report was "generally…well done" and that it identified Student's major needs. His two main objections to the report involved the style of the report. First he had a concern that the report, as written, would be difficult for an unsophisticated parent to read and understand. He also expressed concern that the District's report set up "straw men" issues, such as whether Student was properly classified with autism. In his opinion, there is no dispute about these "straw men" issues and they should not have been discussed in the triennial assessment.

18.    The evidence supports a finding that neither of Dr. Patterson's objections is sufficient to invalidate the District's assessment. Student's mother was not an unsophisticated individual who might be confused by a technical-sounding report. Instead she is astute, dedicated and well-versed in special education procedures. She acts as an advocate for other parents in special education matters, and was represented during the 2006-2007 school year by one of the most respected special education attorneys in the field. Following her receipt of the District's assessment report, she sent a 31-page letter to the District, containing questions and concerns about the information in the assessment. The District's counsel sent an equally long letter in response, addressing each of her concerns and questions. Any problems with the presentation of the report were addressed in that follow-up correspondence. Likewise, even if the District's report discussed irrelevant matters and "straw men," it still covered the essential elements required by law and was still valid and reliable.

19.    Dr. Patterson also took issue with the assessment because the District did not conduct some of the specific tests listed in the assessment proposal the parent signed. However, Michele Bronson, the school psychologist, testified that she determined during the course of the assessment process that she had sufficient information to determine Student's needs and did not need to conduct those assessments. Student cites to no legal authority

---

[6] During the hearing, the parties stipulated that each of the District witnesses, if questioned on direct examination, would testify that the District's triennial assessment met the various requirements of the law. Because of the stipulation, there is no need for this Decision to discuss the testimony of each of the District employees involved with the assessment and the actions each one took in conducting the assessment. Instead, this Decision will focus on those areas in which Student contends the District's assessment was deficient and the testimony of the witnesses related to the alleged deficiencies.

requiring a district to conduct all proposed assessments if it has sufficient information. There was no violation.

20.    Student's experts criticized some of the District's assessors for using prompts and accommodations. However, the District assessors were unanimous in their testimony that no prompts or accommodations were used in a way that would invalidate assessment results.

21.    Student also takes issue with a few of the individual tests and assessments administered as part of the triennial assessment. In particular, Student's experts criticized the speech/language portion of the triennial assessment and the academic assessment.

22.    The speech/language portion of the District's assessment was conducted by Rachel Zijlstra, a speech/language pathologist who directs a company known as Sound Therapies. Zijlstra is not a District employee, but she was hired by the District to conduct the assessment. She is on the Board of Directors for the San Diego chapter of the Autism Society and has provided speech/language services to hundreds of students over the years. Zijlstra found that Student had adequate language for academic success, but showed significant deficits in the areas of social language and ability to communicate ideas.

23.    Student's speech/language expert Joanne Hein conducted her own assessments of Student in 2005 and December 2006. Hein is a well qualified speech/language pathologist who has treated speech/language patients for over 30 years. She criticized the District's speech/language assessment because it failed to sufficiently address receptive language and because it emphasized Student's difficulties with social communication while minimizing his significant problems with his underlying language skills. She felt that the District's findings were not detailed enough with respect to the context in which Student's strengths and weaknesses occurred (for example, whether Student exhibited certain types of language strengths in various settings). She disagreed with the District's conclusion that Student had adequate language for academic success. She also disagreed with the recommendations for services made in the District's assessment.

24.    Hein's criticisms of the District's assessment are not sufficient to invalidate that assessment. Both Hein and Zijlstra testified that many of their test results and findings were very similar. Hein agreed that at least some of the testing done by Zijlstra was appropriate and done correctly. Contrary to Hein's observations, a review of the speech/language portion of the District's assessment shows that there was constant mention made of the context in which Student performed and how his performance differed in unstructured settings. At least one of the tests given by Zijlstra, the Comprehensive Assessment of Spoken Language (CASL), did address the issue of receptive language. Hein said that she prefers to use different tests, because she felt that the CASL does not sufficiently distinguish between expressive and receptive language, but she admitted that it is a respected test.

8

25.    During her testimony, Hein admitted that she had never observed Student in a social situation or even with a peer. All her testing was done in her office. Zijlstra, on the other hand, observed Student in a social skills group at ACES[7] as well as conducting tests in an office. Zijlstra's conclusion that Student's greatest areas of need with respect to speech/language involved social communication and Student's ability to communicate ideas was supported by the testimony of other witnesses, including the District's academic assessor Nancy Fazio and school psychologist Michele Bronson. Even Student's expert Dr. Patterson recognized Student's needs in the social/emotional area.

26.    The evidence supports a finding that the District's speech/language assessment was appropriate and sufficient to address Student's needs.

27.    Student also criticized the portion of the triennial assessment which related to academic skills, in particular reading and writing. The academic portion of the triennial assessment was performed by Nancy Fazio, a program diagnostic resource specialist working for the District. She has been with the District since 1978 and has held positions as a resource specialist and special day class (SDC) teacher, among others. She holds both special education and general education teaching credentials. She has taught hundreds of special education students over the years and has conducted hundreds of assessments. She found that Student had a good vocabulary and could pull information from a text if asked very specific questions, but he lacked the ability to draw inferences from what he read. She found that he could read comfortably at a third grade level, but was inconsistent at higher grade levels. His instructional reading level was in the fourth to sixth grade range. He could read a story at higher levels, but needed support to draw conclusions. He would get caught in detail and miss the main idea of the story. His greatest needs were his inferential and higher order thinking skills.

28.    Student's reading expert Lynne Thrope concurred with the District's assessment that Student's independent reading level was at the third grade, and found his instructional reading level was at the fourth grade. She reported that Student had dyslexia, a visual reading disorder, dysgraphia, a disorder of written expression, and a central auditory processing deficit. She disagreed that Student's instructional reading level went from fourth to sixth grade. She believed there is no way Student could do sixth grade work. However, most of her criticisms of the triennial assessment involved the District's references to her own previous assessment. While she agreed with many of the District's findings, she believed that she was misquoted more than once in the District's assessment report. She also believed that the District's assessment did not address Student's areas of need in word recognition, spelling and vocabulary. She felt that just because Student was stronger in these areas did not mean he could not learn more. She also felt that skills related to literal comprehension should be part of his educational plan.

---

[7]  Comprehensive Educational Services, Inc., doing business as A.C.E.S. (ACES), was the NPA that, among other things, supplied Student's behavioral aides for his home program and provided him with instructional services.

29.    With respect to writing, Thrope felt that the District's assessment did not address all of Student's written communication needs. Unless he would be in a computer driven classroom, he would need a lot of work in constructing sentences, formation of letters and similar tasks.

30.    The evidence supports a finding that the District properly assessed Student in his academic areas of need. The District had Thrope's previous assessment report and referred to it in the District's assessment. Thrope's findings were very similar to Fazio's regarding Student's reading levels. Although Thrope believed that the designation of Student's instructional reading level of fourth through sixth grade was in error, she did agree that his instructional level was at fourth grade. Just because Fazio's test results showed Student had some skills above fourth grade level did not invalidate Fazio's findings. Because Student's program anticipated that he would learn to use the computer for writing, it was not necessary to do a detailed academic assessment of his needs with respect to formation of letters. The assessment properly recognized that he had a weakness in that area and that he needed assistive technology. While Thrope would have preferred additional assessment in the areas of vocabulary, word formation, and literal comprehension, she did not dispute that Student's primary area of weakness involves drawing inferences.

31.    In Student's written closing argument, Student contends that the District did not assess in the areas of executive processing skills and speed, short term and working memory, social language, oral motor skills, speech and intelligibility, and motor skills related to oral and G-Tube feeding. However, a review of the triennial assessment report shows that each of these areas or the skills underlying these areas was addressed. Student also contends that the District failed to assess in the area of occupational therapy (OT), but the evidence does not support that contention. The District's triennial assessment contains a comprehensive OT section, covering the aspects of OT which Student contends were missed.

32.    The evidence supports a finding that the District's Multidisciplinary Assessment dated July 14, 2006, was appropriate and met the requirements of law.

*Did the District fail to assess Student in all areas of unique need during the 2006-2007 school year, particularly in the areas of speech and language, learning disabilities related to reading, writing, and math, assistive technology, listening comprehension, physical therapy and social/emotional?* [8]

Speech/Language

33.    As set forth in Factual Findings 22-26 above, the District's speech/language assessment conducted as part of the triennial assessment was comprehensive and identified

---

[8] Although Student's counsel stated during the Prehearing Conference that one of Student's issues involved the District's failure to adequately assess in the area of assistive technology, Student's written closing brief omitted any argument on that issue, so presumably Student dropped that issue. However, even if that is still an issue in the case, the validity and comprehensiveness of the District's assistive technology assessment was well supported by the testimony of Anne Callies, the District's assistive technology expert who conducted the assessment.

EXHIBIT A

10

Student's unique needs in that area. Student did not present any evidence to show that Student's speech/language needs changed during the remainder of the 2006-2007 school year to warrant a second assessment. Student's expert Joanne Hein testified that when she assessed Student in December 2006, his speech/language needs had changed very little since her assessment in 2005.

Academic Areas of Reading, Writing and Mathematics

34.    As set forth in Factual Findings 27-30 above, the District's Multidisciplinary Assessment included sufficient testing and assessments in the area of Student's unique needs in academic subjects such as reading, mathematics and writing. There is no evidence that Student's needs changed after the July 2006 triennial assessment to an extent that a new assessment would be mandated.

Listening Comprehension

35.    Student contends that the District failed to assess in the area of listening comprehension. The evidence does not support Student's contention.

