# EXHIBIT A
# Part 2

174.    The December 4, 2006 IEP contained more than 30 goals for Student. Many of these goals are very similar to those in the August 30, 2006 IEP, except that they were modified to provide greater clarity. For example, while it was implied in the August 30 goals that Student would be taught using the 4th grade curriculum, the December 4 goals state that specifically. Additional goals were added at the request of Student's mother and/or the NPA providers. To the extent that the goals are the same or are clarified versions of the goals from the August 30 IEP, they are valid for the same reasons stated in Factual Findings 140-165 above. While clarification was not necessary to make these valid goals, there was certainly nothing wrong with clarification.[21] The parties stipulated that the District witnesses would testify the goals were appropriate.

175.    Lynne Thrope criticized goal four, because in her opinion the goal inaccurately states that spelling is an area of strength for Student. She also disagreed that the teacher should be given a choice of using a visual, verbal or written prompt with Student, because Student was a visual learner. She objected to goals 6, 29 and 31 because she does not believe Student is capable of accomplishing them.

176.    The evidence does not support a finding that the goals are improper. Just because spelling is listed as a "relative strength" in the "baseline" section of the goal does not make the goal improper. Student cites to no legal authority whatsoever that allowing a credentialed teacher to decide what type of prompting to use with a Student makes a goal improper. If Student is unable to make progress on goals 6, 29 and 31, they can be altered.

177.    Dr. Patterson testified that goals seven through nine were not couched in the California content standards for math, but his main criticism was that Student was not capable of performing the mathematical skills necessary for the goals.

178.    The evidence does not support a finding that these goals were improper. If Student was not capable of performing these mathematical calculations, they were clearly an area of need for Student and the goal addresses that need. If Student is able to master these basic mathematical problems, he will have made educational progress. He cannot reach seventh grade curriculum until he first masters the fundamental steps along the road.

179.    The December 4, 2006 IEP incorporated some of Vinceneux's proposed OT goals for Student. For example, the IEP contains goals related to climbing stairs, safe body mechanics and breath control. Although Vinceneux agreed with many of the December 4, 2006 OT goals, he testified that the goals do not address the areas of sensory processing, "multisensory processing and praxis on command," and integration of primitive reflexes. However, as set forth in Factual Finding 163 above, even Vinceneux believed it was important to work on core stability prior to dealing with the primitive reflexes, and the IEP

---

[21]  Because most of Student's objections to the goals were discussed earlier, only the new issues raised in Student's written closing argument as to the December goals will be addressed here. For example, Carol Atkins' criticism of the District's failure to include goals related to remediation of Student's auditory processing problems is addressed in Factual Findings 37 and 162.

EXHIBIT A

goals address core strength. As for sensory processing, the IEP has goals specifically related to visual processing and attention. With respect to "multisensory processing and praxis on command," Vinceneux's suggested goals to address this area included a goal requiring Student to negotiate an obstacle course and a goal requiring him to "maintain both visual and auditory attention" on an instructor giving verbal and visual directions and follow those directions. Although there is no "obstacle course" goal in the December 4 IEP, there is a goal specifically related to following oral or written directions.

180.    The evidence supports a finding that the goals proposed in the December 4 IEP met Student's unique needs and were appropriate to help him make educational progress.

*Did the District deny Student a FAPE in the proposed December 2006 IEP by failing to provide adequate staff development and training in the use of Student's specialized software programs which Student needs to access the curriculum?*

181.    Student contends that the amount of AT services called for in the December 4, 2006 proposed IEP are inadequate to meet Student's unique needs. In particular, Student contends that because the District's AT expert was not sufficiently familiar with Student's Kurzweil software, Clicker 4 software, or PKU Life program, she could not know how long it would take to train personnel in those programs.

182.    The December 4, 2006 proposed IEP calls for eight hours of AT services to be provided per year. This would consist of three hours of consultation/training for Student's instructors to be provided prior to Student starting school and five hours of consultation/training for the remainder of the school year, as needed. The assistive technology devices called for in the proposed IEP include: "Scan read software for reading; Speaking spell check device; content authoring software; graphic organizers modified for written language along with hardware to run them. FM system provided by audiology. Slant Board." The "special factors" page of the IEP also calls for "training for staff related to health needs and use of assistive technology."

183.    Anne Callies, the District's AT coordinator, has a degree in speech pathology and a master's degree in special education. She has an AT certificate from California State University at Northridge. She has worked as the District's AT coordinator since the department began in 1999. She has assessed and provided AT services for hundreds of pupils. She has been involved with providing AT services to Student since 2005.

184.    In 2005, Callies went to Student's home to provide training in the Kurzweil and Clicker 4 software. Student's mother was already familiar with the programs, so they discussed other types of programs. Callies has gone through training to use the Clicker 4 software. She is familiar with PKU Diet Manager brand of software. She tried to find the PKU Life brand of software which Student's mother prefers, but learned that it was discontinued. She subsequently learned that PKU Life is now an internet-based system. In July 2006, she conducted the AT portion of Student's triennial assessment and made the recommendation for the eight hours of training per year.

185.    Student has not met his burden of showing that the December 4 IEP proposed inadequate AT training and support.  Contrary to Student's claims about Kurzweil and Clicker 4, Callies is familiar with those programs and could provide training.  Callies is also familiar with Student's needs based on her assessment of Student in July 2006.  While she was unfamiliar with the parents' preferred brand of PKU software, she was familiar with the brand available to the District.  Her undisputed testimony was that she tried to find the parents' preferred software to purchase and could not because it is no longer being sold.  There was no violation by the District.

*Did the District deny Student a FAPE by failing to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP?*

186.    Student contends that the December 4 IEP document is confusing because it states on the front page that Student will be in an SDC for 30 hours per week, but the detailed class schedule on the second page does not add up to 30 hours per week in an SDC.

187.    The December 4, 2006 IEP calls for Student to gradually transition to a full day at Wangenheim.  Once the transition period is complete, it is anticipated that Student will attend six periods of school, five days a week, with three SDC classes, two classes taught by a combination of general and special education teachers, and a final period at the learning center in which Student will receive as many of Student's DIS services as possible.  During the Student's classes Student would be assisted by a one-to-one behavioral aide.  The "sixth period" at the learning center was crafted by the District to address the concerns raised by Student's mother that Student would miss out on his academic studies if he was pulled out for DIS services.  The District staff explained this offer, including the sixth period, to Student's mother at the December 4, 2006 IEP meeting and they testified about it at hearing.  The evidence does not support a finding that there was genuine confusion by Student's parents as to what was offered and the manner in which it was offered.

188.    Student also contends that the District's failure to offer a specific time period when each of the DIS services would be given during the school day made the IEP confusing.  However, the undisputed testimony at hearing confirmed that the DIS services were left fluid so that the majority of DIS services could be provided in the learning center.  As stated above, this was designed to address the concerns of Student's mother and was specifically explained to her on that basis.  There was no confusion as to what was offered.

189.    Student has not met his burden to show that the December 4 IEP failed to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP.  There was no denial of FAPE on that basis.[22]

---

[22] Student raises an additional concern that it was not possible to tell who would be providing the DIS services while the transition plan was being implemented.  That concern will be dealt with in the discussion of the transition plan below.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop and implement an appropriate transition plan to transition Student from a home school program to a school based program?*

190.   Both the August 30 IEP and the December 4 IEP provided a transition plan to help Student transition from his home program to a school program.  Student contends that these two transition plans were inadequate and that District denied Student a FAPE by failing to propose an adequate transition plan.

191.   The transition plan in the August 30 IEP called for Student to transition to the Sierra placement over a period of three weeks.  During the first week, Student would attend school only half days and would continue to receive behavior support at home from an NPA known as "ACES" for two hours a day.  During the second week, his school day would be increased to include lunchtime and his two hour home program would continue.  During the third week he would attend school full time and his home program would be discontinued. At all times during the transition, he would have access to a special area of the classroom for one-to-one support as he needed it.  The transition plan called for collaboration between home and school with the District's case manager acting as a liaison to the parent.  The plan stated at one point: "Should any member of the district team believe the Transition Plan needs modification, a meeting may be called for that purpose.  Reasonable notice would be required to accommodate schedules."

192.   Although the language of the August 30 transition plan provides for a definite time period for the transition, Sheila Doctors, the District's case manager for Student, testified that the intent was to have a gradual transition that might take more than three weeks, depending on the Student's readiness to move from one step to the next.  She explained that in a best case scenario the transition could take three weeks, but only if, based on the data, the collaborative team determined he was ready to move.  She said that Student would keep his NPA DIS providers until the transition was complete.  Contrary to her testimony, the transition plan does not specify that Student would keep his NPA DIS providers during the transition, except for the ACES services outlined in the plan.  A reading of the plan makes it appear that Student's NPA DIS services would end at the time the plan began.  In addition, the plan does not provide for the fluid, data-driven transition that Sheila Doctors described.  If Doctors' interpretation of the plan is correct, the plan also fails to describe who will review the data to determine if Student is ready to progress to the next step.

193.   The transition plan in the December 4 IEP does provide for the flexible approach for Student's transition from one phase of the transition plan to another that Doctors described.  The plan contained extensive information regarding the types of staff training that would occur prior to Student starting school.  The plan was broken into four phases.  Between each phase, a collaboration team consisting of District personnel and NPA providers would meet to determine if Student was ready to move on to the next phase.  The determination of whether Student was ready to move on would be made based on data collected during the previous phase.

EXHIBIT A

194.   Student's parents were not members of the collaboration team. The IEP provided that decisions would be made by the team "with parent input." Sheila Doctors testified that even if all the data indicated Student should move on to the next phase, but Student's parents did not agree, Student would not move on. However, the language of the transition plan does not specify that. Other District witnesses testified that the parents could request an IEP meeting if they objected to the decision of the collaboration team. There was no mechanism in the transition plan for the parents to receive notice of a collaboration team decision, except through contact from Sheila Doctors.