36.    On July 26, 2006, Marcia Veltre, an audiologist working for the District, conducted extensive testing relating to Student's central auditory processing disorder and his difficulties with listening comprehension. Student's auditory expert Carol Atkins criticized the way Veltre administered and reported her findings on some of the tests. For example, Atkins raised concerns that Veltre did not distinguish between one ear and the other on the frequency and duration discrimination test.[9] However, she admitted that her findings and Veltre's findings in general were very similar. When Atkin's drafted her May 2007 report, she relied on Veltre's test results and previous testing done of Student, rather than conducting new tests of Student.

37.    The main disagreement between the two reports is whether Student requires direct auditory services designed to remediate his central auditory processing deficit. There is a dispute among the experts as to whether training designed to remediate auditory processing deficits has any value for a child of Student's age. Maturation of the auditory nervous system is thought to be maximized around 10 to 12 years of age. Atkins herself wrote in her April 21, 2005 report that "Persistent difficulty at his age suggests that modification of the listening environment and developing self-advocacy strategies may be more beneficial than direct therapy." Veltre's recommendations included modifications and accommodations to the classroom environment to address Student's auditory needs, but did not recommend direct remediation designed to reduce Student's auditory processing deficit.

---

[9]  In Student's written closing argument, Student contends that Veltre only tested one ear. The evidence does not support that contention. Atkins criticized Veltre for failing to distinguish between the two ears on one type of test, not for only testing one ear to the exclusion of the other. Many of the tests reported in Veltre's assessment showed separate results for each ear.

11

38.    Despite the disagreement over recommended services, the evidence supports a finding that Veltre's assessment properly identified Student's listening comprehension needs in her assessment. The District did not fail to assess Student in the area of listening comprehension.

Physical Therapy

39.    Student contends that the District failed to assess Student in the area of physical therapy (PT). The District's triennial assessment did not contain a specific PT assessment. On June 6, 2006, prior to the preparation of the triennial assessment report, the District sent a supplemental assessment proposal to Student's mother which included a proposed PT assessment. Student's parents did not consent to the proposed assessment and no specific PT assessment was conducted by the District.

40.    The District's physical therapy expert Patricia La Bouff explained that the triennial assessment provided sufficient information to address Student's PT needs, and that after that triennial assessment was completed, she no longer believed a separate PT assessment was necessary. The OT and adaptive physical education (APE) portions of the assessment adequately determined Student's needs in the areas of core strength, posture, endurance, coordination and movement.

41.    Student's PT expert Roxanne Husson identified the same basic needs for Student as LaBouff did during her testimony, including core strength and endurance. She also found that he needed limitations in his physical activity due to his osteoporosis. She did not conduct any independent tests to determine whether he had osteopenia or osteoporosis, but instead relied upon the doctors' reports.

42.    La Bouff explained that part of the reason for the District proposing a PT assessment was to address the concerns of Christian Vinceneux, the occupational therapist providing services to Student through an NPA, that Student's primitive reflexes might not be fully integrated. Primitive reflexes are automatic, involuntary physical movements used by infants to begin development of motor skills. For example, when an infant turns his head to the side, his arm moves as well, as a precursor to developing hand-eye coordination. Usually as the child grows older, the child is able to overcome these primitive reflexes. Based on his observations of Student during OT sessions, Vinceneux determined that Student still exhibits primitive reflexes which would affect his coordination and motor skills.

43.    After Student's parents refused the proposed PT assessment, La Bouff observed Student's physical activity during the OT and APE assessments and determined that Student was able to overcome his primitive reflexes when appropriate. There was no need for a further assessment. She also opined that current PT theory and studies show that reflex integration intervention is not effective.

44.     The evidence does not support a finding that the District failed to assess Student in the area of PT. Although the District initially sent an assessment plan to Student's parents (to which the parents did not consent), the District was able to determine Student's unique needs with respect to PT through the other tests and assessments done during the triennial assessment. There is no indication that Student's PT needs changed during the 2006-2007 school year to warrant another assessment. The evidence is disputed as to whether Student had needs relating to integration of primitive reflexes, but even if he did, the District had enough information in the triennial assessment and Vinceneux's prior reports to address those concerns. There was no need for additional assessment.

Social/Emotional

45.     Student also contends that the District failed to properly assess Student's emotional needs, including his social skills. Contrary to Student's claims, the District's psychoeducational assessment included rating scales designed to assess his adaptive behavior and social functioning. His significant needs in social communication and social awareness were discussed throughout the District's assessment. His social skills and needs were analyzed by Michele Bronson, the District's school psychologist, as well as the speech/language assessor and the APE assessor. The District's attempts to get Student away from his home program and into an educational environment with other children were a direct result of the District's understanding of those needs. The evidence does not support a finding that the District failed to assess in the areas of social/emotional needs.

Music Therapy

46.     Student contends that the District failed to assess in the area of music therapy. At various times in the past Student has received music therapy and sound therapy to assist him in his academic pursuits.

47.     Sound therapy and music therapy are two different techniques used to assist a child with academic performance. Sound therapy involves a child listening through headphones to particular selections of music. The music is chosen to help soothe the child and prepare the child to focus on academic tasks. It may be used as part of an OT program. Music therapy involves songs with words taught to a child to help with matters such as memorization. A good example is the familiar "ABC" song that children sing to help them memorize the alphabet.

48.     The evidence does not support a finding that Student has academic "needs" in the area of music. Instead, both sound therapy and music therapy are tools used to assist with his academic, attention and processing needs.

49.     Michele Lazar, the founder of Coast Music Therapy, a private agency that provides music therapy services, explained that Coast Music Therapy does not identify areas of need when they evaluate children for music therapy services. Instead they rely on other assessments and evaluate whether music therapy could assist pupils with any of the needs

EXHIBIT A

identified by other assessors. They are not qualified to determine areas of need. She testified that music therapy is effective as a memorization aid for younger children. However, after children reach a certain age, their studies tend to be less about rote memorization and more about higher thinking skills. She believed that music therapy might assist Student with his social skills by helping Student memorize "social scripts" that he could use when dealing with other Students. However, she admitted that she did not know if other strategies would work just as effectively.

50.     Contrary to Student's claims, there was no need to assess Student in the area of music therapy. The other comprehensive assessments of Student were sufficient to allow the IEP team to determine if Student's unique needs could be met by the inclusion of a music therapy program as part of his designated instruction and services (DIS services). According to the triennial assessment, most of Student's academic needs were in the area of higher thinking and inferential reasoning, not rote memorization. While music therapy might help Student to memorize social scripts, there was no evidence that it was a required technique or even a necessary technique to increase his social awareness. The evidence does not support a finding that the District failed to assess in all areas of unique need because the District failed to provide a music therapy assessment.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student before eliminating physical health services and failing to appropriately assess Student regarding Student's health needs, including diet?*

51.     Student contends that the District failed to assess Student with respect to Student's health needs during the 2006-2007 school year and that the District eliminated physical health services without an assessment.

52.     The "stay put" IEP of July 17, 2006, provided for 30 minutes per month of "specialized physical health care services." These specialized services were to consist of PKU training for all staff and food handling services as described elsewhere in the IEP.

53.     The District's August 30, 2006 IEP proposal did not contain a listing of "specialized physical health care services." However, it did contain a proposal for eight hours per year of "health nursing services." The District employees explained that these health nursing services were the same as the "specialized physical health care services" in the "stay put" IEP. The December 4, 2006 IEP contained the same provision for eight hours per year of "health nursing services." The district nurses testified that eight hours of health nursing services included three hours of training of school staff by the school nurse regarding Student's health needs and five hours thereafter as needed to follow up with the school staff.

54.     The evidence supports a finding that there was no elimination of specialized physical health services in the August and December 2006 IEP offers. The change of name did not change the fact that the service was offered. The evidence does not support a finding that the District eliminated physical health services without an assessment.

55.     Student also contends that the District failed to sufficiently assess Student's health needs during the 2006-2007 school year.  The evidence does not support this contention.

56.     On June 30, 2006, Dr. Dewan, one of Student's treating physicians at Children's Hospital, sent a letter discussing Student's PKU needs, his G-Tube feeding and his osteoporosis/osteopenia.  On July 5, 2006, the District sent Student's parents a release form to obtain medical information from Student's doctors with respect to his various health conditions, including PKU, epilepsy, and osteoporosis. The names of the physicians on the form were left blank to permit Student's mother to fill in the names of the appropriate doctors.  Student's mother responded with a fax stating:

> At this time, I am disinclined to sign any medical release.  The district's MS, Dr. Howard Taras, the district doctor, should be appropriate to offer whatever general information the district needs in order to provide a FAPE to [Student].

On July 10, 2006, Student's mother apparently changed her mind and signed a release permitting the District to obtain information from Dr. Dewan.

57.     On July 12, 2006, Student's physician Dr. Reich signed an authorization for G-Tube feeding by the District at 7:00 – 7:30 a.m. and 2:30 – 3:00 p.m.  The amount of formula and procedure for the feeding were specified in the order.

58.     Prior to June 25, 2006, Dr. Carolynne Casey, a school nurse working for the District, conducted a health assessment of Student and prepared a report.  The assessment was based on information provided by Student's mother, Casey's observation of Student's G-Tube feeding, and a review of available medical records.  The report addressed Student's health needs with respect to his PKU and G-tube feedings.  The report made recommendations for specialized health care services and accommodations to be provided for Student in order to enable him to access his education.

59.     Around the end of June, Casey withdrew from Student's assessment team because of problems with her health.  Dr. Casey's assessment was later finalized by other District personnel.  Portions of her report, including some of the information provided by Student's mother to Casey and Casey's description of the G-Tube feeding, were redacted prior to the time the report was finalized.  The report did not state that material had been redacted, and Casey was not aware of the redactions until months later.  The final report also included additional information regarding osteoporosis that was not in Casey's original report.