195.   In the first phase of the December 4 transition plan, Student would attend school for two hours in an SDC and continue with a partial ACES home program. In the second phase, Student would extend his school day to a third period collaborative science class, taught by both a special education teacher and regular education teacher. Student's home ACES program would continue, but the hours would be reduced. In the third phase, a lunch hour and SDC math class would be added to Student's day and his ACES home program would be reduced to two hours per day. During phase four, a co-taught world history class and the "sixth period" learning center would be added. During sixth period, Student would receive DIS services, work on discrete tasks and receive pre and post teaching. A collaboration team meeting would be held during the third week of Student's phase four to see whether Student was progressing appropriately and determine if any changes needed to be made to his program. The transition plan called for Student to have access to one-to-one instructional areas within and outside the classroom as needed.

196.   The December 4 transition plan does not specify whether any of Student's DIS services given by the NPA providers besides ACES would continue during the transition period. It also does not specify when and to what extent District-provided DIS services would begin during the transition period. According to the District's written closing argument the transition plan would "…maintain [Student's] in-home aide and his current DIS providers/levels of service until he was fully transitioned into school." MarySue Glynn and Sheila Doctors confirmed during their testimony that the District intended to have the NPA providers continue to give DIS services during the early phases of the transition plan. However, that is not specified in writing in the plan or in the IEP pages describing services.

197.   In Student's written closing argument, Student raises several objections to the two proposed transition plans: 1) that they were based on an inadequate behavior support plan; 2) they did not spell out how Student's DIS services would be provided during the transition period; 3) the transition plans provided that Student would move on to the next phase of the transition based on data collected, but provided no mechanism for what would happen if the collaboration team disagreed; and 4) they excluded Student's mother from the collaboration team decisions on whether to move Student to the next phase of the transition except by giving input to the case manager.

198.    As set forth in Factual Findings 81-96, the behavior support plans in both IEPs were adequate, so Student's first contention is without merit.

199.    With respect to the remaining issues, Student has met his burden of showing that the transition plans are incomplete and confusing. The language of the August 30 transition plan is directly contradictory to what Sheila Doctors testified the District intended. It does not state that the NPA DIS services will continue until the transition is complete, and it does not provide for a transition from one step to the next only when the data states the transition will be made. It does not state who will make the determination that Student needs to move from one step to the next or whether Student's parents will be part of that decision making process. However, to the extent that it did provide for those things, it suffers from the same problems as the December 4 transition plan, as discussed below.

200.    The December 4, 2006 transition plan does propose the flexible plan that Sheila Doctors discussed. However, the plan is still confusing, because it does not specify who would provide the DIS services during the transition period (the school or the NPA providers), whether those services would decrease to the number of minutes per week set forth in the December IEP, and where they would be provided. The undisputed evidence shows that the District intended to continue all DIS services through the home program unchanged (except ACES services), but that should have been memorialized in the IEP to avoid confusion and later disputes. As set forth in Legal Conclusions 49-54, because of the open-ended nature of the transition program, any phase of the transition could, in effect, become Student's placement for the remainder of the school year. Therefore, the failure to specify the DIS services Student would receive denied Student a FAPE.

201.    The evidence also supports a finding that the transition plan was inadequate because it did not provide for Student's parents to be part of the decision-making process for determining whether to move to the next phase. This is not just a question of teaching methodology or whether Student needs one-to-one time during a school day. This is not a collaboration meeting to develop proposed goals that will ultimately be presented to the parents for approval. Instead, Student's placement and ACES services are changed every time a new phase is added. If Student's mother agrees to the IEP, but disagrees with the decision of the transition team that Student is ready to move on, will she have a remedy in due process? How will she even learn that the decision has been made? If the District's intent was truly to give Student's mother veto power over the collaboration team's decision of whether to move to the next phase, that should have been specified in the IEP. Simply specifying "parent input" when the parent is not even at the meeting is not sufficient. The evidence supports a finding that Student's mother should have been part of the collaboration team meetings to determine if Student was ready to move from one phase to the next. The failure to include her rendered the transition plan improper and denied Student a FAPE.

202.    Once Student's mother is part of the collaboration team meetings, Student's other objections to the transition plan are easily dealt with. Student is correct that the transition plan does not specify how decisions will be made if the transition team disagrees that Student is ready to move on, but that is only troubling if Student's mother is not part of

EXHIBIT A

the team. If she is part of the team, she will have notice and an opportunity to seek a due process hearing no matter how the decision is made.

203.    The District contends that transition plans are not required to be part of an IEP and that problems with a transition plan cannot cause a denial of FAPE. However, as discussed in legal Conclusions 49 – 54, the August 30 and December 4 plans were not simply transition plans that would occur over a few days or a week. Because of the open-ended nature of these plans, in which Student would not move on to the next phase until the data supported movement, any phase of the plan could, in effect, become Student's placement for the entire school year. Under these circumstances, it was critical for the plans to be complete and provide for parental involvement. The evidence supports a finding that the August 30, 2006, and December 4, 2006 transition plans were not appropriate, and the failure to have appropriate transition plans in the IEPs denied Student a FAPE.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop an appropriate health care plan that would enable Student to attend school safely?*

204.    Student contends that the District failed to develop an appropriate health care plan to enable Student to attend school safely. The law requires an IEP to include a statement of the special education and related services to be provided to the pupil. Related services (also known as DIS services in California) include health and nursing services necessary for a child to benefit from special education. These health and nursing services may include, among other things, providing services by qualified personnel and managing the individual's health problems on the school site. Health and nursing services may also include services referred to as "specialized physical health care services." Specialized physical health care services are health services prescribed by a child's physician requiring medically related training for the individual performing the service and which are necessary during the school day to enable the child to attend school.

205.    The District's assessment identified four health related areas that could affect Student's education – his PKU and special dietary needs, his G-Tube feedings, his seizures and his osteoporosis/osteopenia. Student contends that the August and December IEPs did not offer appropriate health care services to address Student's needs with respect to his special diet and G-Tube feedings. Student contends that the IEPs should have included dietician services to help Student maintain his special diet, as well as specific information about his G-Tube feedings.

206.    Because of Student's PKU, he requires a special diet at all times. Different foods contain varying amounts of PHE. Individuals with PKU must calculate the amount of PHE in the foods they eat to make certain that they do not go above their daily limit. Most adults with PKU can estimate the amount of PHE in foods based on their knowledge and experience with the foods. The evidence is undisputed that, in Student's case, the only way to adequately determine the amount of PHE Student ingests in a day is to calculate the food Student is about to eat, weigh the food before he eats, and then weigh what is left over at the end. Student is a picky eater and does not always finish his food. The amount of PHE must

then be calculated based on the food he has actually eaten. That way his parents know how much PHE he must ingest at dinner in order to maintain the appropriate levels of PHE in his system.

207.    It is not clear from the evidence exactly how fragile Student's condition is with respect to his food intake at this time. Dr. Cederbaum, Student's expert on PKU, testified that Student's blood levels are very good and it would probably not hurt him if he were to accidentally ingest too much PHE on one or two days. However, over time the buildup of PHE could be harmful to him.[23] Conversely, if Student does not get sufficient PHE each day, his body could begin to break down the tissue in his system, causing him harm.

208.    Even if the evidence does not establish that Student would be in jeopardy from a single day of ingesting too much or too little PHE, the evidence does establish that it is necessary to monitor and control his PHE intake. If Student will be eating food at school, the District must take steps to ensure he has a proper diet. Given the need for Student's specialized diet and the danger to Student if the school staff does not provide appropriate food, Student's PKU does require health care services if Student will be eating at school. Student also requires adult supervision to make certain that he does not eat foods from other children that are not permitted in his diet.

209.    The August 30, 2006 IEP provides information about Student's health needs on the page regarding present levels of performance. It states that "PKU – requires low protein foods; All staff require training re: diet and g-tube feedings; Awareness of high/low levels of PHE and effects; [Student] needs adult support as he learns to monitor all food intake at school." The IEP also attached Dr. Casey's redacted assessment which describes his dietary needs.

210.    The August 30, 2006 IEP proposal at Sierra Academy did not call for any food to be prepared for Student on the campus. Instead, Students at Sierra Academy bring their own lunches to school. Therefore, there was no need for procedures regarding food preparation for Student in the IEP.

211.    The July 2006 "stay put" IEP included a series of pages prepared by Student's mother regarding the details of PKU and Student's dietary needs. The District did not include them in the August 30, 2006 IEP because they intended to cover all that material in training provided to the Sierra staff.

212.    Glynn testified that the intent of the IEP was to have training in Student's diet, PKU needs, and G-Tube feeding provided to all staff at Sierra before Student started school there. Student's one-to-one behavior support aide would monitor his food intake and assist Student with his G-Tube feeding after being trained by a District school nurse. Jennifer

---

[23]  Dr. Cederbaum declined to state a specific time period after which ingestion of too much PHE would be harmful for Student.

EXHIBIT A

Gorman, a District nursing supervisor, testified that the eight hours of nursing services per year would cover three hours of training for the Sierra staff and a half-hour per month for the school nurse to monitor the G-Tube feedings, diet and other health care issues that needed to be reviewed with staff on a periodic basis. The school nurse would visit the school site once a month.

213.    The evidence supports a finding that the August 30, 2006 IEP adequately provided health services to address Student's PKU and dietary needs. Student would be bringing his lunches to campus and the IEP called for training for all Sierra staff regarding his diet. Student's one-to-one aide and other adults would be able to monitor his food intake to make certain he was not given improper foods to eat by a classmate. Because there was no food being prepared for him on campus, no detailed PHE information was necessary.

214.    The evidence also supports a finding that the December 4 IEP sufficiently provided for health services to meet Student's dietary needs. The "special factors" page of that IEP describes step-by-step food preparation requirements for Student and identified the category of employee who would provide those services. Brenda Reynosa, a registered dietician working for the District, testified that she would be responsible for meal planning and training of staff at Wangenheim regarding Student's dietary needs. She would also act as a support for Wangenheim cafeteria staff if they had any questions. Reynosa has been a registered dietician for 23 years and has supervised meal plans for over a thousand students. She was involved with Student's meal planning when he attended District schools prior to the time Student's mother pulled him from school in 2003. Student's mother praised the way the District's food services handled Student's dietary needs in the past.

215.    Student contends that the December 4 IEP should have contained the multi-page PKU information provided by Student's parents that had been included in the July 17, 2006 "stay put" IEP. However, the evidence does not support that contention. The information in the December IEP is adequate to set forth Student's PKU needs, particularly in light of the training and oversight to be provided by Ms. Reynosa. Student also contends that if Reynosa is absent, there would be no back-up individual to maintain Student's diet. However, Reynosa would be preparing a meal plan for Student. There is no indication the cafeteria staff would be unable to follow that plan in Reynosa's absence. The evidence supports a finding that the District properly offered Student a FAPE in this regard.