60.     The District did not provide a satisfactory explanation during the hearing for why Casey's report of her observations of the G-Tube feeding was removed from the final assessment.  Dr. Casey testified that the feeding observation information was "extremely

15

critical information," and she could not understand why it was redacted.[10]

61.    Despite the redactions to Dr. Casey's report, the evidence supports a finding that, as of August 30, 2006, when the first IEP proposal at issue in this case was made, the District had sufficiently assessed Student regarding Student's health care needs. While Casey's information about the G-Tube feeding was important, the District had that information included in the orders received from Student's doctors. The District's medical expert Dr. Howard Taras testified that the District had enough information to prepare a health plan for Student as of August 30. None of Student's witnesses contradicted this.

62.    After the triennial assessment, there was further interaction between the parties regarding Student's health needs. In approximately October or November 2006, Sheila Doctors, the District's case manager for Student, attempted to contact Dr. Dewan to obtain information regarding the relationship between PKU and sensory motor integration difficulties. She learned that Dr. Dewan was no longer working at Children's Hospital. Student's mother did not know that Dewan was no longer at Children's Hospital until Sheila Doctors told the IEP team about it during an IEP meeting.

63.    Prior to November 15, 2006, Student requested an independent health evaluation to be done at District expense. In mid-November, the District staff consulted with Dr. Taras to determine which types of specialists would be appropriate for the independent medical evaluation. On November 15, 2006, the District faxed a letter to Student's counsel agreeing to fund such an assessment. On the same day, after receipt of the District's letter, Student's counsel sent a letter withdrawing the request.

64.    On November 17, 2006, the District sent a proposed assessment plan for medical assessments by a pediatric gastroenterologist and orthopedist, including a release for medical information form and agreement to authorize payments for the medical assessment. The cover letter stated in part:

...while [Student's mother] has withdrawn her request for an independent health assessment, the District nonetheless believes medical assessments, performed by both a pediatric gastroenterologist and orthopedist, are necessary. This will ensure proper identification of [Student's] PKU related needs, ensure the District is addressing all of [Student's] health related needs,

---

[10] The redaction of Dr. Casey's draft assessment was not even discovered by Student until the testimony of Jennifer Gorman, a nursing administrator for the District. During cross-examination, Nurse Gorman admitted that during a conversation with Dr. Casey in preparation for this hearing, Casey told Gorman that the assessment report had been changed and faxed Gorman a copy of the original assessment report. When Gorman was asked during her testimony if she had a copy of the original report, she first answered that she did not have it with her. Upon follow-up questioning, she admitted that the faxed report was in her purse next to the table where District's counsel was sitting. Apparently, District's counsel knew about Dr. Casey's unredacted report prior to the hearing, but never produced a copy to Student's counsel, despite a records request by Student's counsel, because the District believes that drafts of assessment reports are not educational records that must be produced under state or federal law.

and address [Student's mother]'s concerns with the District's health assessment.

Dr. Taras explained that the District had requested the outside medical assessment in November because Student's mother insisted that the District could not keep her child safe at school. The District did not believe that it lacked sufficient information to provide for Student's needs.

65.    Around November 21, 2006, Student experienced some medical problems. As part of a series of email messages regarding the scheduling of an IEP meeting, the District requested that Student's mother sign the assessment plan for the independent medical evaluation "especially given this new information about [Student's] health." Later that day, Student's mother agreed to the proposed assessment plan, and her counsel's office sent an email requesting the names of the independent doctors that the District wished to use for the assessment so the parents could schedule the appointments.

66.    Student's mother sent a separate letter on November 21, 2006, in which she revoked her release for the District to obtain information from Dr. Dewan. She testified at hearing that she did so because the District had not complied with her request that they provide her with a written statement regarding anything discussed with the doctor.

67.    On December 4, 2006, Dr. Taras met with Student's mother during a break in the IEP meeting. He asked her to sign medical releases to let the District obtain medical information from Student's current physicians. Based on his understanding that signed releases would be forthcoming, he determined that an independent medical assessment was not necessary. Dr. Taras believes that obtaining an outside medical evaluation is not as good as obtaining information directly from the child's treating physicians. It is important to make certain that Student's medical needs are being addressed in a consistent manner at both school and home.

68.    On December 15, 2006, Dr. Taras sent a letter to Student's counsel's office explaining that no further medical assessment was necessary at that time "because I could not determine what, if any, specific differences there were between the District's and the parent's positions on a suitable health plan for [Student]."

69.    As of January 16, 2007, Student's mother had not signed any releases, and the District had not scheduled the independent medical assessment. On January 16, 2007, District's counsel sent a letter to Student's counsel requesting that Student's mother sign the releases for medical information that Dr. Taras would bring to the meeting with Student's mother.

70.    On January 17, 2007, Student's counsel replied with a letter explaining that Student's family was in the process of establishing a new medical treatment team for Student's treatment. On January 19, 2007, Dr. Taras met with Student's mother to discuss

EXHIBIT A

the development of a health care service plan for Student. He also discussed the need for medical releases at that meeting.

71.     On February 5, 2007, the District's counsel sent a letter explaining the need for Student's mother to submit releases so the District could obtain recent health information from Student's physicians. The letter states that either the parents should sign the releases, or the District would have to continue with the independent health assessment signed by Student's mother on November 21, 2006.

72.     On February 7, 2007, Student's mother signed a release for the District to obtain medical information from Dr. Cohen and Dr. Reich. The release was limited to providing that information to Dr. Taras, another doctor or a school nurse. On February 14 and 15, 2007, Dr. Taras telephoned these doctors. The doctors gave him inconsistent information about the amount of Phenex 2 formula[11] student received in his G-Tube feedings each day. When Taras tried to clarify with them regarding the correct amount of Phenex, they referred Taras to Dr. Cederbaum as the physician who was actually dealing with Student's PKU issues.

73.     On March 13, 2007, the District sent release forms to Student's mother to obtain medical information from Dr. Cederbaum and other doctors who had seen Student (Dr. Newfield, Dr. Pring and Dr. Serena). On April 5, 2007, Student's mother signed the releases, but limited her authorization to verbal communications with the physicians only, not transfer of patient records. Those signed releases were transferred to the District on April 6, 2007. The restrictions on these releases made it cumbersome for Dr. Taras to deal with these doctors when he contacted them by telephone. For example, Dr. Cederbaum wanted to send Taras a written report regarding Student. When Taras explained that he could not under the terms of the release, Cederbaum was annoyed and never provided the information Taras needed. Taras did not obtain the correct dose of Phenex from Cederbaum.

74.     On April 27, 2007, Student's mother revoked her consent for the District to contact Dr. Cederbaum. The reason stated in counsel's letter was that the District had "misrepresented the facts of this case, as well as the contents and quality of the District's various offers for [Student's] placement and services…." During the hearing, Dr. Taras denied that any such misstatements were made.

75.     On May 2, 2007, the parties held an IEP meeting to discuss Student's ESY placement for the 2006-2007 school year. Dr. Taras prepared a draft of a health care service plan for Student, but was unable to finalize it, because he still needed specific information regarding how much Phenex formula Student was taking during each G-Tube feeding and he needed to know which school Student would be attending. After the meeting, the District sent another medical assessment plan to Student's parents. Counsel's letter explained that

---

[11] Phenex 2 is the type of PHE-free formula used in Student's G-Tube feedings.

18

this new assessment plan was not precisely the same as the November 21, 2006 assessment plan to which Student's mother had consented.

76.    On June 28, 2007, Student's counsel sent a reply letter questioning whether a medical assessment was necessary in light of the documents which the District subpoenaed in connection with this administrative hearing. The District sent a responsive letter on July 2, 2007, explaining that the District needs current doctors' orders before providing services, and needs authority to discuss any questions regarding those orders with the physician. If the parent will not provide the releases, then the District needs an assessment.

77.    On July 17, 2007, Student's counsel wrote back explaining that Student's mother would sign releases "now that the due process proceeding is drawing to a close and the District cannot use information obtained from [Student's] physicians against [Student's parents] in the proceeding...."

78.    The evidence supports a finding that, at all times, the District was aware of the four health needs of Student – his PKU/dietary needs, G-Tube feeding, seizures and osteoporosis/osteopenia. These basic health needs did not change as the 2006-2007 school year progressed and there was no need for additional medical testing or assessments to determine if Student had those needs. Instead, what the District required was current medical information from Student's doctors regarding the details of Student's treatment – things such as the time of Student's G-Tube feedings each day and the amount of Phenex formula in each feeding. Those matters should have been obtained through medical releases signed by Student's mother and orders provided by the doctors. The limitations on the releases by Student's mother and refusal to provide releases hampered the District's efforts to prepare a health plan, but did not invalidate the District's prior assessment.

79.    The District's subsequent assessment plans to conduct independent health assessments in November and May do not change this. As Dr. Taras explained, the District only made those offers because of the complaints by Student's mother that the District could not keep her child safe at school. They wanted an outside opinion about whether it was safe. While there was nothing improper about the District's wish to satisfy parental concerns, it was not necessary for the District to do so in order to understand Student's health needs.

80.    The evidence does not support a finding that the District denied Student a FAPE during the 2006-2007 school year by failing to assess Student in the area of health, including dietary needs.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student's behavioral needs and failing to develop an appropriate behavior plan?*

81.    There is no dispute that Student has behaviors which impede his learning. Both the August 30 and December 4 IEPs contain behavior support plans designed to address Student's behavioral needs. However, Student contends that the behavior support plans developed by the District were not sufficient to address Student's behaviors. Student

contends that the District should have conducted a Functional Analysis Assessment (FAA) and prepared a Behavior Intervention Plan (BIP). A district is supposed to develop a BIP when a child exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives in his IEP. Serious behavior problems include those which are self-injurious, assaultive, cause serious property damage, and other severe behavior problems that are pervasive and maladaptive for which the instructional/behavioral approaches in the child's IEP are found to be ineffective. In order to develop a BIP, a district must first conduct an FAA. An FAA is conducted when the IEP team finds that the instructional-behavioral approaches in the IEP have been ineffective.