216.    Student's G-Tube feeding is done through a surgically implanted vessel that leads from a plug on the surface of his skin through a tube into his stomach. It is referred to as "syringe" G-Tube feeding. Student's formula is prepared according to the amount of Phenex 2 prescribed by his doctor. Student is capable of mixing his own formula if he has adult supervision and prompting. The formula is poured into the G-Tube and then the tube is flushed with a cup of water. Student has difficulty pouring and it can take a while for him to accomplish the procedure, even with adult supervision. He often spills the formula and requires a change of clothes when he is finished. The formula has a foul odor, and Student's mother believes it would not be considerate of others to perform a G-Tube feeding in a

classroom. Student used to require two G-Tube feedings a day. On April 17, 2007, Student was changed to three G-Tube feedings a day on the advice of Dr. Cederbaum.

217.     The District's nurses disagreed about whether Student's G-Tube feeding would properly be classified as a physical health DIS service. Dr. Casey testified that it is a specialized health care procedure and can be considered a physical health DIS service. Nurse Gorman agreed that a G-Tube feeding is considered a specialized health care service. Nurse Vergara, on the other hand, testified that in Student's case, the G-Tube procedure would not be a physical health DIS service, because Student was doing the procedure himself with adult supervision.

218.     In 1990, the California Department of Education produced a book entitled "Guidelines and Procedures for Meeting the Specialized Physical Health Care Needs of Pupils." The book, also known as the "Green Book," provided guidelines that school districts could follow. These guidelines were not mandatory, and are largely outdated now. A G-Tube syringe feeding was included within the part of the book dealing with "specialized physical health care services procedures requiring a physician's authorization." The District's website also lists G-Tube feedings under "specialized physical health care services." The District's procedures, which were approved by Dr. Taras on August 30, 2006, include the following statement in bold type:

> THIS PROCEDURE SHALL BE PERFORMED BY THE CREDENTIALED SCHOOL NURSE IN ACCORDANCE WITH PHYSICIAN'S ORDERS. A STAFF MEMBER MAY PERFORM THIS PROCEDURE UNDER THE SUPERVISION OF THE CREDENTIALED SCHOOL NURSE OR SPECIAL EDUCATION ITINERANT NURSE AFTER THEY HAVE BEEN INSERVICED AND CAN DEMONSTRATE COMPETENCY IN PERFORMING THE PROCEDURE. THIS PROCEDURE WILL BE MONITORED AND DOCUMENTED BY A CREDENTIALED SCHOOL NURSE.

219.     The evidence supports a finding that a G-Tube feeding, if required to be provided during the school day by District personnel, is properly considered a specialized phsyical health care service.

220.     The parties dispute whether and to what extent an IEP must specify the health services provided by the District to a pupil. The District used to include specialized physical health care services in the IEP document, but about five years ago began preparing separate individual health support plans (IHSP).[24] These IHSPs are prepared for all children who need health care services at school, even those who have no IEP. They are specific to a certain school and provide detailed information for health procedures, medication doses and similar information. These are generally drafted by the school nurse in conjunction with the parent, but they do not require parental approval in the same way an IEP does. They

---

[24] These are also referred to as individualized school health care plans (ISHP).

49

generally require a doctor's prescription or order authorizing the school to provide the medication or services. These IHSPs are generally kept in the nurse's office at the school the child attends.

221.    The District believes that an IHSP can only be developed after the placement has been agreed upon in the IEP. The District did not develop an IHSP for the August 30, 2006 IEP, because Student's mother made it clear that she would not agree to have Student attend Sierra Academy.

222.    The District's position is not well taken. As discussed more fully in Legal Conclusions 40 – 48, Student's G-Tube feeding was a specialized physical health care service and was required to be included in the IEP as a related service. A parent is entitled to know and approve of the general procedure by which health care services will be provided. This does not change just because Student will be attending an NPS. By taking the G-Tube feeding procedure out of the IEP, the District deprived Student's mother of the opportunity to consent to the manner of delivery of service through the IEP process. It is not an excuse that the District does not have a set placement until the parent signs the IEP. The District is required to make a placement offer in a proposed IEP. The specialized physical health services that are "related services" are part of that offer. If a district wishes to set forth detailed information regarding those services in a separate document or IHSP, there is nothing improper about that, as long as general nature of the services and the manner in which they will be provided is included in the IEP document.

223.    The evidence supports a finding that, prior to the August 30, 2006 IEP, the District had sufficient information to include specialized physical health services related to Student's G-Tube feedings in the IEP. The District had a release for information from Dr. Dewan and the information provided by Dr. Casey's assessment. Even though Dr. Casey's observation notes of Student's G-Tube feeding were redacted from the final assessment report, the District had the physician orders from Dr. Reich, which described the G-Tube procedure in detail. Even Dr. Taras admitted that the District had sufficient information to draft an IHSP dealing with Student's Phenex formula as of August 30, 2006.

224.    The August 30 IEP does not describe general procedures for G-Tube feeding, where that procedure would take place on the Sierra campus, or identify the category of employee who would assist Student with the feedings. There is a mention of the need for adult supervision in Dr. Casey's assessment report. However, Casey's report does not identify the type of employee (e.g. behavioral aide; special education health technician, school nurse, etc.) who would assist Student.

225.    The evidence supports a finding that the August 30, 2006 IEP proposal did not provide Student a FAPE because it failed to include specialized physical health care services with respect to Student's G-Tube feedings necessary for Student to attend school and access his education.

EXHIBIT A

226.    The December 4, 2006 proposed IEP called for 8 hours of health nursing services a year. These services included the training of staff at Wangenheim regarding Student's PKU and G-Tube needs. The special factors page of the IEP states "District Nurse will prepare an IHSP and Health Profile folder prior to [Student] starting school, and staff training will be provided as indicated in the Transition Plan...." The transition plan contains the statement "Health/Safety training will include the following areas...G-tube feeding and demonstration with model...." The transition plan goes on to state:

> G-tube feeding will be scheduled to occur daily in the Nurse's room. Timing will be determined in collaboration with the school nurse and parent, in order to fit g-tube feeding into [Student's] schedule at an appropriate time and to clarify which staff member will assist until [Student] becomes independent.

227.    The IEP does not specify which category of District staff would be responsible for the G-Tube feeding. During the hearing, there was disagreement among the District witnesses as to which type of employee would assist Student with the procedure. Glynn and Nurse Linda Vergara testified that Student's one-to-one behavioral aide would assist with G-Tube feedings. The school nurse would teach the aide how to assist Student.

228.    Matthew Howarth, the District supervisor for behavioral aides, testified that Student's one-to-one behavioral aide was not responsible for assisting with Student's G-Tube feedings under the December 4, 2006 proposed IEP. Instead, it was contemplated that Student would go to the nurse's office every day for the G-Tube feeding and the nurse would direct the feeding. Howarth explained that health was not in the scope of his duties. He was told that his staff should be trained to assist the nurse in implementation of the health plan.

229.    During the December 4 IEP meeting, Nurse Vergara, an itinerant school nurse whose territory included Wangenheim, expressed concerns that the amount of nursing time set forth in the IEP would not be sufficient to cover the nursing time actually needed for Student. The District staff members attending the IEP meeting were "bowled over" by her comments and did not ask her to explain her concerns at that time. During the hearing, Vergara explained she had been concerned that the eight hours of nursing services would not be enough to include activities such as writing the IHSP, getting physician orders for the current school year, seeing if there was any training on site, and evaluating the competency of his G-Tube feedings. She later learned that many of these services were already covered in his transition plan and would not count as part of the eight hours of nursing services.

230.    The evidence supports a finding that the December 4, 2006 IEP did not offer Student a FAPE because it failed to set forth appropriate specialized physical health care services related to Student's G-Tube feeding. The IEP should have specified which category of employee would assist with the G-Tube feedings. One of the reasons for the IEP process is to give a parent notice and the ability to object to the District's basic program and services for the Student. While an IEP is not required to specify teaching methodologies or the individual names of staff members who will provide services, it does specify the job classifications of those employees. By taking the G-Tube procedure out of the IEP and

EXHIBIT A

placing it in a separate document, the District took away the parents' ability to object as part of the IEP process. What would happen if the parent signed the December 4 IEP and then the school nurse and parent disagreed about which staff member would assist with the G-Tube feeding? What would stop the District from implementing the IEP with the behavioral aide assisting the G-Tube feedings against the parental wishes? How would the parent challenge that District's decision if the G-Tube feeding information was not contained within the IEP? The District could defend any due process proceeding simply by asserting that it was in full compliance with the IEP.

231.    The problem with the District's IHSP theory is highlighted in the present case, in which even the District staff members disagreed about the appropriate category of employee to assist with the feedings. It is also highlighted by Nurse Vergara's concerns expressed at the December 4 meeting about the sufficiency of the nursing time specified in the IEP.

232.    As set forth in Factual Findings 62-77, the District's task of preparing an appropriate health plan for Student was hampered by the reluctance of Student's parents to sign releases for medical information. If a child needs a district to provide specialized physical health services in order to access his or her education, it is critical that the IEP *team*, not just selected District employees, have access to relevant health information from the Student's doctors. In this case, the parents' insistence that only certain employees talk to Student's doctors or that no written information be provided was not reasonable and hampered the IEP process. This was particularly true in light of the discrepancies between doctor's orders that came to light after the December IEP meeting.[25]

233.    However, as of December 4, 2006, the District had physician orders detailing the G-Tube feeding procedure and Dr. Casey had observed the G-Tube feeding. The District could have specified the basic G-Tube feeding procedure in the proposed IEP, but did not do so. Because of the failure to specify the specialized physical health services necessary for Student to access his education, the December 4, 2006 IEP failed to offer Student a FAPE.

234.    Student also contends that a behavioral aide is not an appropriate category of employee to assist Student with the G-Tube feeding.[26] The evidence supports Student's contention in this regard.