82.    Student's behaviors which impede his learning include difficulty sustaining attention, making "decontextualized comments" such as silly talk or growling, and eloping (leaving the instructional area or remaining in the bathroom for an extended length of time). He also engages in behaviors such as rubbing his eyes when frustrated or overwhelmed, hitting his head with his hand, hitting his head on objects, and hitting objects. These behaviors were recorded in the District's behavior support plan (BSP) in the two IEPs, and the BSPs were designed to address those behaviors.

83.    Student's experts do not dispute that Student engages in these behaviors or that the BSP accurately lists them. Student's psychoeducational expert Dr. Patterson agreed that the predictors of the behaviors in the BSPs were in part correct, although he believed that additional things could have been added. However, Patterson was concerned that the BSPs did not include any baselines for behaviors and believed that an FAA was necessary to establish those baselines. For example, he explained that the BSPs talk about eloping behavior but did not specify when that eloping behavior occurred – did it occur when Student was engaged in preferred activities?  In his opinion, Student exhibits self-injurious behaviors such as hitting his head when frustrated, which require an FAA. He does not believe that an FAA is restricted only to those situations in which a child is exhibiting self-injurious behaviors, but can be used any time a District wants to find out what the baseline is for the behavior.

84.    The District witnesses were consistent in their testimony as to the thoroughness of the District's behavioral assessment and the appropriateness of the BSPs. Michele Bronson, the school psychologist for the District who conducted the social emotional portion of the triennial assessment, has conducted thousands of assessments of Students and done about 20 FAAs. She testified as to the appropriateness of the triennial assessment and Student's needs in social/emotional areas. Although she had previously recommended an FAA in 2005 (prior to her assessment of Student), once she conducted her 2006 assessment and reviewed the behaviors he exhibited, she did not believe an FAA was necessary. She explained that the two BSPs contained no baseline for behavior because the District personnel would have to gather that information in the new school setting. Even Dr. Patterson admitted that the District could not obtain baselines for Student's behavior in a classroom until Student was actually in a classroom setting.

EXHIBIT A

20

85.    Mathew Howarth, a District employee who supervises the District's applied behavior analysis (ABA) program, agreed that there was no need for an FAA. He explained that a District looks at the frequency, intensity and duration of behaviors in order to determine if an FAA is necessary. In this case, frequency and duration were never an issue, and there was no indication that intensity was a problem. Behavior must be severe before an FAA is warranted. There was no severe behavior by Student. A BSP must include descriptors of the behaviors, level of frequency of the behaviors, predictors, environmental factors, behaviors that need to be taught to the Student and reactive strategies. The August 30 BSP and the December 4 BSP contained all of these elements.

86.    Student's OT expert Christian Vincenoux felt the District's assessment and resulting BSP in the August IEP were flawed because they did not take in account the motor deficits that affect Student's behaviors. Instead, the District's BSP was based on sensory and avoidance behaviors. In his experience, Student's behavior and attention issues were, at least in part, motor based. A BSP which focused solely on sensory and avoidance issues would not be sufficient to address those issues.

87.    Student's motor problems include things such as his difficulty holding a pencil and writing words, getting dressed or using fine movements to pour his Phenex formula. In Vincenoux's opinion, what appears to be avoidance behavior by Student, such as putting his head down on the desk, may instead by caused by fatigue due to his motor difficulties. Vincenoux believes that different approaches are necessary to address Student's behavior issues depending on the cause.

88.    Vincenoux assisted the District with the development of the BSP in the December 4, 2006 IEP. At his urging, sensory-motor factors were placed into that BSP and he believed the December 4 BSP was sufficient to address those issues.

89.    Vincenoux's opinion is not sufficient to invalidate the August 30 BSP. Even if Vincenoux was correct that some of Student's behavior was caused by motor problems, the majority of evidence at the hearing pointed to sensory and avoidance issues as being the primary basis for Student's behavior problems. An ACES report sent to the District around the time of the August 30 meeting stated that "the function of all these behaviors appears to be primarily escape or avoidance."

90.    Part of Vincenoux's opinion was based on his determination that a "token" system in which Student was given rewards for on-task behavior was not entirely effective with Student. However, the evidence at hearing showed that Student did respond favorably to a token reward system. Many of the NPA reports affirmed that a token system was effective with Student. Dr. Patterson testified that Student "works for reinforcement" and was on a "reinforcement paradigm" using a reward system during Patterson's testing.

91.    A comparison of the August 30 BSP and the December 4 BSP shows that there were few differences in the actual interventions proposed regarding the behaviors. Mathew Howarth explained that the differences between the two were not substantive. The additional

21

information regarding motor deficits provided extra details regarding the hypotheses of what led to Student's behaviors, but was not necessary for an adequate behavior plan. Vinceneux's testimony is not sufficient to show that the August 30 BSP was inappropriate.

92.     Student also challenges the District's BSP based on a letter from ACES dated September 13, 2006, in which Nicole Luke states that the BSP misrepresented the information provided in the ACES report. However, that letter did not elaborate on the nature of the misrepresentations. During the hearing, Luke explained that her concerns had to do with the numerical data that ACES had collected which she thought would be helpful to include in the BSP. However, she could not state whether the failure to include that data affected the August 30 BSP. She also could not give an opinion as to whether Student's mother should have accepted the BSP. A review of the August 30, 2006 BSP shows that it incorporated much of the information and strategies listed in Luke's report.

93.     The parties dispute whether Student's behaviors are self-injurious to the extent that an FAA is necessary. Although ACES dutifully recorded incidents of eye rubbing and Student hitting his head, they seemed to be mild incidents which were easily handled by ACES staff. Luke, the ACES representative who testified at the hearing, stated that she would not classify Student's eye rubbing as self-injurious. ACES did not find his other behaviors (hitting his head, etc.) to be severe in a home environment. ACES never needed to use any type of restraint to stop Student's behaviors, but could simply redirect him by giving him a break, such as stretching or taking a walk.

94.     Dr. Patterson's own experience with Student demonstrates the mild nature of Student's behavior problems. During his assessment of Student, he was able to divert Student from hitting his head with his hand, merely by stating "we don't do that" and moving Student's hand. He gave no indication that Student repeated his conduct after Patterson's comment.

95.     The evidence does not support a finding that Student engaged in self-injurious behaviors of the type or extent that require an FAA. Dr. Patterson is a highly qualified and credible witness and he does believe strongly that Student requires an FAA. However, there are factors which lessen the persuasiveness of his testimony on this occasion. Dr. Patterson based his opinion, in part, on mistaken information. For example, he believed that Student had been expelled from his summer 2006 placement at Coronado Academy because he was a "basket case." There was no evidence whatsoever that Student had been expelled from Coronado for that reason or that Student had exhibited such extreme behaviors as to classify him as a "basket case" while at Coronado. Sheila Doctors, who observed Student at Coronado testified that he had good days and bad days while he was there. Although Students behavior problems did escalate during the time he was at Coronado, his one-to-one aide was able to redirect him by giving him breaks.

96.     The District witnesses, on the other hand, were consistent in both their testimony and their findings. Student failed to meet his burden to show that the social/emotional assessment and resulting BSP prepared by the District were inappropriate.

22

Student has failed to show that an FAA was required or that the District failed to properly assess Student with respect to behavior.

*Did the District violate IDEA by failing to reimburse Student's parents for the Independent Educational Assessments (IEEs) obtained by the parents, as requested by Student's mother at the October 9, 2006 IEP meeting?*

97.    In October 2006, Student's mother expressed dissatisfaction with the District's assessment and requested that the District fund independent educational evaluations (IEEs). In response to the District's request for additional information regarding her request, her counsel sent a letter of clarification on November 15, 2006. The District denied that request and filed for due process to defend its assessments on November 29, 2006.

98.    As stated above in Factual Findings 1-96, the District's assessment was valid and addressed all of Student's areas of unique need. As set forth in Legal Conclusions 12-13, if a District's assessment is upheld in a due process hearing, the parent is not entitled to an independent assessment at public expense. Student has failed to meet his burden of showing that the District violated IDEA by failing to reimburse Student's parents for the IEEs that the parents obtained.[12]

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have an IEP in place at the commencement of the school year on September 5, 2006?*

99.    Student contends that the District denied Student a FAPE by failing to have an IEP in place at the commencement of the 2006-2007 school year. The law requires a school district to have an IEP in effect for each individual with exceptional needs within its jurisdiction at the beginning of each school year. An IEP meeting must be held at least annually to review the Student's progress.

100.    As discussed in Factual Finding 10 above, prior to July 17, 2006, Student was being educated in a home program, with various services provided by NPA providers. At the time of the triennial assessment in June and July 2006, Student and the District began discussions to try to find an appropriate school placement for Student.

101.    During these discussions, the parties had an informal agreement that IEP discussions would be handled in the following manner: The District would draft a proposed IEP, which would be forwarded to Student's counsel for review. Student would suggest changes to that IEP document. The District would make revisions and return the revised document to Student's counsel. Eventually, if the Student approved of the draft IEP, the parties would meet at an IEP meeting to finalize and sign the IEP document.

---

[12] For this reason, it is not necessary to address the District's contention that some of the IEEs obtained by the parents were not true assessments but were instead records reviews done by expert witnesses in preparation for this litigation.