235.    The law provides that two types of school employees may provide specialized physical health care services to children with special needs: 1) qualified persons who possess

---

[25]  In addition, it is troubling that Student's mother withheld important medical information from the District at the December 4, 2006 IEP meeting. Student's mother did not inform the District about Dr. Newfield's opinion contradicting part of what Dr. Dewan had stated regarding osteoporosis/osteopenia. Student's mother, no matter how long she has cared for Student, is not a doctor, and she should not withhold critical physician information from the District at the same time she expects the District to provide health-related services to her child.

[26]  Because this relates to Student's proposed resolutions, it is appropriate to make Factual Findings on this issue, even though the IEP did not specifically call for a behavioral aide to assist with the G-Tube feeding.

an appropriate credential; and 2) qualified designated school personnel trained in the administration of specialized physical health care performing the services under the supervision of a school nurse or licensed physician. A school nurse falls under the first category and may provide specialized physical health care services. In order for an individual to become a qualified designated school employee, the individual must meet the training requirements set forth in law. As set forth in Legal Conclusions 40-47, medically related training must be in an approved program in standardized procedures. Those standardized procedures are protocols and procedures developed through collaboration among school or hospital administrators and health professionals.

236.    The District has two job classifications which are clearly intended to be "qualified designated school personnel." The first is entitled "Special Education Technician." The essential functions of that position state the technician will: "Perform specialized health care procedures under direction of school nurse." There is also a job classification known as "Special Education Health Technician." The essential functions for that position state the technician will "Perform specialized physical health care for pupils such as…gastrostomy feedings…or other services that require medically related training." The Special Education Health Technician position requires training or experience to equal one year of experience as a Health Assistant I or Special Education Technician.

237.    The essential functions of the job classification for "Behavior Support Assistant" do not make any mention of performing health related services, either with or without the direction of a school nurse. In addition, the District provided no evidence to show that the three hours of training for the behavioral aide called for in the IEP would be sufficient to constitute the training in an approved program in standardized procedures required by law.

238.    The testimony of Nurse Gorman supported the differences between these classifications. She explained that, when she was a school nurse at the school Student used to attend (prior to the time his mother pulled him from the District schools), either Nurse Gorman herself or a special education health technician performed the G-Tube feedings for Student.

239.    Dr. Taras explained that District job classifications are for personnel purposes. From a medical point of view, it does not matter if an employee providing the G-Tube feeding is classified as a Behavior Support Assistant or Special Education Health Technician. Unless the employee is a school nurse, the employee must work under the direction of a school nurse.

240.    Despite Dr. Taras' testimony, the evidence does not support a finding that the behavioral aide should assist with the G-Tube feeding. Howarth, the supervisor for the behavioral aides, testified that he does not handle health matters. The District's own job classifications do not state that behavioral aides will assist with health functions. If Dr. Taras is correct that any District employee can perform G-Tube feedings, why have two special job classifications which are authorized to perform this function? A G-Tube procedure is an

invasive medical procedure with possible complications. The District has not met its burden of proving that a behavioral aide was qualified to assist Student with his G-Tube feeding without the physical presence of the school nurse to oversee the process.

241.    The District failed to meet its burden of proving that the December 4 IEP offered Student a FAPE. Student met his burden of proving that the District failed to develop an appropriate health care plan that would enable Student to attend school safely.

*Did the District violate the provisions of the Individuals with Disabilities Education Act (IDEA) by failing to implement a "stay put" placement as of July 25, 2006?*

242.    Prior to July 2006, Student was receiving his education in a home program, with various DIS services provided by the District. When the parties agreed to the July 17, 2006 IEP that placed Student at Coronado Academy during ESY, they also agreed that, in the event they could not agree upon a placement for the 2006-2007 school year, Student would return to his home program with the following DIS services paid for by the District: 1) ACES behavioral training provided by an ACES supervisor for school staff and parents of two hours per month; 2) ABA supervision services to be provided by a Board certified behavior analyst of eight hours per month; 3) ABA Clinic attended by ACES one-to-one behavioral aide(s) two times per month; 4) Occupational therapy four hours per week at the School Options facility; 5) Speech/language therapy four hours per week at Laurie Silverman & Associates; 6) Assistive technology of one hour per month at "[Student's] Home if not in school"; 7) Transportation reimbursement for parent transporting Student to DIS providers' offices; 8) ABA one-to-one aide(s) provided by ACES NPA for 41.5 hours per week in Student's home.

243.    Student contends that the District failed to comply with "stay put" in the following respects: 1) the District failed to provide AT services in Student's home; 2) the District failed to provide Student with the services of a credentialed special education teacher; and 3) the District failed to reimburse Student's mother for transportation costs.

244.    The evidence supports a finding that the District provided AT services to Student's family during the "stay put" period. As set forth in Factual Finding 184, Anne Callies, the District's AT expert, had visited Student's home in 2005 to provide training to Student's mother in the use of the AT devices. Although Callies did not visit Student's home once a month during the 2006-2007 "stay put" period, she was available on an as needed basis to handle technology questions and concerns. For example, Student's family contacted her when a laptop computer needed repair. During the "stay put" period, Callies tried to respond to every AT request the parents made. Because Student's home program and technology did not change before and after his short Coronado placement, there was no need to perform further training. AT services provided on an "as needed" basis were appropriate. There was no violation of stay put.

EXHIBIT A

245.    Student also contends that the District was required to provide a credentialed special education instructor to teach Student his curriculum during the stay put period. The evidence does not support this contention. There is nothing in the stay put provisions in the July 17 IEP indicating a credentialed special education was required to come to Student's home to teach Student during the stay put period. Instead the District witnesses testified that the stay put was intended to be a continuation of Student's home program that had operated since Student's mother pulled Student from the District schools in 2003.

246.    Alternatively, Student's mother contends that the District failed to implement the "stay put" provisions by refusing to give Student's mother a copy of the District's curriculum. Student's mother contends that she was providing Student's academic education, while ACES provided behavioral support. On October 28, 2006, Student's mother requested a copy of the District's curriculum so she could use it to provide Student's academic instruction. The District refused to provide it to her.

247.    The District disputes Student's contention that Student's mother was providing him with academic instruction. The evidence is unclear as to how much actual instruction Student's mother provided to Student. It appears that much of her time with Student during the week was spent driving Student to his various NPA providers. She also frequently took him to "Starbucks" coffee shop. Student's mother testified that she was able to instruct Student even while driving or visiting Starbucks.

248.    Even if Student's mother did provide extensive academic education to Student, there was no violation of "stay put" due to the District's failure to provide her with a curriculum. Student's mother insisted on the home program as "stay put" and it was merely a continuation of the same home program she had employed for Student ever since she pulled him from his District classroom in 2003. There was no evidence that she had relied upon the District to provide her with a "curriculum" in the past, and there was no requirement that the District provide her with a "curriculum" in the stay put IEP. Even if Student had not been terminated from Coronado, the stay put IEP called for Student to return to his home placement as soon as Coronado's summer program ended. If Student's mother had needed a written curriculum from the District, she could have asked for one at the July 2006 IEP meeting. There was no stay put violation by the District.

249.    Student also contends that Student's parents were not reimbursed for transportation costs as set forth in the stay put agreement. During the hearing, the District employees did not dispute that the District had agreed to reimburse those costs, but explained that Student's parents had to submit the paperwork necessary for reimbursement. On July 18, 2007, Student's mother testified that she resubmitted the paperwork during one of the breaks in the hearing. To the extent that the District has not yet reimbursed her for her transportation costs, it is appropriate for the District to do so now. However, Student did not meet his burden of proving that the appropriate paperwork was submitted earlier, so there is no showing of a violation by the District of stay put. Therefore, the District will still be considered the "prevailing party" on this issue.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to allow meaningful participation in the IEP process by Student's parents?*

250.    Student contends that the District failed to allow Student's parents to have meaningful participation in the IEP process based on three grounds: 1) the District sent Student's parents too many revisions of the various IEPs prior to the IEP meetings and sent them too close in time to the meetings; 2) the District held "collaboration meetings" between August 30 and December 4, 2006, which specifically excluded Student's parents; and 3) the District refused to consider the input provided by Student's mother to the IEP team, including proposed goals and objectives and other concerns. The law requires that parents be afforded a meaningful opportunity to participate in the IEP process.

251.    As stated above in Factual Finding 101, Student and the District agreed to an informal procedure in which the District would send drafts of proposed IEPs to Student's counsel for review prior to IEP meetings. During the time period relevant to this case, there were IEP meetings held on July 17, 2006, August 30, 2006, October 9, 2006, October 27, 2006, November 16, 2006, December 4, 2006, and May 2, 2007. At least one of Student's parents attended each of these IEP meetings, except the August 30 meeting. Between July 2006 and May 2007, the District sent many IEP drafts to Student's counsel.

252.    The District witnesses testified that these drafts were sent in an attempt to comply with the informal procedure established by the parties. The District would draft an IEP. After comment by Student's parents, their counsel or the NPA providers, the District would modify that IEP and then send a copy of the modified IEP to Student's counsel for further comment. There was nothing improper about the District's conduct in this regard. Instead, the District was attempting to cooperate with Student's parents and consider their input. It is true that some of these drafts were sent close to the date of the IEP meetings, but that was due to the ongoing, collaborative nature of the process, not an attempt to harass Student's parents. There is no legal requirement for a District to send a draft IEP to a parent before a meeting or to make changes before a meeting. Student requested that the District send him draft IEPs. There was no procedural violation because his request was granted. It certainly did not prevent the meaningful participation in the process by Student's parents.

253.    The evidence does not support a finding that the District prevented participation by Student's parents in the IEP process by excluding them from the District's collaboration meetings.[27] After the October 9, 2006 IEP meeting, Sheila Doctors organized a few "collaboration meetings" between District staff and the NPA providers. These meetings were informal gatherings in which staff members and NPA providers would meet to discuss certain aspects of the IEP, such as the transition plan or speech/language goals. The input from the meeting participants was considered by the District in drafting the IEP proposals sent to Student's counsel prior to the IEP meetings. There were at least three collaboration meetings of this type held between October 9, 2006, and December 4, 2006.

---

[27]    These collaboration meetings have no connection to the collaboration meetings in the proposed transition plan discussed in Factual Findings 193-194.