102.    Student's last agreed-upon and implemented IEP was signed on July 17, 2006. It was agreed upon using the informal IEP procedure discussed in Factual Finding 101, and provided placement, services, and goals for Student for the extended school year (ESY) session of the summer of 2006. The IEP placed Student in a non-severe special day class (SDC) at Coronado Academy. Coronado Academy is a public school, but is not part of the San Diego Unified School District. Student was permitted to attend Coronado Academy through an inter-district agreement. The IEP called for Student to attend the SDC class 20 hours per week, along with a continuation of some of his NPA services.

103.    At the time Student began at Coronado Academy, there were only 12 days left for the ESY summer session, but Student would not be attending on the final day, because of a personal commitment. The IEP team agreed that after the end of Student's 11-day program, Student would return to his home program, with services provided by NPA providers. The IEP also provided which of those services would constitute "stay put" in case the parties were unable to agree upon an IEP for the 2006-2007 school year.[13]

104.    Student attended the Coronado Academy for only five out of the 11 days anticipated in the IEP. On the fifth day, July 26, 2006, Coronado Academy asked Student to leave the program. Student's termination from Coronado has already been litigated by the parties before the California Department of Education (CDE) and is not at issue in this proceeding. Student's current due process claims relate to the events which occurred after Student's termination from Coronado Academy.

105.    The District personnel were shocked by Coronado's termination of Student's placement. Prior to July 26, 2006, the District had hoped that Student would continue to attend Coronado Academy after the start of the new school year. After the termination, District personnel immediately contacted Student's NPA providers to allow the "stay put" home program to begin early. Then the District began to look for another appropriate school placement for Student.

106.    During the July 17, 2006 IEP meeting, the parties agreed to meet again at an IEP meeting prior to August 31, 2006, to determine Student's placement and services for the 2006-2007 school year. On July 28, 2006, the District's counsel sent a letter to Student's counsel proposing August 25 and August 30 as possible IEP meeting dates. Toward the end of July, the parties exchanged a series of emails discussing meetings dates. Student requested a meeting date in mid-August, but the District explained that a late August date was necessary to give the District time to prepare and send a draft IEP to Student's counsel in accordance with the parties' informal agreement. District's counsel asked via email for Student's availability for an IEP meeting during the last week of August, and Dona Wright, a paralegal working for Student's counsel, replied that she was available that entire week.

---

[13]  The specific DIS services called for in the July 17, 2006 IEP and the subsequent "stay put" placement are discussed below, in connection with Student's contentions that the District failed to provide the stay put services called for in that July 17, 2006 IEP.

EXHIBIT A

24

Wright planned to attend the meeting instead of Student's attorney, because of the attorney's other commitments.

107.    On August 1, 2006, Wright informed the District personnel via email that Student's mother would not agree to another school placement until she could see the classroom in session during the school year. In addition, Student's mother wanted all the NPA providers who were currently providing Student with services to attend the IEP meeting.

108.    The District personnel attempted to prepare a draft IEP to send to Student's counsel in advance of a late August meeting in accordance with the parties' informal agreement. However, the District staff was hampered by the need to find another placement on short notice after Student's termination from Coronado Academy while at the same time trying to respond to the CDE litigation brought by Student regarding the Coronado termination, trying to get input from the NPA providers on the proposed IEP, and trying to respond to Student's correspondence. In addition, because it was the summer, some District staff members were on vacation.

109.    On August 22, 2006, the District sent written formal notice of an IEP meeting set for August 25, 2006. The District had arranged with Student's three NPA providers to attend the meeting as the parents requested. Student's mother and Dona Wright were also scheduled to attend the meeting.

110.    On August 23, 2006, Student's counsel sent a letter to the District. Counsel complained about the short notice for the meeting and about the fact that counsel had not yet received a draft copy of the proposed IEP. He stated, "I have advised [Student's mother] to not sign the IEP meeting notice, dated 8/22/06, in order to reserve her rights regarding the scheduling of this IEP meeting."

111.    On the afternoon of that same day, the District's counsel sent a letter by fax explaining that the District still intended to send Student proposed goals and services for review prior to the meeting, and might have to push the meeting back to the following week to permit sufficient time for review. The following day, August 24, 2006, the District's counsel sent another letter explaining that they would be sending a draft of the proposed IEP by August 25, and would move the meeting to August 30, 2006, to give Student time to review the draft IEP.

112.    After receiving the District's August 24, 2006 letter, Student's counsel sent an email that same day, insisting that the District "provide a written, complete draft IEP, not just goals and objectives." The letter went on to state:

> After we have reviewed the draft IEP, and assuming that we are close, we will respond, and then an IEP can be scheduled. As previously indicated, we will advise our client not to attend an IEP unless the District arranges for [Student's] current service providers to be present. If the District cannot

25

comply with this simple and very reasonable request, the District can hold an IEP without [Student's] mother or his counsel, and then send us a copy for our review.

The letter went on to state that Sierra Academy, the placement the District was considering at that time, was of concern to Student's mother, because of bad experiences she had had in the past at that school with Student's brother. The email also confirmed that Student's mother wished to visit any proposed placement while school was in session before agreeing to the placement.

113.    On August 25, 2006, the District sent Student's counsel a draft copy of the proposed IEP for the 2006-2007 school year. On August 29, 2006, the District followed up with a draft of a proposed transition plan to accompany the August 25 IEP offer. The District's letter accompanying the transition plan requested feedback regarding the August 25 IEP proposal.

114.    On August 29, 2006, the District faxed formal notice of an August 30, 2006 IEP meeting to Student's mother. Student's mother signed the notice and faxed it back the same day. Student's mother checked the box on the notice form that stated: "I will not attend the meeting; hold the meeting without me." Student's counsel sent an email with the notice explaining that Student's parents and the NPA providers would not have sufficient time to review the draft IEP prior to the meeting and the NPA providers were not available for the meeting. Student's counsel told the District to go ahead with the meeting without the parents and send the final IEP developed at the meeting to Student's counsel for review after the meeting was over. Counsel once again stated that Student's mother wanted to see the proposed Sierra Academy placement while school was in session before she agreed to any placement. The letter stated: "We believe that because school is just starting at Sierra Academy, on [sic] observation should be scheduled for a date when the teachers and the students have had some time to settle into their routines."

115.    On August 30, 2006, the District held the IEP meeting. There was no appearance at the meeting by Student, his parents or their counsel. A representative from Student's NPA speech/language provider was in attendance at the meeting. The other two NPA providers did not attend the meeting, although the District had invited them to attend. The District staff and the NPA provider in attendance at the meeting reviewed the proposed placement, services and goals set forth in the draft IEP and made minor revisions to some portions of the draft IEP in accordance with the discussions at the meeting.

116.    On September 6, 2006, the District's counsel sent a letter to Student's counsel describing the minor revisions that had been made to the proposed IEP and enclosed a complete copy of the IEP with the changes highlighted. The document was called a "draft" because the District still anticipated that Student's counsel would propose changes to the IEP which the parties would discuss in accordance with their informal agreement. However, despite the designation of the document as a "draft," it was a complete IEP proposal. Had

Student agreed to the proposal, the District would have been prepared to provide services in accordance with its terms.

117.    The evidence does not support a finding that the District violated IDEA by failing to have an IEP in place at the commencement of the school year on September 5, 2006. To the contrary, the evidence shows that the District sent Student a draft IEP prior to August 30, and then held an IEP meeting on August 30. Student refused to participate in the IEP meeting on August 30, 2006, and insisted that the District go ahead with the meeting in Student's absence rather than rescheduling the meeting. Student refused to sign any IEP until Student's mother had a chance to review the proposed placement *after school was in session*. While it is understandable that Student's parents might wish to view a placement after school had begun, Student's choice to visit the proposed placement after school began made it impossible for the parties to agree on a proposed placement prior to the start of school.

118.    Although the parties had an informal arrangement in which the District would send a draft IEP to Student for review, there was no legal requirement for the District to do so. The District's failure to send a draft IEP to Student's counsel in mid-August was based on circumstances beyond the District's control, including the unexpected termination at Coronado, the scramble to find another appropriate placement, the need to deal with the CDE complaint, and the need to address the issues set forth in the lengthy correspondence from Student about the triennial assessment. Further, even if the District had prepared the draft IEP earlier, Student's parents still would not have signed it until they could view the placement after school had begun. Any failure of the District to have an IEP in place by the start of the school year was caused as much by the choices of Student's parents as by the District's delay in preparing a draft IEP.

119.    Student also contends that the August 30, 2006 proposal was only a draft and not a final IEP proposal, so the District missed the deadline for creating a proposal. That contention is not well taken. The District called its document a draft because the District hoped to receive input from Student's parents. The District was trying to cooperate with the parents even after the parents refused to participate in the IEP meeting. There was nothing wrong with that, and the label given to the document did not change the fact that it was a full IEP proposal that the District was prepared to implement if and when it was signed. There was no procedural violation by the District.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have appropriate team members – including Student's parent(s) – at the IEP meeting convened on August 30, 2006?*

120.    According to the special education law, an IEP team must include, among other people, the parents of the child and a regular education teacher of the child if the child is or may be participating in the regular education environment. As stated above in Factual Finding 114, Student's mother signed the IEP notice for the August 30, 2006 IEP stating that

EXHIBIT 4

27

she would not attend the meeting and that the District should go ahead with the meeting without her.

121.    Student's mother, on advice of counsel, chose not to attend the IEP meeting and directed the District to finalize the IEP proposal without her. She did not request to reschedule the meeting, nor did she indicate she would attend a meeting if rescheduled. As discussed in Legal Conclusions 20 - 23, although the law requires school districts to go to great lengths to ensure parental attendance at IEP meetings, those laws are designed to protect unrepresented parents who do not fully understand the importance of their participation in the IEP process. They were not designed for a parent who chooses, on advice of counsel, not to participate. These laws are not intended to be a "trap" for a district which relies on a letter from a sophisticated parent instructing the district to hold the meeting without her. There was no procedural violation by the District because the District chose to go forward with the meeting under these circumstances.