254.   At the collaboration meetings, Sheila Doctors asked the participants to sign a paper stating their "level of agreement to the revision of the plan." She did this because she wanted to know clearly what everyone thought. Some of the NPA providers felt uncomfortable about signing this paper, and either signed with a qualifying statement or signed only for attendance at the meeting. The District took no action against the providers who signed attendance only or qualified their signatures.

255.   Student's parents were not invited to these collaboration meetings, despite a request by their counsel that they be permitted to attend. The District personnel did not invite the parents because they considered these meetings to be pre-planning meetings which are often held by District staff to help develop an IEP proposal. Student's parents were not happy to be excluded.

256.   The evidence supports a finding that the exclusion of Student's parents from these meetings did not prevent them from participating in the IEP process. Under the circumstances of this case, in which the parents objected to virtually every goal and objective, placement and service proposed by the District, and in which there had been multiple meetings of many hours already, it was very reasonable for the District to hold pre-IEP meetings to try to craft language such as speech/language goals that could then be presented to the parents. The parents insisted that the NPA providers be part of the IEP process, and the District incorporated them in a much more active role by holding the collaboration meetings. No IEPs were signed at these meetings and the parents still had a full opportunity to (and did) contest the proposed goals and transition plan at IEP meetings. Rather than being harassment, these meetings were a good faith attempt by the District to craft language that would meet Student's needs and be acceptable to everyone involved.

257.   The evidence also does not support a finding that there was anything improper when the District asked the participants of these collaboration meetings to sign a document indicating whether they agreed with what was proposed. The District was trying to create a consensus among the experts to assist it with drafting IEP goals and other portions of the IEP. If the NPA providers seemed to agree at the collaboration meeting, but then disagreed at the IEP meeting, it would defeat the purpose of collaborating. There was no failure by the District to allow meaningful participation by the parents.

258.   Likewise, the evidence does not support a finding that the District failed to consider the parents' input in the IEP process. In fact, the evidence shows that the District was constantly modifying the IEP documents in order to try to arrive at a proposal that would be agreeable to the parents. The District added goals to the December 4, 2006 IEP to address Student's PKU and stair climbing, both of which the parents had raised as concerns. During the IEP meeting, when Student's mother objected that the proposed IEP did not contain enough time for physical education, the District increased the amount of APE time. After Student's parents had rejected the proposed Sierra placement and requested a comprehensive campus for Student, the District crafted a program at a comprehensive campus in accordance with their wishes. When the parents raised concerns that Student would be pulled from

57

academic classes for his DIS services, the District made an arrangement for Student to receive many of these services at the learning center after class.

259.    Student's mother and her counsel wrote continual correspondence and emails to the District with comments, suggestions and complaints about the District proposals. The District dutifully answered these concerns. Student objects that these discussions should have taken place during an IEP meeting, but the evidence shows that the parties chose to conduct much of their IEP discussion by correspondence rather than at an IEP meeting. The administrative record contains dozens of email messages, letters and other documents that were exchanged between the parties and their counsel.[28] There was nothing improper in the District's actions.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to consider the goals and objectives proposed by Student's parents?*

260.    Student contends that the District failed to consider the goals and objectives proposed by Student's mother. On October 24, 2006, Student's mother sent an email to the District with approximately 12 pages of proposed goals and objectives. On November 27, 2006, District's counsel sent a 13-page letter with a detailed response regarding each of the proposed goals.

261.    Student does not deny that the response was sent, but instead contends that the goals should have been discussed during an IEP meeting instead of through correspondence. The evidence does not support Student's contention.

262.    As stated in Factual Finding 259 above, both parties in this case chose to conduct much of their dialogue by correspondence rather than at an IEP meeting. Having decided to operate in that fashion, Student cannot complain now about that process.

263.    Further, the evidence supports a finding that the District did incorporate parental input into the proposed IEP goals. For example, at the December 4, 2006 IEP meeting, Student's mother stated that the District's proposed PKU goal was based on her proposed goal. There was no violation by the District.

---

[28] Although the time period at issue in this case was only one school year, there are over 500 pieces of documentary evidence. Much of the evidence consists of communication of one form or another between the parties or their counsel.

EXHIBIT A

LEGAL CONCLUSIONS

*Burden of Proof and Applicable Law*

1.      The burden of proof in this proceeding is on the party seeking relief. (*Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528].)  Because this is a consolidated case, in which both parties have brought claims, each party has the burden as to those issues for which the party is the petitioner.

2.      Pursuant to the Individuals with Disabilities Education Act (IDEA) and California Law, children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (20 U.S.C. § 1400(d); Ed. Code, § 56000.)  FAPE consists of special education and related services that are available to the student at no charge to the parent or guardian, meet the state educational standards, include an appropriate school education in the State involved, and conform to the child's IEP. (20 U.S.C. § 1401(9).)  The federal regulations promulgated pursuant to IDEA were amended, effective October 13, 2006.  For those events in the instant case which took place prior to October 13, 2006, the older version of the regulations is applicable. (See *Ms. S. v. Vashon Island School District* (9th Cir. 2003) 337 F.3d 1115, 1119, fn. 3.)

*Is the District's Multidisciplinary Assessment dated July 14, 2006, appropriate?*[29]

3.      Before any action is taken with respect to the initial placement of a special education student, an assessment of the student's educational needs must be conducted. (Ed. Code, § 56320.)  Thereafter, a special education student must be reassessed at least once every three years. (Ed. Code, § 56381, subd. (a).)  No single procedure may be used as the sole criterion for determining whether the student has a disability or determining an appropriate educational program for the student. (20 U.S.C. § 1414 (b)(2)(B); Ed. Code, § 56320, subd. (e).)

4.      The tests and materials use in the assessment must be valid for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's primary language or other mode of communication unless this is clearly not feasible. (20 U.S.C. § 1414(b)(3)(A)(i)-(iii); Ed. Code, § 56320, subd. (a).)

5.      Assessments must be conducted by individuals who are both "knowledgeable of [the student's] disability" and "competent to perform the assessment, as determined by the school district, county office, or special education local plan area." (Ed. Code, §§ 56320,

---

[29] Because the same legal analysis applies to issues two and three (regarding whether the District failed to assess in all areas of need and whether the District failed to conduct a proper physical health assessment), the Legal Conclusions for those two issues will also be discussed under this heading.

subd. (g), 56322; see, 20 U.S.C. § 1414(b)(3)(A)(iv).) A psychological assessment must be performed by a credentialed school psychologist. (Ed. Code, § 56324, subd. (b)(3).)

6.     In California, a district assessing a student's eligibility for special education must use tests and other tools tailored to assess "specific areas of educational need" and must ensure that a child is assessed "in all areas related to" a suspected disability, such as vision, hearing, motor abilities, language function, general intelligence, academic performance, communicative status, self-help, orientation and mobility skills, career and vocational abilities and interests, and social and emotional status. (Ed. Code, § 56320, subd. (c), (f).)

7.     As set forth in footnote 6 above, the parties stipulated that the District witnesses would testify that the District's assessments met all the requirements of law and assessed Student in all areas of need. Student contended that certain assessments were not properly done and that certain areas of need were not assessed. However, as set forth in factual Findings 1 - 50, the evidence does not support Student's contentions. The District's assessments were comprehensive, thorough, and addressed all areas of need for Student. As set forth in Factual Findings 51 - 80, the evidence supports a finding that the District's health related assessments were sufficient to determine Student's health-related educational needs and there was no elimination of health related services without an assessment.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to assess Student's behavioral needs and failing to develop an appropriate behavior plan?*

8.     When a child's behavior "impedes the child's learning or that of others," a school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." (20 U.S.C. § 1414(d)(3)(B)(i).) When a child "exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives" of the child's IEP, a district must develop a formal behavior intervention plan (BIP), which becomes part of the child's IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) Serious behavior problems are defined as "behaviors which are self-injurious, assaultive, or cause serious property damage or other severe behavior problems that are pervasive and maladaptive for which instructional/behavioral approaches in the student's IEP are found to be ineffective." (Cal. Code Regs., tit. 5, § 3001, subd. (aa).) Before a BIP is developed, the district must conduct a functional analysis assessment (FAA). (Cal. Code Regs., tit. 5, § 3052, subd. (a)(3).) An FAA is a detailed assessment of a child's behavior, which includes, among other things, systematic observation of the occurrence of the targeted behaviors, systematic observation of immediate antecedent events associated with the behavior and the consequences of the behavior. (Cal. Code Regs., tit. 5, § 3052, subd. (b)(1).)

9.     As discussed in Factual Findings 81-96, there is no evidence in this case that Student's behavior is serious enough to warrant an FAA or BIP. Although there is evidence of mild self-injurious behavior, such as Student rubbing his eyes or hitting his head with his hand, the evidence shows that the interventions practiced by ACES staff and others have been successful at diverting Student whenever the behaviors begin. For example, when

Student started to hit his head in Dr. Patterson's office, Patterson was able to stop him with a comment and a gentle touch. At this point, there is no reason to believe that the behavioral approaches taken by the District's proposed BSPs would be ineffective. Of course, should Student's behaviors escalate when he begins school, it might be appropriate to conduct an FAA in the future. However, at this point, there is no need for an FAA or BIP.

10.    A behavior support plan is not the formal, detailed document that a BIP is. Student cites to no authority that a behavior support plan must contain quantitative baseline data regarding frequency and duration of behaviors. The behavior support plans in the August 30 and December 4 proposed IEPs address the behaviors that impede Student's learning and are based on interventions that have been proven to work with Student.

11.    As set forth in Factual Finding 45, the District's social/emotional assessment of Student was appropriate and properly identified Student's behavioral needs. Student has not met his burden to show the District failed to properly assess Student.

*Did the District violate IDEA by failing to reimburse Student's parents for the Independent Educational Assessments (IEEs) obtained by the parents, as requested by Student's mother at the October 9, 2006 IEP meeting?*

12.    When a parent disputes a school district's assessment and requests that the district pay for an independent educational evaluation (IEE) at public expense, the district must either agree to fund that IEE or "without unnecessary delay" file for a due process hearing to defend the propriety of its assessments. (34 C.F.R. § 300.502(b)(2) (2006).) If the district prevails in proving that its assessments were appropriate, the parents still have the right to an IEE, but not at public expense. (34 C.F.R. § 300.502(b)(3) (2006).)