122.    There is a factual question as to whether a general education teacher attended the August 30, 2006 IEP meeting. No individual signed the attendance sheet of the IEP in the capacity of a general education teacher and the IEP itself indicated that a general education teacher was "not needed." During the hearing, MarySue Glynn testified that more than one person in attendance at the meeting was trained as a general education teacher and could give input to the IEP team regarding the possibility of a general education placement.

123.    However, it is not necessary to resolve this factual dispute for purposes of this Decision, because even if there was no general education teacher at the August 30, 2006 IEP meeting, there was still no violation by the District. As of August 30, 2006, no one believed that Student would be capable of moving into a general education program. Student had been out of school in a home program for approximately three years and was far behind his grade level in reading, writing and math. His placement at Coronado had been in an SDC, not a general education classroom, and his proposed placement on August 30, 2006, was in an SDC. Even the IEP four months later in December 2006, which proposed a comprehensive campus placement for Student, proposed that Student start in an SDC, and then gradually transition to collaborative education classrooms (taught by a combination of general and special education teachers) only after it was determined how well he tolerated an SDC. Student's experts testified at hearing that Student was not ready for a general education classroom in any fashion. Based on the information that the District had on August 30, 2006, there was no indication that Student would be participating in the general education environment. There was no procedural violation.

124.    In Student's written closing argument, Student also contends that the IEP was inappropriate because two of Student's NPA providers were not present. An IEP meeting may include personnel who provide related services to a student or other individuals when appropriate. However, the law does not mandate their attendance. The District had a full assessment of Student at the time of the August 30, 2006 IEP meeting and numerous reports from the NPA providers. The evidence does not support a finding that the District committed a procedural violation by holding a meeting without the NPA providers.

125.   The August 30, 2006 proposed IEP called for Student to be placed at Sierra Academy, a nonpublic school (NPS). Student contends the IEP meeting violated the law because no representative of Sierra Academy was at the meeting. If a District is proposing a private placement, the District should have a representative of the private school at the meeting or in contact with the IEP team by telephone or other means.

126.   Sheila Doctors testified that a representative of Sierra Academy was invited to attend the IEP meeting, but did not attend. The District did not contact the Sierra representative by telephone during the meeting, but the District personnel in attendance at the meeting were well aware of the programs and services offered at Sierra Academy and could address those services at the meeting. As discussed in Legal Conclusions 24-25, even if there was a procedural violation in this regard, it did not cause a denial of FAPE.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose an appropriate placement for Student in the August 30, 2006 IEP?*

127.   The August 30, 2006 IEP proposed that Student be placed in an SDC at Sierra Academy for 30 hours per week, with 90 minutes per week of speech/language services, 90 minutes per week of occupational therapy, 30 minutes per week of physical therapy and 8 hours per year of health nursing services. The nursing services consisted of three hours of training for the Sierra staff related to Student's health needs and five hours of consultation as needed. There was also training/consultation time included for assistive technology, consultation time for speech/language, occupational therapy and physical therapy, and ABA services and supervision provided by Resources for Students with Autism, a District program.

128.   Sierra Academy has approximately 40 students on the campus. Student would be in a middle-school group of approximately six to 12 pupils, but his classes would be limited to about six pupils. All pupils bring their own lunches to the school. Although the campus does not have any other pupils with PKU, they do have other pupils with dietary restrictions. The program proposed for Student would call for collaboration by the various DIS providers with the classroom teacher, and each pupil on campus has access to computers and assistive technology. Student would have a one-to-one behavior support aide to assist him for at least the first three months of his time at Sierra.

129.   The evidence supports a finding that placement in an SDC was appropriate to meet Student's unique needs as they were understood on August 30, 2006. Both the District's and Student's expert witnesses raised concerns about Student going into a general education classroom on a comprehensive campus after three years of home schooling. All the experts agreed that Student needed a smaller, structured environment in which to learn. Both parties also agreed that Student should be in some type of school environment rather than his home school.

130.    The parties stipulated that all District witnesses would testify that the District's proposed August 30, 2006 IEP offered Student a FAPE. Implicit in that stipulation is the finding that the District witnesses were all of the opinion that the Sierra SDC was the appropriate placement for Student as of August 30, 2006. Student's goals and objectives from the proposed August 30, 2006 IEP could be implemented at Sierra and Student could make educational progress there.

131.    Student's experts, on the other hand, disagreed with each other about what would be an appropriate placement for Student. Student's NPA providers questioned whether Student could make educational progress in a small classroom and testified that Student needed one-to-one teaching in order to learn. However, Student's expert Dr. Patterson testified unequivocally that the only appropriate placement for Student at this point was a small, structured SDC with plenty of support. Student's unique needs require him to be in a classroom with other children to develop the social skills he lacks.

132.    The evidence supports a finding that Student's goals and objectives could be implemented at Sierra and that Student could make educational progress there.[14] Dr. Patterson's testimony and the stipulated testimony from the District's experts are persuasive in this regard. Some of Student's goals and objectives relate to social skills, which cannot be dealt with in a one-to-one situation. The NPA providers who testified that Student could only learn through one-to-one instruction each focused on the narrow fields in which they provide services, not on Student's needs as a whole. To the extent that Student needed one-to-one assistance, Student would have a behavioral aide to assist him.

133.    Student is correct that the IEP could be more artfully worded in terms of the one-to-one aide services that would be available to Student. The IEP states the following regarding aide support: "In class support daily 9/5/06 – 12/15/06 then reviewed, until data indicates fading support. Data to be reviewed at monthly collaboration meetings." There are no specific hours for aide services listed on the cover page of the IEP. However, the District witnesses testified that the intent was to have a one-to-one aide with Student at all times during the first three months of his time at Sierra. If Student's only objection to the IEP was lack of clarity about the aide services, that could have been cleared up by attending the August 30 meeting or sending a letter.

134.    Student's mother testified that, during her visit to Sierra, she was informed that one-to-one services were not available for any children there, but her testimony does not prove that a one-to-one behavioral aide would not have been provided by the District. The evidence indicates that Student's mother had already made up her mind to reject Sierra before she even visited the facility. Her attorney's letter sent prior to the August 30 IEP meeting stated that she had had problems with Sierra with one of her other children. Sheila Doctors reported that Student's mother told the Sierra representatives when she arrived for the site visit that she had no intention of letting her child attend Sierra. Instead, she made the site visit to talk about possible placement for other disabled children for whom she acts as a

_____

[14]   The specific goals and objectives proposed in the August 30, 2006 IEP are discussed below.

30

special education advocate. The evidence does not support a finding that the one-to-one aide services called for in the August 30 IEP would be unavailable if Student attended Sierra.

135.    Student contends that the Sierra Academy was not an appropriate placement for Student because of the stairs on campus and because the campus has no full-time nurse or nursing office. The Sierra Academy is located in a facility that used to be a church and has a long row of stairs that leads up to the classrooms. There is no elevator to allow access between the levels.

136.    The parties dispute whether Student has difficulty climbing and descending stairs. When the District staff conducted their assessments of Student, they observed that Student was able to climb stairs with no apparent fear or difficulty. Christian Vinceneux, student's NPA occupational therapist, on the other hand, noted that Student is nervous about descending stairs. He did not believe it would be safe for Student to climb or descend stairs at Sierra Academy when there are a lot of other students on the stairs at the same time.

137.    The evidence does not support a finding that the presence of stairs made the Sierra campus inappropriate for Student. As stated in Factual Findings 7-8, above, the parties dispute whether Student has osteoporosis or osteopenia sufficient to make it dangerous for him to climb stairs. However, the August 30, 2006 IEP offer must be evaluated in light of what the District knew at that time. At the time of that IEP meeting, the only report that the District had was Dr. Dewan's report stating that Student had osteoporosis and osteopenia. But the District's knowledge of Dr. Dewan's report does not change the appropriateness of the placement as of August 30, 2006. Even if the District believed that Student had osteoporosis/osteopenia and was uncertain when climbing stairs, the August 30, 2006 IEP called for Student to have a behavioral aide assigned to him during his first three months at Sierra. After that first three months, the need for the aide would be reviewed. That aide would be able to assist Student on the stairs and prevent other students from jostling him or frightening him.[15] There was no danger to Student.[16]

138.    The evidence also does not support a finding that the lack of a full-time nurse or nursing office on the Sierra campus would make it an inappropriate placement. The IEP called for the District's nurses to provide training for all the Sierra staff regarding Student's dietary restrictions and G-Tube feedings. Although the evidence was undisputed that Student needs adult supervision for his G-Tube feedings, there was no evidence that the supervision must be provided by a registered nurse. For example, as discussed in Factual

---

[15] Patricia La Bouff, the District's PT expert, testified that she is familiar with Sierra and that there are seldom more than five or six pupils on the stairs at any time. However, even if all 40 of Sierra's pupils ran down the stairs at the same time, Student's aide would be there to protect Student from being jostled by other children.

[16] It is also interesting to note that the initial report issued by Student's psychoeducational expert Dr. Patterson in May 2007, reported in Student's history that, "He has no difficulty with climbing stairs and falls appear to no longer be an issue." Dr. Patterson later corrected that report at the request of Student's mother to state that Student "has difficulty descending stairs."