13.    As set forth in Factual Findings 1-98, the District's triennial assessment was appropriate and addressed Student's areas of need. Within days after Student's mother clarified her request for IEEs, the District filed its request for due process regarding its assessment. The District properly defended its assessments in this hearing and there is no basis to require the District to reimburse Student's parents for the IEEs that they obtained.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have an IEP in place at the commencement of the school year on September 5, 2006?*

14.    There are two parts to the legal analysis in due process actions brought pursuant to the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. (*Bd. of Educ. of the Hendrick Hudson Sch. Dist v. Rowley* (1982) 458 U.S. 176, 206 – 207 [102 S.Ct. 3034].) Second, the court must assess whether the IEP developed through those procedures was designed to meet the child's unique needs and was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

EXHIBIT A

15. Not every procedural violation of IDEA constitutes a denial of FAPE. (*W.G. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484.) According to Education Code section 56505, subdivision (f)(2), a procedural violation may constitute a substantive denial of FAPE only if it did any of the following:

(A)    Impeded the child's right to a free appropriate public education;

(B)    Significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a free appropriate public education to the parents' child;

(C)    Caused a deprivation of educational benefits.

16. The law requires a district to have an IEP in place at the beginning of each school year for every child who is eligible for special education. (20 U.S.C. § 1414(d)(2)(A); Ed. Code, § 56344, subd. (b).) This is a recognized procedural requirement of IDEA. (*Ms. S. v. Vashon Island School District, supra,* 337 F.3d at p. 1130.)

17. As more particularly set forth in Factual Findings 99 – 119, the failure to have a signed IEP in place for the 2006-2007 school year was not the District's fault. After the Coronado placement was terminated, the District employees scrambled to find a new placement, respond to Student's CDE case and address Student's lengthy correspondence. As a result, the District was not able to prepare a draft IEP in accordance with the parties' informal agreement until the end of August. However, Student's counsel made it clear that Student's mother would not consent to the District's proposed placement until she could view it *after school was in session.* That choice by Student's mother prevented any IEP from being signed before the start of the new school year.

18. Student contends that the District's proposal of August 30, 2006, was only a draft, not a final IEP offer. While it is true that the copy sent to Student's counsel was called a "draft," as set forth in Factual Findings 116 – 119, it was only called that because the District was still attempting to cooperate with Student's parents and consider Student's input. No matter what it was called, it did constitute a final IEP offer, and it was developed prior to the start of the school year. The only thing it lacked was parental approval and signature. There was no procedural violation by the District.

19. Student contends that the "final" IEP offer was not identified as such until September 15, 2006, 10 days after the start of the school year. Even if it was true that the District missed the deadline by 10 days, Student has not made a showing that the delay impeded Student's right to a FAPE, caused a deprivation of educational benefits, or impaired the right of Student's parents to participate in the IEP process. Student's parents would have refused to sign the proposed IEP until they could arrange a site visit after school started even if a final IEP had been sent two weeks before. There was no denial of FAPE from any delay.

*Did the District deny Student a FAPE during the 2006-2007 school year by failing to have appropriate team members – including Student's parent(s) – at the IEP meeting convened on August 30, 2006?*

20.    Under IDEA, the IEP team consists of: (1) the parents of a child with a disability; (2) "not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment)"; (3) "not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child"; (4) a representative of the local educational agency who is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; is knowledgeable about the general education curriculum; and is knowledgeable about the availability of resources of the local educational agency; (5) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team already described; (6) at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and (7) whenever appropriate, the child with a disability. (20 U.S.C. § 1414(d)(1)(B).)

21.    Federal regulations require a district to hold an IEP meeting before placing a child in a private school or facility and require that the private school participate in the meeting: "The agency must ensure that a representative of the private school or facility attends the meeting. If the representative cannot attend, the agency must use other methods to ensure participation by the private school or facility, including individual or conference telephone calls." (34 C.F.R. § 325(a)(2) (2006); 34 C.F.R. § 300.349(a)(2) (1999).)

22.    A parent is an important part of the IEP process, and a school district is required to undergo considerable effort to see that a parent attends the IEP meeting. (Ed. Code, § 56341.5; *Honig v. Doe* (1987) 484 U.S. 305, 311 [108 S.Ct. 592]; *Amanda J. v. Clark County Sch. Dist.* (9th Cir. 2001) 267 F.3d 877, 882.) If a district is unable to convince the parent to attend the meeting, the district may go forward with the meeting in the parent's absence. (Ed. Code, § 56341.5, subd. (h).)

23.    As set forth in Factual Findings 120-126, the District invited Student's NPA providers to the meeting, and one of them (Student's NPA speech/language provider) did attend. The District had information and reports from the other providers and was aware of their input with respect to Student's progress in their individual areas of service. There was no violation based on the failure to have those individuals at the meeting. Student's mother specifically waived her attendance at the meeting based on advice of counsel. While a District is normally supposed to go to great lengths to convince a parent to attend a meeting, including telephone calls and similar efforts, the laws requiring those efforts were designed for unrepresented parents who do not understand the importance of the IEP process. They were never designed to be a trap for a District when a legally sophisticated parent waives attendance at the meeting based on advice of counsel. There was no procedural violation by the District.

24.    There is no dispute that no representative from Sierra Academy attended the August 30 meeting, and the District did not contact Sierra by telephone during the meeting. However, the District invited a representative from Sierra to attend, and there were District personnel in attendance at the meeting with personal familiarity regarding Sierra.

25.    Even if there was a procedural violation based on the failure to have a Sierra representative at the meeting, there was no denial of FAPE. As set forth in Legal Conclusions 15-17, Student's parents had no intention of signing this IEP at the August 30 meeting no matter who was or was not in attendance, because Student's mother wanted to visit Sierra after the school year had begun. Before Student's mother made her decision to reject the Aug 30 proposal, she had personally visited Sierra. The failure to have a Sierra representative or the NPA providers at the meeting did not impede Student's education, result in a deprivation of educational benefit, or prevent Student's parents from participating in the process. There was no violation of IDEA.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose an appropriate placement for Student in the August 30, 2006 IEP?*

26.    A school placement is appropriate for a Student if it will meet a child's unique needs, will allow the child to make progress on the IEP goals and objectives and is reasonably calculated to enable the child to receive educational benefit. (*Rowley, supra,* 458 U.S. at pp. 206-207.) In addition, a special education student must be educated with nondisabled peers to the maximum extent appropriate and may be removed from the regular education environment only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. (20 U.S.C. § 1412(a)(5)(A).) This is often referred to as the "least restrictive environment."

27.    An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (*Adams v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) An IEP "is a snapshot, not a retrospective." (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*)

28.    There is no dispute that, as of the August 30, 2006 IEP meeting, no one believed that Student could be educated in a general education classroom. Even Student's own psychoeducational expert Dr. Patterson recommended placement in an SDC at a small campus. Student does not contend that Sierra was not the "least restrictive environment" appropriate as of August 30, 2006.

29.    As set forth in Factual Findings 127-139, Student's concerns about the physical facilities at Sierra and the lack of one-to-one education are not supported by the evidence. The August 30 IEP called for Student to have a one-to-one aide for at least the first three months at Sierra, and the need for the aide would be evaluated after that. As long as Student had the one-to-one aide, the aide could guard the Student against any injury from

EXHIBIT A
64

rambunctious children on the stairs and could provide one-to-one time as necessary. Had the District attempted to withdraw the aide before it was safe to do so, Student's mother could have sought due process protection at that time. Although Sierra does not employ a full-time nurse, had the District proposed an appropriate health care plan in the IEP, the correct personnel could have been present at Sierra to assist Student with the G-Tube feedings each day.

30.     The IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* 458 U.S. at pp. 198-200; see, *Seattle Sch. Dist. No. 1 v. B.S.* (9th Cir. 1995) 82 F.3d 1493, 1500.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instructional and related services which are individually designed to provide educational benefit to the student. (*Rowley,* at p. 201.)

31.     Student did not meet his burden of proving that he would be unable to make educational progress at Sierra. Even if Student would have preferred entirely one-to-one instruction or believed that one-to-one instruction would help Student make more progress, the evidence still supports a finding that Student could make progress at Sierra.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to propose appropriate goals and objectives in the August 30, 2006 IEP?*

32.     Both California and Federal law require an IEP to contain "a statement of measurable annual goals, including academic and functional goals," which are designed to "meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum" and "meet each of the child's other educational needs that result from the child's disability." (20 U.S.C. § 1414(d)(1)(A)(i)(II); Ed Code, § 56345, subd. (a)(2).) The IEP must also contain "a description of how the child's progress toward meeting the annual goals...will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided." (20 U.S.C. § 1414(d)(1)(A)(i)(III); Ed. Code § 56345(a)(3).)

33.     Although the law requires goals to be "measurable," the law does not set rigid standards for the way in which a goal must be written. Student contends that a goal must include a "baseline" containing "quantifiable data" regarding a student's ability to perform the specific task set forth in the goal in order to measure progress. Student cites no authority to support this interpretation of the laws and regulations. Goals are not intended to be mathematical equations, in which any minor error in structure or calculation invalidates the goal. Instead, the goals are simply intended to assist the IEP team in determining if a pupil is making progress. Student wishes to hold the District to a goal writing standard that would be impossible for any district to meet. As set forth in Factual Findings 140-165, the goals

EXHIBIT A

proposed in the August 30 IEP were appropriate to help the District determine if Student was making educational progress.

34.    Student also contends that the August 30 IEP goals do not align to California content standards for the 7th grade general education curriculum. It is unclear if Student contends that every child, no matter what that child's unique needs might be, must have IEP goals requiring the child to meet a grade level equivalent for his or her age. Although the law requires that goals be designed to help a child make progress in the general education curriculum, it does not require a district to ignore a child's actual needs, if the child is not yet ready for grade-level general education curriculum. There is no dispute that, as of August 30, 2006, Student's independent reading and math levels were at approximately a third grade level and he had been out of school in a home program for three years (with the exception of a few days at Coronado Academy). If the District had proposed goals which met 7th grade general curriculum standards, the District would not have addressed Student's unique needs. Indeed, as set forth in Factual Findings 150 - 160, Student's own experts testified that several of the District's goals *were too hard for Student*. Dr. Patterson doubted that Student could come up to grade level in one year's time.