EXHIBIT A

Finding 236, the District has two classifications of special education technicians that can provide assistance with G-Tube feedings. If Sierra did not have appropriate personnel to assist with the feedings, the District could have provided that personnel. There was evidence that Student occasionally experiences nausea after his G-Tube feedings and must lie down, but there was no evidence that Student required a trip to the nurse's office when that happened. Student's NPA providers testified that there had never been a medical emergency or need to call in health care personnel at any time while they were providing services to Student. Student presented no evidence to show that Sierra Academy was completely devoid of rooms where a child could sit or lie down if not feeling well. The District's failure to specify who would be providing the G-Tube services at Sierra in the IEP was a problem, but that issue will be discussed below in connection with Issue 14 involving the failure to have an appropriate health plan.

139.    Student raised the issue of the Sierra placement and has the burden of proof on the issue. Student has failed to meet his burden. The evidence does not support a finding that the proposed placement in the August 30, 2006 IEP was inappropriate for Student.[17]

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose appropriate goals and objectives in the August 30, 2006 IEP?*

140.    Student also contends that the goals and objectives in the August 30, 2006 IEP were not appropriate for Student. The law requires an IEP to include a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the disability to enable the child to be involved in and make progress in the general curriculum and meet the child's other educational needs that result from the child's disability. The IEP must include a description of the manner in which the progress of the child toward meeting the annual goals will be measured. As more particularly set forth in Legal Conclusions 32-35, the law does not require perfection in goals, nor does it require adherence to the rigid structure of a mathematical calculation. Goals are simply a way to determine whether a Student is making educational progress.

141.    The proposed IEP dated August 30, 2006, contained 26 annual goals for Student. The goals were designed to address areas of need including reading comprehension, mathematics, gross and fine motor skills, self-help skills, behavior, and social skills.

142.    As stated in Factual Findings 27-30, Student's needs in the area of reading comprehension involve the ability to go beyond the literal text to make inferences and determine the main idea of the story. The District's reading goals in the IEP focused on the

---

[17]    Student's due process request also raised the curious assertion that the District's later IEP offers, which proposed a different placement for Student, proved that "the District itself recognized that the proposed placement at Sierra was not appropriate for Student." Student's position is not well taken. The changes in the District's offer after August 2006, were due to discussions with and input from Student's parents and the NPA providers. The District's good faith effort to work with the parents as part of the IEP process did not constitute an admission of prior wrongdoing. Just because one placement is appropriate does not automatically mean that all other placements are inappropriate.

32

need for Student to draw inferences in text and to learn to address words with multiple meanings in the context of a story.

143.    The August 30, 2006 IEP also contained goals that addressed Student's unique needs with respect to writing and written expression. These goals involved skills related to outlining and writing compositions with proper organization.

144.    Student's unique needs with respect to mathematics were addressed with goals involving word problems requiring addition, subtraction, multiplication or division, knowledge of graphs and money, fractions, and decimals.

145.    The IEP also contained goals to address Student's behavioral, social/emotional, and speech/language needs. These included teaching Student to ask for breaks and use "self-advocacy" strategies when he became stressed, to self-monitor completion of tasks, to communicate his personal needs, to tell a cohesive narrative about his personal experiences, to read "nonverbal" cues of a listener in a conversation and modify his behavior accordingly, to maintain a relevant topic while engaged in conversation with a small number of peers, to follow multiple-part directions in a classroom setting, and to respond appropriately to negative peer behavior.

146.    Student's OT and APE needs were addressed through goals designed to help Student improve his motor skills and core strength. These goals included tasks such as typing, using handwriting for functional tasks, eating properly with utensils, maintaining an upright posture at this desk, throwing a ball properly, performing push-ups, and dribbling a basketball.

147.    The parties stipulated that all District witnesses, if called to testify on direct examination, would testify that the goals in the proposed IEPs were appropriate at the time proposed, were measurable, and addressed all areas of need. Based on this stipulation, it is unnecessary to recite the testimony of each District witness regarding the goals in this Decision. Instead, it is appropriate to look at the criticisms specifically raised by Student.[18]

148.    Student contends that the "baselines" for most of the goals were improper. Student believes that goals must have "baselines" containing quantitative data in order to be measurable. However, as set forth in Legal Conclusions 32-35, there is no requirement in law for baselines containing "quantifiable data." The goals properly describe the level at which Student is functioning at the time of the IEP. The various objectives state measurable methods for determining Student's progress toward his goals and the goals themselves contain standards to determine if they have been met. The evidence supports a finding that the goals set forth in the August 30, 2006 IEP were measurable, were designed to address Student's unique needs and were designed to help him make educational progress.

_____

[18] Because Student is challenging the goals in the August 30, 2006 proposed IEP, Student has the burden of proof on that issue, even without the stipulation.

33

149.   Student also raises criticisms to specific goals. Student's reading expert Lynne Thrope raised objections to the reading and writing goals (goals one through seven and fifteen). She found goal one difficult to understand because it refers to two types of text (narrative or expository) and two types of procedures (listening and reading). She had the same problem with goals two through five, because they included "narrative or expository" text. She thought the goals should have been split into two separate goals. She objected to the statement in the baseline of some of the goals that Student read "instructionally at the 4th-6th grade level...." She believed that because a specific grade level was not stated, it was not clear which grade level content standards would be used in teaching Student. She felt that goal seven was not appropriate for Student because of his autism – autistic children have difficulty with point of view. She objected to goal 15, because cursive writing was difficult for Student and he had the aid of a computer. She also criticized the goals because they did not cover all areas of Student's needs. She created her own goals when she worked with Student.

150.   Student's speech/language expert Joanne Hein disagreed somewhat with Thrope with respect to goal one. She stated that a speech/language pathologist will sometimes put listening and reading into a single goal, but she was concerned about putting them together in one goal unless a speech/language pathologist was involved. She objected to goal three because she did not believe Student had the ability to make inferences. She also felt there was no baseline to determine where he started, so it was hard to measure his progress.

151.   The testimony of Christian Vinceneux, the OT from the NPA who worked with Student, was also somewhat at odds with Thrope's opinions. He objected to goal 15 because Student had already met that goal.

152.   Student has not met his burden of proving that goals one through seven and fifteen were inadequate. While Thrope may have preferred to split goals to make them more specific, combining narrative and expository text did not make the goal confusing or prevent it from being measurable. Even Student's speech/language expert admitted that listening and reading goals are sometimes combined together. The statement in the baseline that Student reads at the 4th-6th grade level instructionally did not make the goal improper – it was clear that Student's instruction would start at the 4th grade level. Thrope's criticisms that cursive writing and point-of-view narratives would be hard for Student do not make the goals improper. The point of the goals is to help Student make progress. Goal 15 only talks about having Student use cursive writing to fill out a form. Thrope herself found that writing was one of Student's areas of unique need. Thrope's opinion regarding cursive writing is directly contradicted by Vinceneux's testimony that Student had already met goal 15. In light of the disagreement between Student's own experts regarding Student's ability to accomplish goal 15, there was nothing wrong with including it in the August 30, 2006 IEP. If Student had already mastered it, further goals could be drafted.

EXHIBIT A

34

153. Student's psychoeducational expert Dr. Robert Patterson objected to the math goals in the IEP (goals eight through ten). He said that goal eight was improper because Student did not have the ability to do multiple digit multiplication. He objected to goal nine because the baseline did not match the goal and the goal was compound. However a review of that goal shows that it dealt with activities related to solving math word problems. The baseline activities were related and it was capable of measuring progress. Dr. Patterson criticized goal 10 because Student could not do it and the baseline was not measurable. His criticisms do not invalidate those goals – the point of goals is to push a pupil beyond what he can currently do. If the goals prove to be too hard, they can be modified later.

154. Student's occupational therapy expert Christian Vinceneux testified regarding the OT goals (numbers 11-19). He believed that goal 11 (regarding the need for breaks) was very complicated and did not address Student's sensory needs. The goal addressed self-regulation, but at times Student's difficulties in performing a task involved motor difficulties, not self-regulation. He objected to goal 12 because there were too many variables and expectations for him to make sense of the goal. He believed that goal 13 was too vague because it did not include the amount of time Student should take to type the information. He objected to goal 14 because it was not specific enough regarding which utensils Student would use with different foods. He disagreed with goal 16 because he did not think Student could achieve it in one year. He thought goal 17 was reasonable, but wanted to make sure the physical activity was permitted by a physician. He believed goal 18 was a reasonable goal. He believed that goal 19 (dribbling a basketball) was inappropriate. Vinceneux also testified that the OT goals did not address postural stability, multisensory processing, safety awareness and body mechanics.

155. Student has not met his burden of proving that the OT goals in the August 30, 2006 IEP were improper. Despite Vinceneux's concerns about Student's sensory needs, the evidence supports a finding that self-regulation strategies were effective for Student on many occasions. Almost every NPA provider report at one time or another pointed out the effectiveness of a "token" reward system with respect to Student's attentiveness to tasks. Even if goal 11 lacked sensory needs, it was still a proper goal. Likewise, even if the goals did not directly address multisensory processing, they still met Student's basic needs. Vinceneux's criticism of goal 12 is not well taken – although the goal is complicated, it is clear what is being taught and how to measure it. While Vinceneux may have preferred goal 13 to include time limits, there was nothing improper about the goal focusing on accuracy of typing rather than speed. Goal 14 is very specific about the tasks to accomplish – any specifics about which utensil to use with a given food could be addressed by the OT helping Student. Goal 16 dealt with postural stability, which Vinceneux recognized as an area of need for Student. Vinceneux's criticism that Student could not achieve 30 minutes of postural stability in one year did not invalidate the goal. If it was too hard, it could be modified in future IEPs. Finally, the goal regarding basketball was not improper. The goal did not call for full contact basketball with other boys, but simply dribbling a basketball. The evidence indicated that Student enjoyed playing basketball with his brother, so the District would have no reason to believe dribbling a ball would be harmful to him. The physical

EXHIBIT A

35

activity goals dealt with body form and position and were sufficient to address concerns regarding academic instruction in the areas of body mechanics and safety awareness.