35.    The case of *Student v. San Francisco Unified School District*, OAH case number N2006070837, cited by Student, does not change this. While that case cites the general proposition that the ultimate goal of special education is to enable a child with disabilities to access the general education curriculum, it does not say the District should ignore a child's unique needs in the process. The August 30 goals were designed to build the fundamental skills and knowledge in core academic areas of reading and math, beginning at a fourth grade level, which Student would need in order to progress through the grades. Anything else would not have met Student's unique needs. Student did not meet his burden of showing that the August 30 IEP goals were improper.

*Did the District's education programming offer, memorialized in the proposed December 4, 2006 IEP, offer Student a FAPE designed to meet his unique needs and allow him to benefit from his education?*

36.    As stated in Factual Findings 190-241, and Legal Conclusions 40-54, the District failed to meet its burden of proving that the December 4 IEP provided Student a FAPE, because it failed to provide for specialized physical health care services Student would need to access his education and failed to provide an appropriate plan to transition Student from his home placement to a school placement. However, as set forth in Factual Findings 166-189, the December 4 IEP proposal did offer Student a FAPE in all other respects.

*Did the District deny Student a FAPE in the proposed December 4, 2006 IEP, by failing to develop annual goals and objectives that would enable Student to make educational progress and access the grade level general curriculum?*

37.    As set forth in Factual Findings 173-180, and Legal Conclusions 32-35, the goals and objectives in the December 4 IEP were an appropriate means of determining if Student had made educational progress.  They are not required to have the mathematic precision called for by Student.

*Did the District deny Student a FAPE in the proposed December 2006 IEP by failing to provide adequate staff development and training in the use of Student's specialized software programs which Student needs to access the curriculum?*

38.    As set forth in Factual Findings 181-185, the evidence supports a finding that the December 4, 2006 IEP called for sufficient staff development and training in the use of Student's specialized software programs.

*Did the District deny Student a FAPE by failing to propose a program that would provide Student with the level of services specified in the December 4, 2006 IEP?*

39.    The law requires an IEP to contain a statement of the special education and related services and supplementary aids and services to be provided to the child.  (Ed. Code, § 56345, subd. (a)(4); 34 C.F.R. § 300.320(a)(4) (2006).)  As set forth in Factual Findings 186-189, the December 4 IEP was clear as to the program and services provided.  To the extent that Student's objections relate to the transition plan, they will be dealt with below.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop an appropriate health care plan that would enable Student to attend school safely?*

40.    The "related services" which must be specified in an IEP include "other supportive services," such as school nurse services, which "may be required to assist a child with a disability to benefit from special education...." (20 U.S.C. § 1401(26).)  In California, related services are called DIS services (Ed. Code, § 56363, subd. (a)), and include "health and nursing services." (Ed. Code, § 56363, subd. (b)(12).)

41.    Health and nursing services may include specialized physical health care services if necessary to meet a child's unique educational needs.  (Cal. Code. Regs., tit. 5, § 3051.12, subd. (b).)  Specialized physical health care services "means those health services prescribed by the child's licensed physician and surgeon requiring medically related training for the individual who performs the services and which are necessary during the school day to enable the child to attend school." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(A).)  California regulations provide that "Specific continuing specialized physical health care services required in order for the individual to benefit from special education *will be included* in the individualized education program." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(3)(A), italics added.)

EXHIBIT A

67

42.    As set forth in Factual Findings 216-219, the evidence supports a finding that Student's G-Tube feeding was a specialized physical health care service. It was prescribed by a physician and was necessary for Student during the school day. The District's own website and several District witnesses recognized it as a specialized physical health care service.

43.    The District contends that it can prepare an IHSP and provide for specialized physical health care services outside an IEP. The District believes that an IHSP is specific to a placement, so it cannot be developed until an IEP is signed. [30] The District cites to out-of-state authority to support its position that no health plan need be incorporated into an IEP. Because the requirement to include these health services in an IEP is specific to California regulations, these out-of-state cases have little value in determining this issue.

44.    The District argues that the reference to the G-Tube feeding in the IEP was sufficient, and that it was not necessary to include the details of that procedure in the IEP. The District contends that the issue is whether an entire IHSP form must be included in an IEP. That is not the issue. Nothing in this Decision requires a District to include its IHSP form in an IEP or that every detail, such as the amount of formula, must be in the IEP. The real issue is whether important matters, such as the job classification of the employee who will provide the service, can be removed from the IEP (and therefore the parents' ability to object through the IEP process). As the court found in the case of *Union School District v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526: "The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later" and "will greatly assist parents in 'presenting complaints with respect to any matter relating to the ...educational placement of the child.'"

45.    The District's written closing brief argues that "Where all of [Student's] health needs are addressed in his IEP and nursing services offered to meet those needs, the District has discharged its IEP obligations." The problem with this statement is that *nursing services* were not offered. Neither IEP states who will perform the services. The parties have a dispute about who is qualified to perform those services. By taking the decision of who would perform the service out of the IEP process, the District has taken away the rights of Student's mother to object to the category of employee who would perform the service. As set forth in Factual Findings 227 – 229, even the District employees were confused as to who would provide the G-Tube services. The District nurse said the behavioral aides who do it and the supervisor of the behavioral aides said the nurses would do it. At least one nurse raised concerns that the amount of nursing time in the IEP might not be sufficient.

---

[30] The District also argues that Student's position regarding this medical information is inconsistent, because Student does not want to provide medical releases for use by the IEP team. The District is correct that the position is inconsistent. If a child requires specialized physical health care services in connection with an IEP, the parent should provide medical releases to enable the IEP team to contact the Student's doctors if necessary. However, the inconsistency in Student's position does not change the clear requirements of California law that the specialized physical health care services be included in the IEP.

46.    California law permits only two types of employees to provide specialized physical health care services: 1) qualified persons who possess an appropriate credential; and 2) qualified designated school personnel trained in the administration of specialized physical health care if they perform those services under the supervision of a credentialed school nurse or licensed physician. (Ed. Code, § 49423.5.)  Medically related training required for employed designated school personnel is "training in an approved program in standardized procedures provided by a qualified school nurse...to enable the person to provide the specialized physical health services necessary to enable the child to attend school." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(E)(2).) "Standardized procedures" are defined as "protocols and procedures developed through collaboration among school or hospital administrators and health professionals...to be utilized in the provision of the specialized physical health care services." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(B).)  The regulation also discusses the different levels of supervision required for the designated employee when performing the specialized health care service.  For example, "direct supervision" means that the "supervisor shall be present in the same building as the person being supervised and available for consultation and/or assistance." (Cal. Code Regs., tit. 5, § 3051.12, subd. (b)(1)(D)(2).)

47.    The District made no showing that Student's one-to-one behavioral aide is a qualified designated school employee who has been trained to perform G-Tube procedures pursuant to California law or that the three hours of training provided by the nurse in the December IEP was sufficient to meet the training in "standardized procedures." The District has two technician employee classifications whose job functions include performing specialized physical health care procedures, and their duties specify the level of supervision that each classification requires.  Because the IEP did not specify which classification of employee would be performing the G-Tube feeding, Student's parents had no way to be sure that an appropriate employee would be assisting their child.

48.    As set forth in Factual Findings 204 – 241, Student has met his burden of proving that the District's two proposed IEPs did not contain sufficient specialized physical health care services to meet Student's unique needs and therefore did not offer Student a FAPE.  Student also met his burden of proving that the one-to-one behavioral aide was not the appropriate person to assist Student with his G-Tube feeding.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to develop and implement an appropriate transition plan to transition Student from a home school program to a school based program?*

49.    California law provides that an IEP should include, if appropriate: "Provision for the transition into the regular class program if the pupil is to be transferred from a special class or nonpublic, nonsectarian school into a regular class in a public school for any part of the school day...." (Ed. Code, § 56345, subd. (b)(4).)  That transition plan should include a "description of activities provided to integrate the pupil into the regular education program" and a description of the activities provided to support the transition of the pupil. (Ed. Code, § 56345, subd. (b)(4)(A), (B).)

69

50.     No one disputes that Student needs a transition plan, whether or not his situation falls under the specific requirements of Education Code section 56345, subdivision (b)(4).  Both the August and December proposed IEPs included detailed transition plans for Student.  However, the District contends that it is not appropriate to impose substantive requirements on a transition plan when the law does not set forth substantive requirements.

51.     It is not necessary to decide the legal issue of whether substantive requirements may be imposed on a standard transition plan, because the evidence set forth in Factual Findings 190-203 shows that the two transition plans in the August 30 and December 4 IEPs were not standard transition plans.  In each case, they provided for distinct phases of Student's transition from his home program into the school in question, with transfer from one phase to another only when the data indicated Student was ready to move on.  If Student took months to go from one phase to another, these two transition plans could, in effect, become his placement for the entire 2006-2007 school year.  Therefore, it was necessary for the proposed transition plan to specify what his services would be during each phase in order for the District to meet its legal requirement of presenting a clear written offer of the proposed placement and services.  (*Union School District v. Smith, supra*, 15 F.3d. at p. 1526.)  As set forth in Factual Findings 190-203, neither of the transition plans adequately states what will happen to Student's DIS services during each phase of the plan.  The District employees testified that Student's NPA DIS services would continue during some of the phases, but that is not at all apparent from the language of either plan.  For example, absent the testimony of Sheila Doctors, the language of the August 30 transition plan appears to have the NPA DIS services stop as soon as the plan begins, except for the ACES services specified in the plan.[31]

52.     In addition, the transition plans were not sufficient because the parents were not included in the collaboration teams that would decide when to move Student from one phase of the project to the next.[32]  The law states that a parent is supposed to be included in groups that make decisions on placement.  For example, federal regulations provide unequivocally that "...each public agency must ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." (34 C.F.R. § 300.327 (2006); 34 C.F.R. § 300.501(c) (2006); 34 C.F.R. § 300.501(c) (1999).)

---

[31]   It is unclear from Student's papers whether Student contends that the transition services should have been included in both the transition plan *and* in the earlier pages of the IEP that describe Student's services.  If so, the contention is not well taken.  There is no need to have such a duplication of language.  Because the plan was included as part of the IEP, there was no requirement for the services to be repeated in two parts of the IEP.  The problem in the instant case is that neither the earlier pages of the IEP describing services nor the transition plan itself specified what would happen to the DIS services during the transition, except for the ACES services.