156.    Joanne Hein also testified regarding the speech/language and social goals (goals 20-23). She objected to goal 20 because she felt having adults prompt Student about his needs would not develop independence. With goal 21, she objected that a receptive language goal was embedded in an expressive language goal. She objected to goal 22 because she thought they should work on language skills before non-verbal skills. She believed that goal 23 tried to cover too much and the benchmarks did not match the goal.

157.    Robin Lipton, the speech/language pathologist from the NPA who has been working with Student, disagreed with Hein. Lipton testified that the speech/language goals set forth in the August 30, 2006 IEP were appropriate. She said that she read goal number 21 around the time of the IEP meeting and it looked like a good goal to her. She told the IEP team at that meeting that the proposed goals and objectives were appropriate. When Student's counsel specifically asked her about measuring progress from the baselines of the goals, she said she could not, but she later affirmed that the benchmarks and annual goal would let her measure Student's progress.

158.    The evidence does not support a finding that goals 20-23 were improper. Robin Lipton is not a District employee and was working directly with Student. She attended the August 30 IEP and gave input to the team that the goals were appropriate. Her testimony, coupled with the stipulation that the District witnesses would testify that the goals were proper, is strong evidence that they were appropriate.

159.    In his written closing argument, Student contends that goals 24-26 "do not contain any baseline whatsoever." That contention is not supported by a review of the goals. They do talk about where Student is generally functioning in those areas. Any specific percentage data needed will be collected once Student starts school. The benchmarks and the goals themselves are measurable and address Student's unique needs.

160.    On September 13, 2006, Nicole Luke of ACES, one of Student's NPA providers, sent a letter to the District with questions about the proposed goals in the August 30, 2006 IEP, and concerns that Student might not have the skills to master some of them. These questions and concerns, sent to the District after the August 30 IEP meeting, do not invalidate the goals. If the goals proved too hard for Student, they could be modified later.

161.    Finally, Student contends that the August 30, 2006 IEP should have contained goals regarding Student's PKU needs, his retention of primitive reflexes, and goals to remediate Student's auditory processing needs.

162.    As set forth in Factual Finding 37 above, the evidence does not support a finding that direct auditory processing remediation is effective for a pupil of Student's age. Even Atkins' 2005 report recommended accommodations rather than remediation. The August 30 IEP contained numerous accommodations design to address Student's auditory

processing needs. The District did not fail to offer a FAPE in the August 30 IEP due to the lack of auditory processing remediation goals.

163.    Likewise, the evidence does not support a finding that the District failed to provide a FAPE because of the lack of goals relating to integration of primitive reflexes. As set forth in Factual Findings 42 – 43, the parties dispute whether Student even has a problem with integration of primitive reflexes and whether interventions designed to integrate primitive reflexes are effective. However, even if Student does have a problem with primitive reflexes and even if interventions are effective, there was no denial of FAPE due to the lack of specific integration goals. Even Vinceneux, Student's OT expert, who opined very strongly about the lack of integration, focused his own OT efforts with Student on core strength and stability first, not primitive reflexes. Dr. Robert Sanet, Student's vision expert, who also testified regarding integration of primitive reflexes, confirmed that Vinceneux's recommendation had been to build up core strength first and that Vinceneux delayed several months before working on primitive reflexes. The August 30 IEP contained postural and exercise goals specifically related to core strength. Any failure to include reflex integration goals did not invalidate the IEP.

164.    Although the August 30 IEP did not specifically contain a goal related to Student's PKU needs or calculating the PHE in foods, it did contain goals related to mathematics and reading, the underlying skills Student needs to accomplish the PHE calculations. Student's expert Dr. Patterson did not believe that Student had the mathematical ability to meet even those basic math goals. In his opinion, student also lacked the underlying mathematical skills necessary for preparing his G-tube formula. While a functional, self-help goal regarding PHE calculations would have been appropriate, the lack of one did not invalidate the District's offer of FAPE in light of the educational areas covered in the August 30 IEP.

165.    Student failed to meet his burden of proving that the goals in the August 30 IEP were improper or failed to address Student's needs.[19]

*Did the District's education programming offer, memorialized in the proposed December 4, 2006 IEP, offer Student a FAPE designed to meet his unique needs and allow him to benefit from his education?*

166.    The District contends that its proposed December 4, 2006 IEP offered Student a FAPE. During the hearing, the parties stipulated that the District witnesses would all testify that the December 4 proposed IEP met all the elements required by law and provided Student with a FAPE. Therefore, it is not necessary for this Decision to consider every element necessary for an appropriate IEP. Instead the Decision will focus on the issues

---

[19]  In Student's written closing brief, Student for the first time raises the argument that the August 30, 2006 IEP did not offer the level of DIS services necessary to achieve the goals. That issue was not raised in Student's due process request or at the time of Prehearing Conference. The District was not properly put on notice about this issue and it will not be considered in this Decision.

raised by Student challenging the IEP. As more particularly set forth in Factual Findings 190-241, the District's December 4, 2006 IEP did not appropriately address Student's health needs and did not contain an appropriate transition plan, so it did not offer Student a FAPE.

167.    The evidence supports a finding that, except as discussed below, in all other respects, the District's December 4, 2006 IEP properly offered a FAPE to Student. After refusing the Sierra placement, Student informed the District that Student would be willing to discuss a placement for Student in an appropriate program on a comprehensive District campus, rather than a private school. The District complied with that request by developing a program for Student at Wangenheim Middle School, a comprehensive middle school campus within the District. The District's proposed program called for Student to be educated in SDC classes for English, reading, and math, in a collaborative science class taught by a general education and special education teacher, and a co-taught world history class taught by a general education and special education teacher.[20] Student's parents objected to Student receiving "pull-out" DIS services during the school day, because they did not want to remove Student from his academic classes. Therefore, the Student's proposed program at Wangenheim included a "sixth period" after school in which Student would go to the school's learning center to receive as many of his DIS services as possible each week, as well as "pre" and "post" teaching to assist him with his other classes. Wangenheim Middle School was not Student's "home school," but it had a learning center where Student could receive after-school DIS services. Student's home school does not have an appropriate learning center.

168.    During the hearing, Dr. Patterson raised concerns about Student's placement on a comprehensive campus. He believed that Student required a small campus such as the District's Del Sol campus. However, he admitted that his opinion in that regard differed from the opinion of Student's parents. The District witnesses all testified that the Wangenheim placement was appropriate. The December 4 IEP services included a one-to-one behavioral aide to assist Student for 32.5 hours per week, and the opportunity for Student to be taken to a one-to-one setting during the school day as needed. The evidence supports a finding that the Wangenheim Middle School was an appropriate placement for Student for the 2006-2007 school year.

169.    The December 4 IEP called for Student to receive the following DIS services: speech-language pathology – 90 minutes per week; OT – 90 minutes per week; APE – 60 minutes per week; assistive technology services of 8 hours per year; vision therapy – 48 hours per year; physical therapy – 30 minutes per week; and behavior support services for 32.5 hours per week. All school staff would receive training regarding Student's health needs prior to Student beginning school.

---

[20] There are differences in the structure and operation of the co-taught and collaborative classes, but those differences are not significant for this Decision.

170.    During the hearing Student raised concerns that the December 4 IEP did not provide one-to-one behavioral aide hours during the time Student would be receiving DIS services in the learning center. However, the District's witnesses testified that Student's time in that program would be with DIS providers or for pre and post teaching. There would be no need for a behavioral aide, as there would be in class. Student's NPA providers gave inconsistent testimony on whether it was necessary to have a behavioral aide with Student during their one-to-one sessions. Some testified it was helpful to have the Student's mother or a behavioral aide present during sessions, while others testified that they were able to conduct sessions without another adult present. Student provided no evidence that trained District educators would require a behavioral aide when working with Student on his DIS services or during pre and post teaching.

171.    Student contends that the level of DIS services, including OT, speech-language and vision therapy, in the December 4, 2006 IEP is insufficient to meet Student's goals. While Student is correct that the amount of DIS services was cut significantly from the hours provided in the stay put IEP, the District witnesses testified that there would not be a need for so many hours of DIS services once Student was in school – his school program would contain instruction related to these services throughout the school day. The testimony of the District witnesses was persuasive on this issue. With Student in a school program with trained educators collaborating to address all of his needs, there would not be the need for the same hours of service that his current, fragmented program requires.

172.    Student also contends that the APE program proposed in the December 4 IEP was not appropriate. In Student's proposed resolutions, Student wants more time in APE each week and wants swimming included as part of his program. However, the District witnesses explained that the program was set up in compliance with Dr. Dewan's restrictions on physical activity due to Student's osteoporosis. As stated in Factual Findings 7-8, it is questionable whether Student actually suffers from osteoporosis, but the District reasonably believed that Student did at the time of the August and December IEPs. Although Dr. Newfield had issued his report questioning whether Student had osteoporosis in September, Student's mother did not inform the District of that report at the time of the December IEP meeting. The District's limitations on APE were designed to meet Student's needs and were appropriate at the time they were offered. There is also no requirement that the District include swimming as part of Student's program – while Student's mother may prefer a swimming program, the program proposed by the District was adequate to meet Student's needs without swimming.

*Did the District deny Student a FAPE in the proposed December 4, 2006 IEP, by failing to develop annual goals and objectives that would enable Student to make educational progress and access the grade level general curriculum?*

173.    Student contends that many of the goals and objectives proposed in the December 4, 2006 IEP were improper. The evidence does not support that finding.



EXHIBIT A

39