[32]   These collaboration team meetings called for in the transition plan should not be confused with the collaboration meetings held during the fall of 2006, discussed in Factual Findings 253-256.  Although the District used the same name for both, the two types of "collaboration team" meetings were very different.  The fall 2006 collaboration meetings were informal gatherings that discussed proposals to bring to an IEP meeting.  The transition plan collaboration team, on the other hand, made determinations regarding placement.

EXHIBIT A

53.     Each collaboration team that reviewed the data collected regarding Student's progress in a previous phase, would be making a decision regarding a change in Student's placement. Neither transition plan provided that the parents would be part of the team making the decision on whether to go to the next phase. In fact, it appears that the collaboration meetings were set up to exclude the parents from the decision. Contrary to Sheila Doctors' testimony, the December 4 IEP does not give Student's mother a veto over whether to move Student to the next phase. It just gives her the opportunity to give input through Sheila Doctors.

54.     The failure to include the parents in the collaboration teams constituted a procedural violation of IDEA. Therefore it is necessary to determine whether that procedural violation also caused a substantive denial of FAPE. The failure to include Student's parents on the transition team significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to Student. If they are not part of a team that decides when to change their child's placement, they are not participating in the decision making process. Student met his burden of proving that the District's proposed August 30 and December 4 IEPs denied him a FAPE because they failed to include appropriate transition plans which identified the services to be performed during the operation of the plan and failed to permit Student's parents to be part of the decision making process on the educational placement of their child.

*Did the District violate the provisions of the Individuals with Disabilities Education Act (IDEA) by failing to implement a "stay put" placement as of July 25, 2006?*

55.     The IDEA requires that during the pendency of due process proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." (20 U.S.C. § 1415(j).) This requirement is commonly referred to as "stay put." As set forth in Factual Findings 242-249, the evidence does not support a finding that there was any failure by the District to implement the "stay put" placement. To the extent that the parents have now submitted appropriate paperwork for reimbursement of transportation costs, the District should be required to reimburse those costs.

*Did the District deny Student a FAPE for the 2006-2007 school year by failing to allow meaningful participation in the IEP process by Student's parents and by failing to consider the parents goals and objectives?*

56.     Both IDEA and California law contemplate that the parents of a child will be part of the IEP team and that the school district will consider input from those parents. (See, e.g., 34 C.F.R. 300.501 (2006); 34 C.F.R. 300.501 (1999).) As set forth in factual Findings 250-263, Student's parents participated fully in the IEP process and had a tremendous amount of input. The District carefully considered each of the many suggestions, comments and criticisms made by Student's mother. Just because the District adopted some of the mother's suggestions and not others does not mean the parent had no input.

71

*What is the appropriate remedy for the District's denial of FAPE for the 2006-2007 school year?*

57.     The law provides for broad discretion in fashioning an appropriate remedy if a Student prevails in a due process hearing, as long as that relief is "appropriate" in light of the purpose of IDEA. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996].) Permissible awards of relief include things such as orders for compensatory education for a child and reimbursement to the parent for a private educational placement of the child.

58.     Student's Prehearing Conference Statement lists almost six full pages of proposed resolutions for this matter.[33] As set forth in Legal Conclusions 12-13, the request that Student's parents be reimbursed for the cost of IEEs is denied. As set forth in Factual Finding 249 and Legal Conclusion 55, Student's request that the District reimburse for transportation costs as provided in the stay put IEP is appropriate, assuming that Student has now submitted complete paperwork.

59.     Student requests that the December 4, 2006 IEP be modified in certain respects. Because only the transition plan and specialized physical health care services relating to Student's G-Tube feeding were inappropriate, those are the only parts of the December 4 IEP that need modification. There is no need to modify the IEP to require the District to create an SDC class at Student's home school for Student. As set forth in Factual Findings 167-172, the Wangenheim placement was appropriate for Student. Student's home school did not have the learning center Student needed. Likewise, there is no reason to require the District to hire ACES or another outside company to provide behavioral services. The District behavioral aides are adequate for that task. There is no need for the District to require a licensed dietician to be on campus. The December 4 IEP and the health training in that IEP adequately provided for Student's dietary needs.

60.     The evidence also does not support a finding of any need for compensatory education or instruction. Although it is true that Student was unable to attend a school based program due to the inappropriate IEPs, there was no evidence that he lost educational benefit as a result of his "stay put" placement. Student contends that Student made significant educational progress in his home program, and the District does not dispute that contention. Student's "stay put" program was a continuation of his home program of the three previous years, and the District provided a panoply of DIS services and one-to-one behavioral assistance/ instruction. In fact, Student was receiving more hours of DIS services during stay put than he would have received under the December 4 IEP. Student made no showing that he lost any educational benefit from continuing in his home program while this case was pending. Indeed, Student insisted that his home program remain his "stay put" placement when he signed the July 2006 IEP.

---

[33]  The Prehearing Conference Statement was marked as Exhibit 498. In order to make a clear record, the District's written closing argument was marked as Exhibit 592, and the Student's written closing argument was marked as Exhibit 593.

61.    Student requests that the December IEP be modified to require that a registered nurse provide one-to-one implementation of Student's IHSP, and take responsibility for Student's health related goals. There is no need for such a drastic change to the December 4 IEP. The District educators and other personnel, after receiving training from the school nurse as provided for in the IEP, are fully qualified to provide the educational and related services Student requires in accordance with the IEP -- only the specialized physical health care procedures regarding Student's G-Tube feeding need to be altered.

62.    Because the District did not propose an appropriately qualified designated employee to assist with the G-Tube feeding, it is appropriate to modify the December IEP to require a school nurse to personally assist with the feeding. However, nothing in this Decision is intended to prevent the District from proposing, in a future IEP, that another classification of employee assist Student with the feedings, provided that the assistant meets the requirements of Education Code section 49423.5. In addition, nothing in this Decision is intended to limit the classification of employee that may be designated pursuant to that code section. This Decision is simply based on the finding that, at the present time and in the present case, the District failed to make an evidentiary showing that the three hours of training provided for District staff in the December 4 IEP would qualify Student's one-to-one behavioral aide to perform specialized physical health care services.

63.    It is also appropriate to modify the December 4 IEP to include at least one of Student's parents in the transition plan collaboration meetings and to clarify that Student's District-funded home services will continue to be provided until phase four of the transition plan. Because both parties agree that the transition plan intended to provide DIS services in that fashion, there is no need to refer this matter to an IEP team for further consideration.

64.    Student requests monetary compensation for his mother's time spent in teaching him in the home program and reimbursement for materials purchased for use in the home program. Student's request is supported by neither the law nor the facts of this case. Student cites to no authority requiring a District to pay a parent a salary for educating his or her child at home. The District cites to one case, *Bucks County Department of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania* (3d Cir. 2004) 379 F.3d 61, in which a court awarded a parent monetary compensation for providing services to her child. However, that case was very unusual because the parent had received training to become a DIS service provider when she was unable to find another DIS service provider to give services to her child. The court limited its holding to a situation in which "a trained service provider was not available...." (*Id.* at p. 75.)

65.    In addition, there is no factual basis for reimbursing Student's parents for home program expenses or paying Student's mother a salary. As set forth in Factual Findings 246-248, there is a question as to how much of Student's educational time with his mother was spent in dedicated instruction and how much was spent transporting him to his various NPA providers and going to places such as Starbucks coffee shops. Although Student's mother sincerely believes that she was able to instruct Student during the time he

EXHIBIT A

was at Starbucks and while she was driving in the car, it is doubtful that much education occurred there, particularly in light of the testimony by Student's own experts about how easily Student is distracted by his surroundings. Further, even if Student's mother is correct that she, not the NPA providers, provided Student's academic education, the evidence shows that Student's mother chose that course by insisting on Student's home placement as stay put. She was the one who pulled Student from his school placement in 2003, and she has been educating him at home since that time, except for a few days at Coronado Academy. Many parents choose to home school their children. No matter how excellent their instruction may be, they are not entitled to payment of a teacher's salary at public expense or reimbursement for their purchases.

## ORDER

1.    The December 4, 2006 IEP is hereby modified to include the following language on page 2 under the heading of health nursing services:

> G-Tube feeding will be scheduled to occur daily in the nurse's office. A school nurse will be present and will personally assist the student with the student's G-Tube feeding. The G-Tube feeding will occur at the time(s) and in the manner designated in a doctor's order from Student's current physician. Student's mother will be responsible for providing the school nurse with a current doctor's order specifying the time(s) of the G-Tube feeding and the amount of formula to be used in the feeding(s), and for providing updated doctor's orders whenever there is any change in the G-Tube feedings.

2.    The December 4, 2006 IEP transition plan is hereby modified to include Student's mother as a participant in each of the collaboration meetings described in the transition plan which will occur prior to Student's movement from one phase of the plan to the next.

3.    The December 4, 2006 IEP transition plan is hereby modified to provide that, until Student reaches phase four of the transition plan, Student's District-funded DIS services will continue with his current NPA providers and at his current levels of service, except for the services of ACES. The District will continue to reimburse Student's mother for her transportation costs in transporting Student to and from those services during that time. Student's one-to-one behavioral services will be provided by the District in accordance with the December 4 IEP and transition plan, although references to ACES in the transition plan may be changed to another NPA provider of the District's choosing which offers comparable services to ACES.[34]

---

[34]   During the hearing, it was learned that ACES is no longer willing to provide services to Student, so it is necessary for another NPA to take over the services that ACES would provide under the transition plan.

4.    If the District has not already done so, the District will reimburse Student's parents for their transportation costs as provided under the "stay put" IEP of July 17, 2006, upon proper documentation being submitted to the District by the parents.

5.    The District's triennial assessments conducted in July 2006, met all the requirements of law, and Student's parents are not entitled to reimbursement for any independent educational evaluations they obtained.

6.    In all other respects, the District's August 30, 2006, and December 4, 2006 IEPs offered a FAPE to Student and all other resolutions proposed by Student are denied.

## PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with this statute: The Student prevailed on issues 10, 14 and 15. The District prevailed on the remaining issues.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated:  October 3, 2007

SUSAN A. RUFF
Administrative Law Judge
Special Education Division
Office of Administrative Hearings